## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

### RICHMOND DIVISION

|  |  |
|---|---|
| ARTURO ESPARZA MACIAS,<br>VICTOR DE LOS REYES RABANALES,<br>CESAR IVAN ESPARZA AGUILAR,<br>JAIME MARQUEZ ESPARZA,<br>MANUEL MARQUEZ ESPARZA,<br>JACOBO ESPARZA AGUILAR,<br>JOSE LUIS DIAZ GOMEZ,<br>RICARDO GUADALUPE GOMEZ TORRES,<br>RODRIGO CANALES SALAZAR,<br>BLADIMIR GUADALUPE MACIAS ESPARZA,<br>CATARINO ODÓN HERNÁNDEZ,<br>FRANCISCO ODÓN HERNÁNDEZ,<br>REUEL EUGENIO VILLAGRANA CANALES,<br>ALONSO CISNEROS AYALA,<br>LEOPOLDO GONZALES,<br>LUIS CARLOS ROMERO, and<br>URIEL CISNEROS,<br><br>Plaintiffs,<br><br>v.<br><br>MONTERREY CONCRETE, LLC, and<br>JOSE DE LA ROSA,<br><br>Defendants | JURY TRIAL DEMANDED<br><br>Case No._____3:19cv830_____ |

### COMPLAINT

### Preliminary Statement

1.     This lawsuit seeks to recover damages incurred by the Plaintiffs as a result of Defendants

Monterrey Concrete, LLC, and Jose De La Rosa's violations of the Trafficking Victims Protection

Act ("TVPA"), 18 U.S.C. § 1589 et seq., the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201

et seq., and the Virginia common law of contracts. In the alternative to their breach-of-contract

claim, Plaintiffs seek restitution from Defendants under a Virginia common-law claim for unjust enrichment and quantum meruit.

2.      At various times between 2014 and 2018, Defendants offered Plaintiffs, all low-income Mexican laborers, employment and induced them to come to the United States to work for Defendants under temporary "H-2B" work visas, with the promise that Defendants would pay Plaintiffs between $14.50 and $18 per hour plus overtime.  Defendants also promised to provide Plaintiffs with decent housing and meals.

3.      Contrary to Defendants' promises, Plaintiffs were exploited and abused, trafficked for their labor, grossly underpaid, and subjected to inhumane working and living conditions.

4.      Upon Plaintiffs' arrival, Defendants confiscated their passports, required them to work at least 70 to 80 hours per week, and paid them only a fraction of what Defendants had promised to pay. Defendants also failed to pay the wages that federal law requires, including overtime.

5.      In order to get visas for Plaintiffs, Defendants told the U.S. Department of Labor that Plaintiffs would be working for Defendants as concrete masons and cement finishers. But in reality, Monterrey Concrete's owner and manager, Jose De La Rosa, frequently "rented" Plaintiffs to other employers for a fee, and sometimes used them to repair and maintain the homes and property of Mr. De La Rosa and his associates.

6.      Moreover, Defendants housed Plaintiffs in deplorable conditions. At times Defendants housed Plaintiffs in an unheated garage shared by as many as 30 people. At other times Defendants put them in a small house with a single toilet shared by as many as 20 people.

7.      When Plaintiffs complained about their work and living conditions, Monterrey Concrete's owner and manager Jose De La Rosa used a variety of tactics to cow the workers into obedience. Sometimes he threatened to send Plaintiffs back to Mexico—in some instances even

driving certain Plaintiffs all the way back to the U.S.–Mexico border to make an example of them and show the other workers that he was serious. Other times he threatened Plaintiffs and their families in Mexico, saying that he had connections to dangerous people in Mexico. And sometimes he would say that the worker was free to leave and work somewhere else without retaliation by Mr. De La Rosa—if the worker would first pay Mr. De La Rosa $10,000 to $12,000 to "buy his freedom."

8.      Defendants' conduct violated the TVPA and FLSA and constituted a breach of contract and unjust enrichment under Virginia law.

## Jurisdiction and Venue

9.      The Court has personal jurisdiction over Defendant Monterrey Concrete, LLC ("Monterrey Concrete") because (1) it is domiciled in Virginia; (2) it transacts business in Virginia; and (3) as Plaintiffs' joint employer, its acts and omissions in Virginia gave rise to Plaintiffs' claims.

10.      The Court has personal jurisdiction over Defendant Jose De La Rosa because (1) he is domiciled in Virginia; (2) he transacts business in Virginia; and (3) as Plaintiffs' joint employer, his acts and omissions in Virginia gave rise to Plaintiffs' claims.

11.      The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) because the action arises under the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1589 et seq., and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq.  The Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367.

12.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this District, and because both Defendants reside and have their primary place of business in this District.

## The Parties

13.     The Plaintiffs are all citizens of Mexico. Defendants arranged for all of them to come to the United States under "H-2B" temporary work visas (except Plaintiff Reuel Eugenio Villagrana Canales, who was initially recruited on an "H-2A" temporary work visa, as described more fully in the Complaint below). The Plaintiffs then performed work for Defendants under those visas in and around Henrico, Virginia between 2014 and 2018.

14.     Defendant Monterrey Concrete is a Virginia limited-liability company with its principal place of business in Henrico, Virginia.

15.     Upon information and belief, Defendant Jose De La Rosa is a citizen of Virginia. Upon information and belief, he is, and at all relevant times was, the sole member, owner, and/or managing partner of Monterrey Concrete.  Mr. De La Rosa had and exercised the power to control Plaintiffs' work schedules and locations, to provide the instruments and materials that Plaintiffs needed to perform the work, and to hire and fire Plaintiffs.  Mr. De La Rosa also oversaw payroll and, upon information and belief, made decisions about how much to pay Plaintiffs.

## FACTS

16.     Monterrey Concrete operates as a concrete contracting business, performing concrete work on building projects in and around the Henrico, Virginia area.

17.     Monterrey Concrete was organized as a limited liability company in July 2008.  Its existence as a duly licensed LLC was automatically terminated in October 2012 and was reinstated in March 2014.

18.     Upon information and belief, the gross annual business volume of Monterrey Concrete exceeded $500,000 at all times relevant to this action.

19.     Jose De La Rosa is a member of Monterrey Concrete. Upon information and belief, he is the sole member of Monterrey Concrete.  Upon information and belief, Mr. De La Rosa oversees the day-to-day operations of Monterrey Concrete.

20.     Mr. De La Rosa supervised the work that Plaintiffs performed for him.

21.     Mr. De La Rosa made the essential decisions for Monterrey Concrete, had and exercised the power to control Plaintiffs' work schedules and locations and instructed workers on their daily assignments.  In practice, this meant that Plaintiffs worked whenever Mr. De La Rosa commanded them to work.

22.     Mr. De La Rosa had the power to hire, discipline, and fire Plaintiffs.

23.     Mr. De La Rosa also oversaw payroll and, upon information and belief, made decisions about how much to pay Plaintiffs.

### The H-2B Visa Program

24.     During all years relevant to this Complaint, Monterrey Concrete sought to bring immigrant workers from Mexico to the United States to perform work under the H-2B visa program.

25.     The H-2B visa program is a nonimmigrant visa program that allows companies to bring unskilled workers to the United States to perform non-agricultural jobs on a temporary basis. 8 U.S.C. § 1101(a)(15)(H)(ii)(b). In order to use the program, the employer must convince the U.S. Department of Labor ("DOL") that (1) there are not enough qualified U.S. workers available to do the jobs, and (2) the use of foreign workers will not negatively affect the wages or working conditions of similarly-employed U.S. workers. 20 C.F.R. § 655.50(b).

26.     By participating in the H-2B program, employers agree to provide numerous worker protections. *See* 20 C.F.R. § 655.20 and 29 C.F.R. § 503.16. These agreements include, without

limitation, that the employer will (1) comply with applicable federal, state, and local employment-related laws, (2) pay the higher of the prevailing wage for the occupation or the minimum wage, (3) provide all tools and supplies free of charge, (4) not hold or confiscate employees' passports or visas, and (5) not retaliate against workers for asserting their H-2B program rights and protections. *Id.* at (a), (k), (n), and (z).

27.     Additionally, employers must give H-2B workers a document called a "job order" that contains all other material terms and conditions of employment and must display a Department of Labor poster at the job site that sets out the rights and protections for H-2B workers. 20 C.F.R. § 655.5 (defining "job order"); 20 C.F.R. § 655.20 and 29 C.F.R. § 503.16 at (l)–(m) (requiring disclosure of job order and notice of worker rights).

### *Monterrey Concrete's 2014 – 2018 H-2B Applications*

28.     In or around December 2013, Monterrey Concrete filed an H-2B Application for Temporary Employment Certification with DOL seeking to employ H-2B workers in 2014 (the "2014 H-2B Application"). The 2014 H-2B Application sought DOL's permission to employ up to 12 foreign workers as concrete masons and cement finishers from March 1, 2014 through December 20, 2014. As part of its application, Monterrey Concrete included a job order that contained the material terms and conditions of the jobs. The 2014 H-2B Application and job order represented to DOL that the jobs entailed 40 hours of work per week and a workday of 8:00 AM to 4:00 PM. The application and job order stated that the regular rate of pay would be $15.72 per hour and that the overtime rate of pay would be $23.58 per hour.

29.     In or around January 2016, Monterrey Concrete filed an H-2B Application for Temporary Employment Certification with DOL seeking to employ H-2B workers in 2016 (the "2016 H-2B Application"). The 2016 H-2B Application sought DOL's permission to employ up

to 17 foreign workers as concrete masons and cement finishers from April 1, 2016 through December 31, 2016. As part of its application, Monterrey Concrete included a job order that contained the material terms and conditions of the jobs. The 2016 H-2B Application and job order represented to DOL that the jobs entailed 35 hours of work per week and a workday of 8:00 AM to 4:00 PM with a one-hour unpaid lunch break. The application and job order stated that the regular rate of pay would be $16.49 per hour and that the overtime rate of pay would be $24.74 per hour.

30.     In or around December 2016, Monterrey Concrete filed an H-2B Application for Temporary Employment Certification with DOL seeking to employ H-2B workers in 2017 (the "2017 H-2B Application"). The 2017 H-2B Application sought DOL's permission to employ up to 17 foreign workers as concrete masons and cement finishers from April 1, 2017 through December 20, 2017. As part of its application, Monterrey Concrete included a job order that contained the material terms and conditions of the jobs. The 2017 H-2B Application and job order represented to DOL that the jobs entailed 35 hours of work per week and a workday of 8:00 AM to 4:00 PM with a one-hour unpaid lunch break. The application and job order stated that the regular rate of pay would be $17.24 per hour and that the overtime rate of pay would be $25.86 per hour.

31.     In or around December 2017, Monterrey Concrete filed an H-2B Application for Temporary Employment Certification with DOL seeking to employ H-2B workers in 2018 (the "2018 H-2B Application"). The 2018 H-2B Application sought DOL's permission to employ up to 22 foreign workers as concrete masons and cement finishers from April 1, 2018 through December 20, 2018. As part of its application, Monterrey Concrete included a job order that contained the material terms and conditions of the jobs. The 2018 H-2B Application and job order

represented to DOL that the jobs entailed 35 hours of work per week and a workday of 8:00 AM to 4:00 PM with a one-hour unpaid lunch break. The application and job order stated that the regular rate of pay would be $17.66 per hour and that the overtime rate of pay would be $26.49 per hour.

32.    DOL granted the 2014, 2016, 2017, and 2018 H-2B Applications.

33.    Under 20 C.F.R. § 655.20 and 29 C.F.R. § 503.16, by executing the 2014, 2016, 2017, and 2018 H-2B Applications, Defendants agreed to:

(i)  pay the higher of the prevailing wage for the occupation or the minimum wage;

(ii)  comply with applicable Federal, State and local employment-related laws and regulations;

(iii)  not place any H-2B workers employed outside the area of intended employment or in a job classification not listed on the approved application;

(iv)  keep a record of workers' earnings and provide the workers with the required earnings statements on or before each payday;

(v)  provide, without charge or deposit, all tools, supplies, and equipment required to perform the duties assigned; and

(vi)  not retaliate against workers for exercising their H-2B program rights and protections.

**Defendants' Recruitment and Hiring of Plaintiffs**

34.    In advance of each of the relevant seasons, Defendants, either directly or through their agents, recruited Plaintiffs in Mexico to come to work for Defendants in Virginia.

35.    In general, recruitment worked as follows: First, Mr. De La Rosa or one of his associates would contact the Plaintiff, stating that Mr. De La Rosa had good-paying concrete work jobs in Virginia. If someone other than Mr. De La Rosa made the initial contact with the Plaintiff, Mr. De La Rosa and the Plaintiff would then talk to each other soon thereafter.

36.     Mr. De La Rosa almost always personally participated in recruiting the workers and telling them about the terms and conditions of the jobs.

37.     Mr. De La Rosa told all Plaintiffs (except Mr. Villagrana Canales) that they would be paid at approximately the regular rates required by that year's H-2B application, plus overtime. He also told some of the Plaintiffs that good housing would be provided.

38.     Plaintiffs elected to accept employment with Monterrey Concrete based on Defendants' promises and representations regarding the nature of the work, the compensation to be paid, and the provision of employer housing.

39.     Defendants then required the Plaintiffs to obtain passports and to travel to the U.S. consulate in the city of Monterrey, Mexico in order to undergo consular processing and get their H-2B visas.

40.     Defendants hired a company called Action Visa Assistance to help manage the process of getting the Plaintiffs their H-2B visas from the U.S. consulate.

41.     During the H-2B visa process at the consulate, Plaintiffs were given copies of their respective H-2B Job Orders. But, the Job Orders were then taken from all or almost all of the Plaintiffs rather than letting them keep the copy for themselves.

**Defendants' Labor and Labor-Trafficking Violations In General**

*Misrepresentation of Job Terms and Conditions*

42.     Upon arriving at Monterrey Concrete's headquarters in Henrico, Virginia, Plaintiffs were gathered for meetings and informed that the working conditions and pay rates would be far different than what Defendants had promised them at the time of recruitment.

43.     Namely, instead of the 8:00 AM to 4:00 PM workdays that Defendants had agreed to provide at the time of recruitment, Plaintiffs were told that they would be working as much as Mr.

De La Rosa told them to work. And throughout their employment, Defendants regularly required Plaintiffs to work at least 70 to 80 hours a week, and sometimes even more than that. Defendants also occasionally required Plaintiffs to work overnight, sometimes up to nearly 24 hours straight.

44.     Instead of paying them the hourly and overtime rates that Defendants had promised them in Mexico, Plaintiffs were told that they would only be paid at a rate equivalent to 40 regular hours per week, even if they worked more hours than that. And except for rare instances, that is how Defendants in fact paid them.

45.     At the time of recruitment in Mexico, Defendants also promised certain Plaintiffs that they would be provided with good housing while in Defendants' employ. But when they arrived in Virginia, they were required to live in grossly overcrowded and substandard housing that Defendants owned or controlled, as detailed further below.

46.     Upon information and belief, Defendants made these false representations to Plaintiffs at the time of recruitment knowingly and with intent to defraud.

*Document Confiscation*

47.     Also at those initial meetings, Mr. De La Rosa retained the passports of Plaintiffs Esparza Macias, Reyes Rabanales, Macias Esparza, Catarino Odon Hernandez, Jacobo Esparza Aguilar, Gonzales (in 2016), Canales Salazar, Manuel Marquez Esparza, Jaime Marquez Esparza, Cesar Esparza Aguilar, Francisco Odon Hernandez, Gomez Torres, Diaz Gomez, and Romero.

48.     In general, if Plaintiffs asked for Mr. De La Rosa to return their passports, Mr. De La Rosa would tell Plaintiffs that he was "keeping it safe," or that Plaintiffs did not need the passports because Plaintiffs were working only for him, or some other similar excuse. He additionally retained the social security cards of Plaintiffs Reyes Rabanales, Macias Esparza, Cesar Esparza Aguilar, Francisco Odon Hernandez, Gomez Torres, and Diaz Gomez.

### *Wage and Hour Violations*

49.     During their time at Monterrey Concrete, all Plaintiffs worked approximately 70 to 80 hours per week, every week, and sometimes more. But despite working at least 70 to 80 hours a week, Plaintiffs were almost always paid at a flat salary rate equivalent to 40 hours of work at the regular rate set out in that year's H-2B Application. Except in rare instances, Plaintiffs were not paid overtime for any hours worked over 40 in a workweek.

50.     In 2014, Plaintiff Gonzales (his first season) was paid biweekly, generally at $629.20 per week, regardless of how many hours he actually worked. $629.20 is 40 times the regular wage rate of $15.72 per hour that Defendants promised to pay in the 2014 H-2B Application.

51.     In 2015, Plaintiff Villagrana Canales was paid biweekly, generally at $900 biweekly, regardless of hours actually worked, based on a contract rate of $16.49 per hour.

52.     In 2016, Plaintiffs Manuel Marquez Esparza (his first season), Jacobo Esparza Aguilar (his first season), Canales Salazar, Alonso Cisneros Ayala, Gonzales (his second season) and Uriel Cisneros were paid biweekly, generally at $659.60 per week, regardless of hours they actually worked. $659.60 is 40 times the regular wage rate of $16.49 per hour that Defendants promised to pay in the 2016 H-2B Application.

53.     In 2017, Plaintiffs Arturo Esparza Macias, Jaime Marquez Esparza, Manuel Marquez Esparza (his second season), Reyes Rabanales, Cesar Esparza Aguilar, Diaz Gomez, Gomez Torres, Esparza Salazar (his second season) and Francisco Odon Hernandez were paid biweekly, generally at $689.60 per week, regardless of how many hours they actually worked. $689.60 is 40 times the regular wage rate of $17.24 per hour that Defendants promised to pay in the 2017 H-2B Application.

54.     In 2018, Plaintiffs Bladimir Macias Esparza, Luis Carlos Romero, and Catarino Odon Hernandez were paid biweekly, generally at $706.40 per week, regardless of how many hours they actually worked. $706.40 is 40 times the regular wage rate of $17.66 per hour that Defendants promised to pay in the 2018 H-2B application.

55.     In addition to consistently being made to work 70 to 80 hours a week, Defendants also occasionally required Plaintiffs to work overnight, sometimes up to nearly 24 hours straight.

56.     Defendants gave Plaintiffs incorrect pay statements falsely indicating that Defendants had paid Plaintiffs at rates and in amounts far above what Defendants had actually paid them.

*Improper Charges*

57.     Plaintiffs almost always had to pay for their own transportation from their hometown in Mexico to the U.S. consulate in Monterrey, Mexico to undergo consular processing and receive their H-2B visas. Then, during the multiday bus ride from Monterrey to Virginia, the workers had to pay for their own meals and lodging.

58.     Defendants did not provide Plaintiffs with the tools and supplies necessary to perform the work free of charge, in violation of 20 C.F.R. § 655.20(k) and 29 C.F.R. § 503.16(k).  Instead, Mr. De La Rosa purchased the tools and supplies, and most Plaintiffs were required to purchase the tools and supplies from Mr. De La Rosa.  A few Plaintiffs purchased the tools and supplies directly from the store with their own money.

59.     Defendants charged Plaintiffs $50 for food each week, with the exception of Mr. Macias Esparza.  The food, prepared by Mr. De La Rosa's sister, Ana de la Rosa, consisted mainly of venison meat hunted by a friend of the De La Rosa family and was often an insufficient amount. Defendants made these charges without obtaining these Plaintiffs' written consent. Plaintiffs did not have a reasonable alternative way of getting food on their own.

60.     Defendants charged certain Plaintiffs for rent and utilities without including those charges in the Job Order and without obtaining Plaintiffs' written consent, as detailed further below.

*Threats and Coercion*

61.     When Plaintiffs complained about their working and living conditions, Mr. De La Rosa used a variety of tactics to cow the workers into obedience. Sometimes he threatened to send Plaintiffs back to Mexico—in some instances even driving certain Plaintiffs all the way back to the U.S.–Mexico border to make an example of them and show the other workers that he was serious. Other times he threatened Plaintiffs and their families in Mexico, saying that he had connections to dangerous groups and people in Mexico. And sometimes he would say that the worker was free to leave and work somewhere else without retaliation by Mr. De La Rosa—if the worker would first pay Mr. De La Rosa $10,000 to $12,000 to "buy his freedom."

62.     Mr. De La Rosa also threatened that he could have Plaintiffs' visas suspended, have Plaintiffs sent to jail, or report Plaintiffs to immigration authorities if they did not do as he said.

63.     Mr. De La Rosa regularly made racist slurs about the indigenous heritage of certain Plaintiffs.

64.     Mr. De La Rosa told Plaintiffs that he had connections with "dangerous people" in Mexico, and suggested that Plaintiffs and that their families would be in danger if they complained. Some Plaintiffs had heard that a former employee's family in Mexico had indeed been threatened after the worker reached out to an attorney about the abuses taking place at Monterrey Concrete.

65.     By means of threats of retaliation and immigration consequences, Mr. De La Rosa attempted to coerce Plaintiffs into overstaying their visas and illegally working a second season for Monterrey Concrete under different names.

66.    Mr. De La Rosa fired several Plaintiffs, including Plaintiffs Gonzales and Reyes Rabanales, for refusing to overstay their visas.

67.    Mr. De La Rosa required Plaintiffs to live in overcrowded, substandard housing that he owned or controlled.

68.    On multiple occasions, Mr. De La Rosa brought friends or associates into Plaintiff's housing late at night while Plaintiffs were sleeping, so that Mr. De La Rosa could show off his dominance over "his" workers.  On these occasions, Mr. De La Rosa would order all the workers to wake up, get out of their beds, and stand in a line—which they did. Mr. De La Rosa would then remark to his friends or associates that they could now see how thoroughly Mr. De La Rosa had brought the workers under his command. These actions were taken to exert power and control over and to humiliate Plaintiffs.

69.    Some Plaintiffs even became afraid to leave their housing on their day off, for fear that if Mr. De La Rosa saw them, he would force them to work.  This fear arose after an incident in which Mr. De La Rosa encountered a group of workers outside of their housing and spontaneously decided that he would make them work additional hours on another project, even though they had already worked for 11 hours that day for another employer to whom he had "rented" them.

70.    As a result of Mr. De La Rosa's threats and actions, Plaintiffs feared retaliation if they escaped or were fired, and were afraid to leave the workplace.

*Requiring Plaintiffs to Work for Other Employers and Perform Tasks Outside of the Job Order*

71.    Plaintiffs performed some concrete work, including preparing residential and commercial sites, pouring, smoothing, finishing, and breaking. But Defendants also required Plaintiffs to perform work outside of the scope of the H-2B job order.  Sometimes Defendants required Plaintiffs to perform this work directly for Mr. De La Rosa or his family members, and

at other times Mr. De La Rosa "rented" Plaintiffs to other companies, entities, or individuals for a fee.

72.     These tasks included, but are not limited to:

    (i)     Repairing, improving, and maintaining Mr. De La Rosa's home and property;

    (ii)    Repairing, improving, and maintaining the home and property of Mr. De La Rosa's brother, Julio;

    (iii)   Performing work at a local church, including but not limited to:

        i.   Shoveling snow;

        ii.  Cooking for events;

        iii. Working in the garden;

        iv.  Repairing the church; and

        v.   Cleaning;

    (iv)    Doing insulation work;

    (v)     Doing roofing work for a neighbor of Mr. De La Rosa;

    (vi)    Repairing machinery;

    (vii)   Performing work for other construction companies, by "rental" agreement;

    (viii)  Remodeling Mr. De La Rosa's restaurant; and

    (ix)    Cleaning horse stables and restocking horse food at the state fair.

*Other Working Conditions*

73.     Plaintiffs were not given a lunch break while working for Defendants.

74.     Water was not typically provided at job sites.

75. Upon information and belief, Defendants did not display a poster informing Plaintiffs of their rights under governing labor laws.

### *Substandard Living Conditions*

76. Mr. De La Rosa promised to provide good housing for Plaintiffs. Although housing was indeed provided, it was anything but good.

77. Defendants housed Plaintiffs in several different living arrangements, depending largely upon the year in which they were working.

78. Defendants required Plaintiffs to stay in the housing that Defendants provided.

79. In 2014 and much of 2016, Defendants required the workers to live in a garage on Mr. De La Rosa's property. Some Plaintiffs in 2017 also lived in the garage for a period of time.

80. Among other problems with living arrangements in the garage, Plaintiffs were only provided mattresses with no bedframe, and some were only provided air mattresses.

81. Upon information and belief, the garage housed approximately 30 individuals at a time.

82. Plaintiffs living in the garage included Mr. Gonzales, Mr. Alonso Cisneros, Mr. Jacobo Esparza Aguilar, Mr. Manuel Marquez Esparza, Mr. Canales Salazar, Mr. Uriel Cisneros, Mr. Esparza Macias, Mr. Francisco Odon Hernandez, Mr. Gomez Torres, Mr. Romero, and Mr. Diaz Gomez.

83. Eventually in 2017 after various Plaintiffs performed work on a smaller house on Mr. De La Rosa's property, he permitted them to relocate into the house from the garage. The house, however, was only a moderate improvement.

84. The house only had one bathroom and there was no water pressure. Many workers showered outside with a hose. There was also no stove in the house.

85.     Upon information and belief, the house was used to house between 12 to 30 workers at a time, depending on the season.

86.     Workers were promised that upon moving into the house they would not be charged rent; nevertheless, they were charged $100 a month each. The workers did not authorize this charge in writing.

87.     The workers were also charged for electricity, totaling approximately $250 per month. The workers did not authorize this charge in writing.

88.     Plaintiffs residing in the house included Mr. Esparza Macias, Mr. Reyes Rabanales, Mr. Macias Esparza, Mr. Catarino Odon Hernandez, Mr. Jacobo Esparza Aguilar, Mr. Gonzales, Mr. Manuel Marquez Esparza, Mr. Jaime Marquez Esparza, Mr. Cesar Esparza Aguilar, Mr. Francisco Odon Hernandez, Mr. Gomez Torres, and Mr. Diaz Gomez.

89.     Finally, some plaintiffs lived in a trailer, including Mr. Cesar Esparza Aguilar, who was charged $100 per month, and Mr. Villagrana Canales, who was not charged.

**Facts Regarding Individual Plaintiffs**

*Leopoldo Gonzales*

90.     Mr. Leopoldo Gonzales was recruited in 2014 in Mexico by Defendant De La Rosa.

91.     In 2014, Mr. Gonzales was promised $16.00 per hour plus overtime and good housing.

92.     In 2016, Mr. Gonzales was promised the contract rate for that year, plus overtime and good housing.

93.     Based on those promises, Mr. Gonzales obtained an H-2B visa, traveled from Mexico to Virginia, and began to work for Defendants. A contract was thus created.

94.     Mr. Gonzales worked for Defendants in Henrico, Virginia under an H-2B visa for approximately 10 months in 2014 and 8 months in 2016.

95.   In 2014, Mr. Gonzales paid for his trip from his hometown to Monterrey and for his food and hotels during the journey.

96.   In 2016, Mr. Gonzales paid for his entire trip from Mexico to Richmond but was reimbursed $500 at the end of his contract.

97.   Mr. Gonzales was required to buy tools in 2014 for the job and was not permitted to take them with him when he left; when he returned in 2016, he was required to buy new tools.

98.   Mr. Gonzales was fired in November 2014 when he refused to overstay the visa.

99.   Mr. De La Rosa only returned his passport to him when he agreed to sign a paper saying that Mr. De La Rosa and Monterrey Concrete had complied with all legal obligations.

100.   Mr. Gonzales only returned in 2016 on Mr. De La Rosa's false promises that conditions and treatment had improved. When Mr. Gonzales arrived in Virginia, he quickly realized that the working conditions and treatment were the same.

101.   Mr. De La Rosa fired Mr. Gonzales again in 2016.

102.   Mr. Gonzales graduated from high school in Mexico and does not speak English. Mr. Gonzales felt coerced to keep working for Defendants due to the climate of fear created by Mr. De La Rosa's threats of immigration and criminal consequences, and by the retaining of his passport.

103.   Mr. De La Rosa and Monterrey Concrete's treatment of Mr. Gonzales, their failure to pay wages to Mr. Gonzales that they were legally and contractually obligated to pay, and their failure to abide by the H-2B regulations caused Mr. Gonzales monetary and emotional injury.

*Reuel Eugenio Villagrana Canales*

104.   Mr. Reuel Eugenio Villagrana Canales was recruited in 2015 in Mexico by Defendant De La Rosa.

105.    Per Mr. De La Rosa's instructions, Mr. Villagrana Canales came to the United States on an H-2A visa (meant for agricultural work) rather than on an H-2B visa (meant for non-agricultural work). Upon information and belief, Mr. De La Rosa arranged for the H-2A visa through a Tennessee company organization called Perez Labor Contractors. The H-2A visa application stated that Mr. Villagrana Canales would be working for a tobacco grower in Tennessee.

106.    After receiving his H-2A visa, Mr. Villagrana Canales paid for his trip from Mexico to Tennessee. For the first two days upon arrival, Mr. Villagrana Canales was required to work in a tobacco field, pursuant to the H-2A visa.

107.    He was not paid at all for the work he performed in the tobacco field.

108.    After those two days, upon information and belief, Mr. De La Rosa "bought" Mr. Villagrana Canales from Perez Labor Contractors, picked him up from Tennessee, and personally drove him back to Richmond.

109.    Mr. Villagrana Canales worked for Defendants in Henrico, Virginia, under an H-2A visa, for approximately 12 months in 2015.

110.    Mr. De La Rosa told Mr. Villagrana Canales that he would have to stay working for Mr. De La Rosa for at least five years because Mr. De La Rosa had paid a lot of money to get Mr. Villagrana Canales his visa.

111.    Mr. De La Rosa also told Mr. Villagrana Canales that if he wanted to leave and work somewhere else, he would have to "reimburse" Mr. De La Rosa $10,000, which is the amount Mr. De La Rosa said he had spent to get Mr. Villagrana Canales his visa. Mr. Villagrana Canales felt that he had no choice but to stay and continue working.

112.    Ultimately Mr. Villagrana Canales escaped Monterrey Concrete.

113.   Mr. Villagrana Canales graduated from high school in Mexico and does not speak English.

114.   Mr. Villagrana Canales felt coerced to keep working for Defendants due to the climate of fear created by Mr. De La Rosa's "pay for your freedom" scheme and his threats of immigration and criminal consequences.

115.   Mr. De La Rosa and Monterrey Concrete's treatment of Mr. Villagrana Canales, their failure to pay wages to Mr. Villagrana Canales that they were legally and contractually obligated to pay, and their failure to abide by the H-2A regulations caused Mr. Villagrana Canales monetary and emotional injury.

*Manuel Marquez Esparza*

116.   Mr. Manuel Marquez Esparza was recruited in Mexico in 2016 by Defendant De La Rosa.

117.   In 2016, Mr. De La Rosa promised Mr. Manuel Marquez Esparza $16.50 per hour plus overtime and good housing.

118.   In 2017, Mr. De La Rosa promised Mr. Manuel Marquez Esparza $17.50 per hour plus overtime and good housing.

119.   Based on those promises, Mr. Manuel Marquez Esparza obtained an H-2B visa, traveled from Mexico to Virginia, and began to work for Defendants. A contract was thus created.

120.   Mr. Manuel Marquez Esparza worked for Defendants in and around Henrico, Virginia, under an H-2B visa for approximately 14 months in 2016 and 2017.

121.   Mr. Manuel Marquez Esparza paid for his trip from his hometown to Monterrey and for his food and hotels during the journey.

122.   Mr. Manuel Marquez Esparza witnessed Mr. De La Rosa physically assault Cesar Esparza Aguilar.

123.   Defendants fired Mr. Manuel Marquez Esparza due to a rumor that he was seeking legal representation to address insufficient pay and poor working and living conditions.

124.   Mr. Manuel Marquez Esparza finished primary school in Mexico and does not speak English.

125.   Mr. Manuel Marquez Esparza felt coerced to keep working for Defendants due to the climate of fear created by Mr. De La Rosa's threats of immigration and criminal consequences, retaining of his passport, and physical assault of a fellow employee.

126.   Mr. De La Rosa and Monterrey Concrete's treatment of Mr. Manuel Marquez Esparza, their failure to pay wages to Mr. Manuel Marquez Esparza that they were legally and contractually obligated to pay, and their failure to abide by the H-2B regulations caused Mr. Manuel Marquez Esparza monetary and emotional injury.

*Jacobo Esparza Aguilar*

127.   Plaintiff Jacobo Esparza Aguilar was recruited in Mexico in 2016 by Defendant De La Rosa.

128.   Mr. De La Rosa promised Jacobo Esparza Aguilar $18.00 per hour plus overtime.

129.   Based on those promises, Jacobo Esparza Aguilar obtained an H-2B visa, traveled from Mexico to Virginia, and began to work for Defendants. A contract was thus created.

130.   Jacobo Esparza Aguilar worked for Defendants in Henrico, Virginia, under an H-2B visa for approximately 20 months in 2016 and 2017.

131.   Jacobo Esparza Aguilar paid for his trip from his hometown to Monterrey and for his food and hotels during the journey.

132.    At one point, Jacobo Esparza Aguilar fainted at a job site and was taken to the hospital. He was instructed by Defendant De La Rosa's sister to tell the hospital the fainting incident occurred at home.

133.    Jacobo Esparza Aguilar escaped in November 2017.

134.    After Jacobo Esparza Aguilar  left, Mr. De La Rosa took some of the tools from the site, hid them, and then reported to the police that Jacobo Esparza Aguilar stole them.

135.    Jacobo Esparza Aguilar graduated from high school in Mexico and does not speak English.

136.    Further, Mr. De La Rosa told Jacobo Esparza Aguilar that he had connections with "dangerous people" in Mexico, and suggested that Plaintiffs and that their families would be in danger if they complained.  As an example, Mr. De La Rosa told Jacobo Esparza Aguilar that a former employee's family in Mexico had indeed been threatened after the worker reached out to an attorney.  Jacobo Esparza Aguilar shared this information with his coworkers.

137.    Jacobo Esparza Aguilar felt coerced to keep working for Defendants due to the climate of fear created by Mr. De La Rosa's threats of immigration and criminal consequences, threats and examples of retaliation to former employees' families by dangerous groups, and retaining of his passport.

138.    Mr. De La Rosa and Monterrey Concrete's treatment of Mr. Jacobo Esparaza Aguilar, their failure to pay wages to Mr. Jacobo Esparza Aguilar that they were legally and contractually obligated to pay, and their failure to abide by the H-2B regulations caused Mr. Gonzales monetary and emotional injury.

*Rodrigo Canales Salazar*

139.     Rodrigo Canales Salazar was recruited in Mexico in 2016 by Defendant De La Rosa.

140. Mr. De La Rosa promised to pay Mr. Canales Salazar $16.50 per hour to perform concrete work.

141. Based on those promises, Mr. Canales Salazar obtained an H-2B visa, traveled from Mexico to Virginia, and began to work for Defendants. A contract was thus created.

142. Mr. Canales Salazar worked for Defendants in and around Henrico, Virginia, under an H-2B visa for approximately 7 months in 2016.

143. Mr. Canales Salazar paid for the entirety of his trip to and from his hometown to Richmond.

144. Mr. Canales Salazar was required to pay for his tools for the job and did not get to keep them when he left.

145. Mr. Canales Salazar's passport was returned to him after another worker complained that it was illegal. He was made to sign a notarized document that he had gotten it back.

146. Mr. Canales Salazar escaped from Monterrey Concrete.

147. Mr. Canales Salazar graduated from middle school in Mexico and does not speak English.

148. Mr. Canales Salazar felt coerced to keep working for Defendants due to the climate of fear created by Mr. De La Rosa's threats of immigration and criminal consequences, threats and examples of retaliation to former employees' families by dangerous groups, and retaining of his passport.

149. Mr. De La Rosa and Monterrey Concrete's treatment of Mr. Canales Salazar, their failure to pay wages to Mr. Canales Salazar that they were legally and contractually obligated to pay, and their failure to abide by the H-2B regulations caused Mr. Canales Salazar monetary and emotional injury.

*Uriel Cisneros*

150.   Mr. Uriel Cisneros was recruited in Mexico in 2016.

151.   Mr. De La Rosa promised Uriel Cisneros $14.50 per hour plus overtime and good housing and food.

152.   Based on those promises, Uriel Cisneros obtained an H-2B visa, traveled from Mexico to Virginia, and began to work for Defendants. A contract was thus created.

153.   Uriel Cisneros worked for Defendants in Henrico, Virginia, under an H-2B visa for approximately four to five months in 2016.

154.   Mr. De La Rosa initially paid for Uriel Cisneros' trip from Mexico to Richmond, but later deducted the expenses from his pay.

155.   Uriel Cisneros was required to buy tools for the job and was not permitted to take them with him when he left.

156.   Defendant De La Rosa told Uriel Cisneros that if he wanted to leave, he would have to pay Defendant De La Rosa $12,000.  Mr. Uriel Cisneros felt that he had no choice but to stay and work for Defendant.

157.   Uriel Cisneros graduated from middle school in Mexico and does not speak English.

158.   Uriel Cisneros felt coerced to keep working for Defendants due to the climate of fear created by Mr. De La Rosa's "pay for freedom" scheme, threats of immigration and criminal consequences, and threats and examples of retaliation to former employees' families by dangerous groups.

159.   Mr. De La Rosa and Monterrey Concrete's treatment of Uriel Cisneros, their failure to pay wages to Uriel Cisneros that they were legally and contractually obligated to pay, and their failure to abide by the H-2B regulations caused Uriel Cisneros monetary and emotional injury.

*Alonso Cisneros Ayala*

160.    Mr. Cisneros Ayala was recruited in Mexico in 2016 by Defendant De La Rosa.

161.    Mr. De La Rosa promised Mr. Cisneros Ayala $14.50 per hour plus overtime and good housing and food

162.    Based on those promises, Mr. Cisneros Ayala obtained an H-2B visa, traveled from Mexico to Virginia, and began to work for Defendants. A contract was thus created.

163.    Mr. Cisneros Ayala worked for Defendants in Henrico, Virginia, under an H-2B visa for approximately five months in 2016.

164.    Mr. Cisneros Ayala paid for his entire trip from Mexico to Richmond.

165.    Mr. Cisneros Ayala was required to spend $350 to buy tools for the job and was not allowed to take them with him when he left.

166.    Mr. Cisneros Ayala graduated from high school in Mexico and does not speak English.

167.    Mr. Cisneros Ayala felt coerced to keep working for Defendants due to the climate of fear created by Mr. De La Rosa's threats of immigration and criminal consequences, and threats and examples of retaliation to former employees' families by dangerous groups.

168.    Mr. De La Rosa and Monterrey Concrete's treatment of Mr. Cisneros Ayala, their failure to pay wages to Mr. Cisneros Ayala that they were legally and contractually obligated to pay, and their failure to abide by the H-2B regulations caused Mr. Cisneros Ayala monetary and emotional injury.

*Arturo Esparza Macias*

169. Mr. Arturo Esparza Macias was recruited in 2017 in Mexico by Defendant De La Rosa and Gustavo de la Garza.

170. Mr. De La Rosa promised Mr. Esparza Macias $17.00 per hour plus overtime and good housing and for workweeks.

171. Based on those promises, Mr. Esparza Macias obtained an H-2B visa, traveled from Mexico to Virginia, and began to work for Defendants. A contract was thus created.

172. Mr. Esparza Macias worked for Defendants in and around Henrico, Virginia, under an H-2B visa for approximately 12 months in 2017.

173. Mr. Esparza Macias paid for his trip from his hometown to Monterrey and for his food and hotels during the journey.

174. Mr. Esparza Macias graduated from high school in Mexico and does not speak English.

175. Mr. Esparza Macias felt coerced to keep working for Defendants due to the climate of fear created by Mr. De La Rosa's threats of immigration and criminal consequences, threats and examples of retaliation to former employees' families by dangerous groups, retaining of his passport, and knowledge of physical assaults to fellow employees.

176. Mr. De La Rosa and Monterrey Concrete's treatment of Mr. Esparza Macias, their failure to pay wages to Mr. Esparza Macias that they were legally and contractually obligated to pay, and their failure to abide by the H-2B regulations caused Mr. Esparza Macias monetary and emotional injury.

*Cesar Ivan Esparza Aguilar*

177. Mr. Cesar Ivan Esparza Aguilar was recruited in Mexico in 2017 to work for Monterrey by Defendant De La Rosa.

178.   Mr. De La Rosa promised Cesar Ivan Esparza Aguilar $17.24 per hour plus overtime.

179.   Based on those promises, Cesar Ivan Esparza Aguilar obtained an H-2B visa, traveled from Mexico to Virginia, and began to work for Defendants. A contract was thus created.

180.   Cesar Ivan Esparza Aguilar worked for Defendants in Henrico, Virginia, under an H-2B visa for approximately eight-and-a-half months in 2017.

181.   Cesar Ivan Esparza Aguilar paid for his trip from his hometown to Monterrey and for his food and hotels during the journey.

182.   Cesar Ivan Esparza Aguilar was required to spend $350 to buy tools for the job and was not allowed to keep them when he left.

183.   One evening, Mr. De La Rosa physically assaulted Cesar Ivan Esparza Aguilar, punching and slapping him.

184.   Cesar Ivan Esparza Aguilar escaped from Monterrey Concrete in December 2017.

185.   After Cesar Ivan Esparza Aguilar left, Mr. De La Rosa took some of the tools from the site, hid them, and then reported to the police that Cesar Ivan Esparza Aguilar stole them.

186.   Cesar Ivan Esparza Aguilar graduated from high school in Mexico and does not speak English.

187.   Cesar Ivan Esparza Aguilar felt coerced to keep working for Defendants due to the climate of fear created by Mr. De La Rosa's threats of immigration and criminal consequences, threats and examples of retaliation to former employees' families by dangerous groups, retaining of his passport, and physical assault by Mr. De La Rosa.

188.   Mr. De La Rosa and Monterrey Concrete's treatment of Cesar Ivan Esparza Aguilar, their failure to pay wages to Cesar Ivan Esparza Aguilar that they were legally and contractually

obligated to pay, and their failure to abide by the H-2B regulations caused Cesar Ivan Esparza Aguilar monetary and emotional injury.

*Jaime Marquez Esparza*

189.     Jaime Marquez Esparza was recruited in Mexico in 2017 by Defendant De La Rosa.

190.     Mr. De La Rosa promised Jaime Marquez Esparza $17.00 per hour.

191.     Based on those promises, Jaime Marquez Esparza obtained an H-2B visa, traveled from Mexico to Virginia, and began to work for Defendants. A contract was thus created.

192.     Jaime Marquez Esparza worked for Defendants in and around Henrico, Virginia, under an H-2B visa for approximately eight months in 2017.

193.     Jaime Marquez Esparza paid for his trip from his hometown to Monterrey and for his food and hotels during the journey.

194.     Jaime Marquez Esparza was required to spend $300 to buy tools for the job and was not allowed to keep them when he left.

195.     Jaime Marquez Esparza realized that he was being rented out to other companies and was additionally concerned about pay.  He made comments to other workers, trying to organize to address their mistreatment by Defendants.

196.     As a result, Defendants fired him.

197.     Jaime Marquez Esparza's coworkers, including Plaintiffs working during that timeframe, were aware of the firing, which further exacerbated the climate of fear.

198.     At first, upon firing Jaime Marquez Esparza, Mr. De La Rosa refused to return his passport.

199.     He ultimately agreed to return the passport only when Jaime Marquez Esparza had a bus ticket to Mexico and was going to the bus station.

200.   Jaime Marquez Esparza finished some high school in Mexico and does not speak English.

201.   Jaime Marquez Esparza felt coerced to keep working for Defendants due to the climate of fear created by Mr. De La Rosa's threats of immigration and criminal consequences, threats and examples of retaliation to former employees' families by dangerous groups, retaining of his passport, and knowledge of a physical assault of a fellow employee by Mr. De La Rosa.

202.   Mr. De La Rosa and Monterrey Concrete's treatment of Jaime Marquez Esparza, their failure to pay wages to Jaime Marquez Esparza that they were legally and contractually obligated to pay, and their failure to abide by the H-2B regulations caused Jaime Marquez Esparza monetary and emotional injury.

*Jose Luis Diaz Gomez*

203.   Mr. Diaz Gomez worked for Defendants in and around Henrico, Virginia, under an H-2B visa for approximately eight months in 2017.

204.   Mr. De La Rosa promised Mr. Diaz Gomez $17.00 or $17.50 per hour plus overtime.

205.   Based on those promises, Mr. Diaz Gomez obtained an H-2B visa, traveled from Mexico to Virginia, and began to work for Defendants. A contract was thus created.

206.   Mr. Diaz Gomez paid for his trip from his hometown to Monterrey and for his food and hotels during the journey.

207.   Mr. Diaz Gomez was required to spend $300 to buy tools for the job and was not allowed to keep them when he left.

208.   Mr. Diaz Gomez witnessed Mr. De La Rosa physically assault Cesar Esparza Aguilar and tried to intervene.

209.   Mr. Diaz Gomez escaped from Monterrey Concrete without his passport.

210.   After Mr. Diaz Gomez  left, Mr. De La Rosa took some of the tools from the site, hid them, and then reported to the police that Mr. Diaz Gomez stole them.

211.   Mr. De La Rosa never returned Mr. Diaz Gomez' passport to him.

212.   Mr. Diaz Gomez graduated from high school in Mexico and does not speak English.

213.   Mr. Diaz Gomez felt coerced to keep working for Defendants due to the climate of fear created by Mr. De La Rosa's threats of immigration and criminal consequences, threats and examples of retaliation to former employees' families by dangerous groups, retaining of his passport, and witnessing a physical assault of a fellow employee by Mr. De La Rosa.

214.   Mr. De La Rosa and Monterrey Concrete's treatment of Mr. Diaz Gomez, their failure to pay wages to Mr. Diaz Gomez that they were legally and contractually obligated to pay, and their failure to abide by the H-2B regulations caused Mr. Diaz Gomez monetary and emotional injury.

### *Ricardo Guadalupe Gomez Torres*

215.   Mr. Ricardo Guadalupe Gomez Torres was recruited in 2017 in Mexico by Defendant De La Rosa.

216.   Mr. De La Rosa promised Mr. Gomez Torres $17.00 per hour.

217.   Based on those promises, Mr. Gomez Torres obtained an H-2B visa, traveled from Mexico to Virginia, and began to work for Defendants. A contract was thus created.

218.   Mr. Gomez Torres worked for Defendants in and around Henrico, Virginia, under an H-2B visa for approximately eight months in 2017.

219.   Mr. Gomez Torres paid for his trip from his hometown to Monterrey and for his food and hotels during the journey.

220.   Mr. Gomez Torres was required to spend $300 to buy tools for the job and was not allowed to keep them when he left.

221.   Mr. Gomez Torres escaped from Monterrey Concrete.

222.   After Mr. Gomez Torres left, Mr. De La Rosa took some of the tools from the site, hid them, and then reported to the police that Mr. Gomez Torres stole them.

223.   Mr. De La Rosa never returned Mr. Gomez Torres' passport to him.

224.   Additionally, after Mr. Gomez Torres escaped, Mr. De La Rosa falsely accused him of stealing a generator.

225.   Mr. Gomez Torres finished some high school in Mexico and does not speak English.

226.   Mr. Gomez Torres felt coerced to keep working for Defendants due to the climate of fear created by Mr. De La Rosa's threats of immigration and criminal consequences, threats and examples of retaliation to former employees' families by dangerous groups, retaining of his passport, and knowledge of a physical assault of a fellow employee by Mr. De La Rosa.

227.   Mr. De La Rosa and Monterrey Concrete's treatment of Mr. Gomez Torres, their failure to pay wages to Mr. Gomez Torres that they were legally and contractually obligated to pay, and their failure to abide by the H-2B regulations caused Mr. Gomez Torres monetary and emotional injury.

*Francisco Odon Hernandez*

228.   Mr. Francisco Odon Hernandez worked for Defendants in and around Henrico, Virginia, under an H-2B visa for approximately 17 months in 2017 and 2018.

229.   Mr. De La Rosa promised Francisco Odon Hernandez good hourly pay and good housing.

230. Based on those promises, Francisco Odon Hernandez obtained an H-2B visa, traveled from Mexico to Virginia, and began to work for Defendants. A contract was thus created.

231. Francisco Odon Hernandez paid for his hotels and food on his journey from Monterrey to Richmond.

232. Francisco Odon Hernandez was required to spend $200 to buy tools for the job and was only permitted to keep some of them.

233. Francisco Odon Hernandez's passport was returned to him after another worker complained that it was illegal. He was required to sign a notarized document that he had gotten it back.

234. Mr. De La Rosa fired Francisco Odon Hernandez in September 2018 saying there was no more work.

235. Francisco Odon Hernandez finished some high school in Mexico and does not speak English.

236. Francisco Odon Hernandez felt coerced to keep working for Defendants due to the climate of fear created by Mr. De La Rosa's threats of immigration and criminal consequences, threats and examples of retaliation to former employees' families by dangerous groups, retaining of his passport, and knowledge of a physical assault of a fellow employee by Mr. De La Rosa.

237. Mr. De La Rosa and Monterrey Concrete's treatment of Francisco Odon Hernandez, their failure to pay wages to Francisco Odon Hernandez that they were legally and contractually obligated to pay, and their failure to abide by the H-2B regulations caused Francisco Odon Hernandez monetary and emotional injury.

*Victor de los Reyes Rabanales*

238. Mr. Reyes Rabanales worked for Defendants in Henrico, Virginia, under an H-2B visa for one month in 2018.

239. Mr. De La Rosa promised Mr. Reyes Rabanales good pay and good housing and food.

240. Based on those promises, Mr. Reyes Rabanales obtained an H-2B visa, traveled from Mexico to Virginia, and began to work for Defendants. A contract was thus created.

241. Mr. Reyes Rabanales paid for the entirety of his trip to and from his hometown to Richmond.

242. Approximately one month after Mr. Reyes Rabanales began his employment for Defendants, Defendants demanded he overstay his visa. When he refused, they fired him.

243. Mr. De La Rosa locked Mr. Reyes Rabanales in a room, forced workers to guard the door, and then forced him into a car with Mr. De La Rosa.

244. Mr. De La Rosa drove Mr. Reyes Rabanales to Texas and abandoned him at a Walmart near the U.S.-Mexico border.

245. Mr. De La Rosa did not return Mr. Reyes Rabanales' passport, and as a result, Mr. Reyes Rabanales was arrested by Mexican authorities.

246. Mr. Reyes Rabanales graduated from primary school in Mexico and does not speak English.

247. Mr. Reyes Rabanales felt coerced to keep working for Defendants due to the climate of fear created by Mr. De La Rosa's use of force, threats of immigration and criminal consequences, threats and examples of retaliation to former employees' families by dangerous groups, retaining of his passport, and knowledge of a physical assault of a former employee by Mr. De La Rosa.

248.  Mr. De La Rosa and Monterrey Concrete's treatment of Reyes Rabanales, their failure to pay wages to Reyes Rabanales that they were legally and contractually obligated to pay, and their failure to abide by the H-2B regulations caused Reyes Rabanales monetary and emotional injury.

*Luis Carlos Romero*

249.  Mr. Romero worked for Defendants in Henrico, Virginia, under an H-2B visa for approximately six months in 2018.

250.  Mr. De La Rosa promised Mr. Romero around $17.20 per hour plus overtime.

251.  Based on those promises, Mr. Romero obtained an H-2B visa, traveled from Mexico to Virginia, and began to work for Defendants. A contract was thus created.

252.  Mr. Romero was required to pay $400 to buy tools for the job and was not permitted to take them with him when he left.

253.  Mr. De La Rosa would harass Mr. Romero for having a hearing disability.

254.  Mr. De La Rosa fired Mr. Romero saying there was no more work.

255.  Mr. De La Rosa then bought Mr. Romero a ticket back to Mexico and deducted the cost from his paycheck.

256.  Mr. Romero graduated from high school in Mexico and does not speak English.

257.  Mr. Romero felt coerced to keep working for Defendants due to the climate of fear created by Mr. De La Rosa's threats of immigration and criminal consequences, threats and examples of retaliation to former employees' families by dangerous groups, retaining of his passport, knowledge of a physical assault of a former employee by Mr. De La Rosa, and constant harassment for his disability.

258.    Mr. Romero and his fellow coworkers on the 2018 work contract felt especially coerced to stay following Mr. De La Rosa's locking Plaintiff Reyes Rabanales into a room and forcing him into a car in Virginia, then personally driving him to the border and dropping him off without a passport.

259.    Mr. De La Rosa and Monterrey Concrete's treatment of Mr. Romero, their failure to pay wages to Mr. Romero that they were legally and contractually obligated to pay, and their failure to abide by the H-2B regulations caused Mr. Romero monetary and emotional injury.

*Bladimir Guadalupe Macias Esparza*

260.    Mr. Bladimir Guadalupe Macias Esparza was recruited in 2018 in Mexico by Defendant De La Rosa.

261.    Mr. De La Rosa promised Mr. Macias Esparza $17.60 per hour plus overtime and good housing.

262.    Based on those promises, Mr. Macias Esparza obtained an H-2B visa, traveled from Mexico to Virginia, and began to work for Defendants. A contract was thus created.

263.    Mr. Macias Esparza worked for Defendants in and around Henrico, Virginia, under an H-2B visa for approximately nine months in 2018.

264.    Mr. Macias Esparza paid for his trip from his hometown to Monterrey and for his food and hotels during the journey.

265.    Mr. Macias Esparza was required to spend $350 to buy tools for the job and was only permitted to keep some of them.

266.    Mr. Macias Esparza was forced to sign a document that he would overstay his visa in order to get his passport back.

267.    Two weeks after he signed the document, he escaped from Monterrey Concrete.

268.   Mr. Macias Esparza graduated from high school in Mexico and speaks minimal English.

269.   Mr. Macias Esparza felt coerced to keep working for Defendants due to the climate of fear created by Mr. De La Rosa's threats of immigration and criminal consequences, threats and examples of retaliation to former employees' families by dangerous groups, retaining of his passport, and knowledge of a physical assault of a former employee by Mr. De La Rosa.

270.   Mr. Macias Esparza and his fellow coworkers on the 2018 work contract felt especially coerced to stay following Mr. De La Rosa's locking Plaintiff Reyes Rabanales into a room and forcing him into a car in Virginia, then personally driving him to the border and dropping him off without a passport.

271.   Mr. De La Rosa and Monterrey Concrete's treatment of Mr. Macias Esparza, their failure to pay wages to Mr. Macias Esparza that they were legally and contractually obligated to pay, and their failure to abide by the H-2B regulations caused Mr. Macias Esparza monetary and emotional injury.

*Catarino Odón Hernandéz*

272.   Mr. Catarino Odón Hernández was recruited in Mexico in 2018 by Defendant De La Rosa's cousin.

273.   Mr. De La Rosa promised Catarino Odon Hernandez good hourly pay and only eight hours of work per day.

274.   Based on those promises, Mr. Esparza Macias obtained an H-2B visa, traveled from Mexico to Virginia, and began to work for Defendants. A contract was thus created.

275.   Mr. Catarino Odon Hernández worked for Defendants in and around Henrico, Virginia under an H-2B visa for approximately 6 months in 2018.

276.   Mr. Catarino Odon Hernández paid for his trip from his hometown to Monterrey and for his food and hotels during the journey.

277.   Mr. Catarino Odon Hernández was required to spend $350 to buy tools for the job and did not get to keep them when he left.

278.   Defendants additionally did not pay Mr. Catarino Odon Hernández for his last three days of work.

279.   In addition, Defendants wrongfully required Mr. Catarino Odon Hernández to pay them $1,300 for work that they improperly deemed insufficient.

280.   Mr. De La Rosa fired Mr. Catarino Odon Hernandez in September 2018 saying there was no more work.

281.   Catarino Odon Hernandez graduated from high school in Mexico and does not speak English.

282.   Catarino Odon Hernandez felt coerced to keep working for Defendants due to the climate of fear created by Mr. De La Rosa's threats of immigration and criminal consequences, threats and examples of retaliation to former employees' families by dangerous groups, retaining of his passport, and knowledge of a physical assault of a former employee by Mr. De La Rosa.

283.   Catarino Odon Hernandez and his fellow coworkers on the 2018 work contract felt especially coerced to stay following Mr. De La Rosa's locking Plaintiff Reyes Rabanales into a room and forcing him into a car in Virginia, then personally driving him to the border and dropping him off without a passport.

284.   Mr. De La Rosa and Monterrey Concrete's treatment of Catarino Odon Hernandez, their failure to pay wages to Catarino Odon Hernandez that they were legally and contractually obligated

to pay, and their failure to abide by the H-2B regulations caused Catarino Odon Hernandez monetary and emotional injury.

## CLAIMS FOR RELIEF

## COUNT I: Forced Labor in Violation of the Trafficking Victims Protection Act (18 U.S.C. § 1589 et seq.), *against all Defendants jointly and severally*

285.   Plaintiffs reallege and incorporate by reference each and every allegation contained in this Complaint as if fully set forth herein.

286.   18 U.S.C. 1589(a) makes it unlawful to:

> [K]nowingly provide[] or obtain[] the labor or services of a person, by one of, or by any combination of, the following means--(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

287.   Defendants knowingly provided or obtained Plaintiffs' labor in violation of 18 U.S.C. § 1589(a)(1) by *inter alia*, retaining Plaintiffs' passports and other documents; making threats of returning Plaintiffs to Mexico; firing workers who complained about their working conditions and taking them to the U.S.-Mexico border, including certain of the Plaintiffs; telling Plaintiffs that Defendant De La Rosa had connections to dangerous people in Mexico; and physically assaulting and/or restraining certain of Plaintiffs.

288.   Defendants knowingly provided or obtained Plaintiffs' labor in violation of 18 U.S.C. § 1589(a)(2)  by *inter alia*, retaining Plaintiffs' passports and other documents; making threats of returning Plaintiffs to Mexico; firing and taking to the border individuals, including certain of the Plaintiffs, who questioned their working conditions; telling Plaintiffs that Defendant De La Rosa

had connections to dangerous people in Mexico; and physically assaulting and/or restraining certain of Plaintiffs.

289. Defendants knowingly provided or obtained Plaintiffs' labor in violation of 18 U.S.C. § 1589(a)(3) by *inter alia*, retaining Plaintiffs' passports and other documents, making threats of returning Plaintiffs to Mexico; firing and taking to the border individuals, including certain of the Plaintiffs, who questioned their working conditions; telling Plaintiffs that Defendant De La Rosa had connections to dangerous people in Mexico; and physically assaulting and/or restraining certain of Plaintiffs.

290. Defendants knowingly provided or obtained Plaintiffs' labor in violation of 18 U.S.C. § 1589(a)(4) by *inter alia*, retaining Plaintiffs' passports and other documents, making threats of returning Plaintiffs to Mexico; firing and taking to the border individuals, including certain of the Plaintiffs, who questioned their working conditions; telling Plaintiffs that Defendant De La Rosa had connections to dangerous people in Mexico; and physically assaulting and/or restraining certain of Plaintiffs.

291. Plaintiffs bring this claim for relief pursuant to 18 U.S.C. § 1595.

292. As a direct and proximate cause of Defendants' actions, Plaintiffs have suffered damages in an amount to be established at trial.

293. Defendants conduct as alleged herein was undertaken deliberately and with actual malice, that is, with a sense of consciousness and deliberate wrongdoing, evil or wrongful motive, intent to injure, ill will, or fraud. Alternatively, Defendants' conduct involved reckless or callous indifference to the rights of Plaintiffs.

294.   Plaintiffs are entitled to recover damages to account for the full value of their losses, including emotional distress, lost wages, punitive damages, and other losses suffered by Plaintiffs as a result of Defendants' conduct, along with reasonable attorneys' fees incurred in this action.

**Count II: Trafficking with Respect to Peonage, Slavery, Involuntary Servitude, or Forced Labor in Violation of the Trafficking and Violence Protection Act, 18 U.S.C. § 1589 et seq., against all Defendants jointly and severally**

295.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in this Complaint as if fully set forth herein.

296.   18 U.S.C. § 1590 makes it unlawful to "recruit[], harbor[], transport[], provide[], or obtain[] by any means, any person for labor or services in violation of this chapter."

297.   As alleged in the preceding paragraphs, Defendants knowingly harbored, transported, provided for, and obtained Plaintiffs for labor in violation of numerous provisions of Chapter 77, including 18 U.S.C. §§ 1589 and 1592(a).

298.   Plaintiffs bring this claim for relief pursuant to 18 U.S.C. § 1595.

299.   As a direct and proximate result of Defendants' actions, Plaintiffs have suffered damages in an amount to be established at trial.

300.   Defendants conduct as alleged herein was undertaken deliberately and with actual malice, that is, with a sense of consciousness and deliberate wrongdoing, evil or wrongful motive, intent to injure, ill will, or fraud.  Alternatively, Defendants' conduct involved reckless or callous indifference to the rights of Plaintiffs.

301.   Plaintiffs are entitled to recover damages to account for the full value of their losses, including but not limited to, emotional distress, lost wages, punitive damages and other losses suffered by Plaintiffs as a result of Defendants' conduct along with reasonable attorneys' fees incurred in this action.

**Count III: Failure to Pay Federal Minimum Wage and Overtime in Violation of the Fair Labor Standards Act, 29 U.S.C. § 201 et seq., *against all Defendants jointly and severally***

302.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in this Complaint as if fully set forth herein.

303.    Pursuant to 29 U.S.C. § 216(b), Plaintiffs have consented in writing to be plaintiffs in this FLSA action. Their written consents are attached hereto as Ex. A.

304.    This count sets forth a claim for declaratory relief and damages for Defendants' violation of the minimum wage and overtime provisions of the FLSA.

305.    At all times relevant to this action:

> (i)    Plaintiffs were "employees" of Defendants within the meaning of 29 U.S.C. § 203(e)(1);
>
> (ii)   Defendants were the joint "employers" of Plaintiffs within the meaning of 29 U.S.C. § 203(d);
>
> (iii)  Defendants jointly "employed" Plaintiffs within the meaning of 29 U.S.C. § 203(g); and
>
> (iv)   Plaintiffs were engaged in commerce or the production of goods for commerce, and/or were employed by Defendants in an enterprise engaged in commerce or the production of goods for commerce.

306.    Defendants violated the FLSA's minimum-wage provision, 29 U.S.C. § 206(a), by failing to pay Plaintiffs at least $7.25 for every hour of work in each workweek, to Plaintiffs' harm, and are liable to Plaintiffs in damages.

307.    Defendants violated the FLSA's overtime provision, 29 U.S.C. § 207(a), by failing to pay Plaintiffs a time-and-a-half overtime premium for their weekly hours worked over 40, to Plaintiffs' harm, and are liable to Plaintiffs in damages.

308.   As a consequence of Defendants' violations of the FLSA, Plaintiffs are entitled to recover their unpaid minimum and overtime wages, plus an additional equal amount in liquidated damages, the costs of suit, and reasonable attorneys' fees pursuant to 29 U.S.C. § 216(b).

309.   By not displaying an FLSA poster advising workers of their FLSA rights as required by DOL regulations, the statute of limitations is tolled.

310.   In the alternative, Defendants' violations of the FLSA were "willful" within the meaning of 29 U.S.C. § 255(a), in that Defendants made no effort whatsoever to pay the Plaintiffs the proper overtime premium notwithstanding the fact that they were plainly and obviously working more than 40 hours a week.

## Count IV: Breach of Contract under Virginia Common Law, *against Defendant Monterrey Concrete, LLC*

311.   Plaintiffs re-allege and incorporate by refence each and every allegation in this Complaint as if fully set forth herein.

312.   An employment contract existed between each Plaintiff and Defendant Monterrey Concrete by virtue of Defendant Monterrey Concrete offering employment to Plaintiffs and Plaintiffs accepting that offer and beginning work for Defendant Monterrey Concrete.

313.   The terms and conditions provided in the temporary labor certification, its accompanying attestations, and the law and regulations applicable to the H-2B program (including the worker protections of 20 C.F.R. § 655.20 and 29 C.F.R. § 503.16) constituted terms of the contracts between Plaintiffs and Defendant Monterrey Concrete.

314.   Alternatively, the terms and conditions provided in the temporary labor certifications, its accompanying attestations, and the law and regulations applicable to the H-2B program (including the worker protections of 20 C.F.R. § 655.20 and 29 C.F.R. § 503.16) constituted the

governing law at the time an employment contract was otherwise formed and thus became terms of the contract.

315.   Defendant Monterrey Concrete also promised to provide some Plaintiffs acceptable housing for $100 per month.

316.   Plaintiffs accepted Defendant Monterrey Concrete's promise and paid Defendants $100 per month.

317.   Plaintiffs satisfactorily performed all employment duties and responsibilities required of them under the employment contracts with Defendant Monterrey Concrete.

318.   Defendant Monterrey Concrete breached the employment contracts with Plaintiffs by compensating Plaintiffs below the applicable rates set forth in their contracts, the prevailing wages, or the required overtime premiums for their work, both of which were additionally promised to Plaintiffs by Defendant De La Rosa acting as an agent for Defendant Monterrey Concrete.

319.   Defendant Monterrey Concrete breached its agreement to provide Plaintiffs with adequate housing, instead cramming up to 20 individuals into an unheated garage and up to 30 people into a small house with a single toilet.

320.   Defendant Monterrey Concrete breached its contract with Plaintiffs by failing to abide by the applicable H-2B regulations, including the requirements that the employer (1) comply with applicable federal, state, and local employment-related laws, (2) pay the higher of (a) the prevailing wage for the occupation or (b) the minimum wage, (3) reimburse the worker for any out-of-pocket transportation and subsistence costs incurred in traveling from their home country to the job site if the worker completes 50% of the contract period stated in the job order, (4) provide all tools and supplies free of charge, (5) not hold or confiscate employees' passports or visas, and (6) not

retaliate against workers for asserting their H-2B program rights and protections. *See* 20 C.F.R. § 655.20(a), (j), (k), (n), and (z).

321.   Defendant Monterrey Concrete's breaches of the contracts caused Plaintiffs substantial injuries, including lost wages, money paid improperly for transportation and tools, money paid for inadequate housing, and emotional distress, for which Plaintiffs are entitled to actual and consequential damages, punitive damages, and prejudgment interest.

322.   As a result of Defendants' conduct, the statute of limitations was tolled.

## Count V: Quantum Meruit Under Virginia Common Law (in the alternative to breach of contract)*, against Defendant Monterrey Concrete, LLC*

323.   Plaintiffs re-allege and incorporate by reference each and every allegation in this Complaint as if fully set forth herein.

324.   Plaintiffs provided the aforesaid requested and valuable services to Defendant Monterrey Concrete.

325.   Defendant Monterrey Concrete knowingly and voluntarily accepted Plaintiffs' work, 70 to 80 hours per week and sometimes more, which was of material benefit to Defendants.

326.   Much of the work requested and provided exceeded the scope of any contract that may have been in existence, as the H-2B orders and offers of employment only covered concrete work, but Plaintiffs were required to perform services other than concrete work.

327.   Defendant Monterrey Concrete did not pay Plaintiffs fair value for the work performed, paying only for 40 hours per week.

328.   Plaintiffs have been injured and damaged as a result of Defendant Monterrey Concrete's failure to fully and fairly compensate Plaintiffs for the above-mentioned services for any hour over 40 in a workweek.

329.   It is inequitable for Defendant Monterrey Concrete to retain the benefits of Plaintiffs' services without fully compensating them for the value of their services.

330.   Defendant Monterrey further promised to provide good housing and food to Plaintiffs during their employment.

331.   Plaintiffs paid for housing and food, but both were woefully substandard.

332.   It is inequitable for Defendant Monterrey Concrete to retain the benefits of Plaintiffs' payments for grossly inadequate food and housing.

333.   As a result, Plaintiffs are entitled to the reasonable value of services performed for which they have not been compensated.

### Count VI: Unjust Enrichment Under Virginia Common Law (in the alternative to breach of contract), *against Defendant Monterrey Concrete, LLC*

334.   Plaintiffs re-allege and incorporate by refence each and every allegation in this Complaint as if fully set forth herein.

335.   Plaintiffs conferred a benefit upon Defendant Monterrey Concrete by laboring between 70 to 80 hours, and sometimes more, per week.

336.   Plaintiffs further conferred a benefit upon Defendant Monterrey Concrete by paying for grossly inadequate housing and food.

337.   Defendant Monterrey Concrete knew that Plaintiffs conferred these benefits to Defendant Monterrey Concrete.

338.   Defendant Monterrey Concrete accepted the benefits (namely, the value of Plaintiffs labor, and the payments for inadequate housing and food) under circumstances that render it inequitable for Defendant Monterrey Concrete to retain the benefits without paying for its value.

339.   Defendant Monterrey Concrete did not pay Plaintiffs the amounts promised to Plaintiffs or required by law.  Defendant Monterrey Concrete therefore has been unjustly enriched.

340.   Plaintiffs are therefore entitled to an award of compensatory damages and/or equitable relief including without limitation imposition of a quasi-contract, restitution, disgorgement or the imposition of a constructive trust upon the monies derived by the Defendant Monterrey Concrete by means of the above-described actions.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully pray this Court will enter an order:

1.     Under Count I, a declaration that the Defendants' actions as set forth herein willfully violated the TVPA under 18 U.S.C. § 1589;

2.     Under Count I and pursuant to 18 U.S.C. §§ 1589 and 1595 an award of to each plaintiff, jointly and severally against each Defendant of compensatory damages, punitive damages, attorneys' fees, and costs;

3.     Under Count II, a declaration that the Defendants' actions as set forth herein willfully violated the TVPA under 18 U.S.C. § 1590;

4.     Under Count II and pursuant to 18 U.S.C. §§ 1590 and 1595 an award of to each plaintiff, jointly and severally against each Defendant of compensatory damages, punitive damages, attorneys' fees, and costs;

5.     Under Count III, a declaration that because there was no FLSA rights poster, the statute of limitations is tolled such that there is no statute of limitations;

6.     In the alternative, under Count III, a declaration that the Defendants' actions as set forth herein willfully violated the minimum wage and overtime provisions of the Fair Labor Standards Act, 29 U.S.C. §§ 206 and 207, such that a three-year statute of limitations is appropriate;

7.      Under Count III, an award of each plaintiff's actual damages under the FLSA, pursuant to 29 U.S.C. §§ 206 and 207 in the amount of all unpaid minimum wages and overtime, jointly and severally against both defendants;

8.      Under Count III, an additional equal amount to each plaintiff as liquidated damages, pursuant to 29 U.S.C.§ 216(b), jointly and severally against both defendants;

9.      Under Counts I and II, an order permanently enjoining each Defendant from further violations of the TVPA;

10.     Under Counts I-III, an award of Plaintiffs' costs and reasonable attorney's fees, as appropriate under the Fair Labor Standards Act, 29 U.S.C. § 216(b), and the Trafficking Victims Protection Act, 18 U.S.C. § 1595, jointly and severally against both defendants;

11.     Under Count IV an award of each plaintiff's unpaid promised wages, in an amount appropriate to the proof at trial, against Monterrey Concrete, LLC, plus statutorily authorized interest payments from the date of failure to pay the wages, to the extent that such relief would not reduce the amount otherwise owed Plaintiffs;

12.     Under Count V, in the alternative to Count IV, an award to Plaintiffs of the reasonable value of the services Plaintiffs performed to Defendant Monterrey Concrete for which Defendant  Monterrey Concrete has not yet compensated them, against Monterrey Concrete, LLC, plus statutorily authorized interest payments from the date of failure to pay the wages, to the extent that such relief would not reduce the amount otherwise owed Plaintiffs;

13.     Under Count VI, in the alternative to Count IV, an award equal to the amount Defendants were unjustly enriched, in an amount appropriate to the proof at trial, against Monterrey Concrete, LLC, plus statutorily authorized interest payments from the date of failure to pay the wages, to the extent that such relief would not reduce the amount otherwise owed Plaintiffs;

14.     Under all counts, pre-judgment and post-judgment interest as permitted by law; and

15.     Such other and further relief as this court deems necessary and proper.

Plaintiffs demand a trial by jury.

Dated:  November 6, 2019                Respectfully submitted,


                        _____/s/ Ian S. Hoffman_____
                        Ian S. Hoffman (VSB No. 75002)
                        Daniel A. Cantor (*pro hac vice* motion forthcoming)
                        ARNOLD & PORTER KAYE SCHOLER LLP
                        601 Massachusetts Avenue, NW
                        Washington, DC 20001
                        Phone:  202-942-5000
                        Fax:  202-942-5999
                        Ian.Hoffman@arnoldporter.com
                        Daniel.Cantor@arnoldporter.com

                        Karen Rigberg (*pro hac vice* motion forthcoming)
                        ARNOLD & PORTER KAYE SCHOLER LLP
                        777 South Figueroa Street, 44th Floor
                        Los Angeles, CA 90017-5844
                        Phone:  213-243-4000
                        Fax:  213-243-4199
                        Karen.Rigberg@arnoldporter.com

                        Jason Yarashes (VSB No. 90211)
                        Simon Sandoval-Moshenberg (VSB 77110)
                        Rachel McFarland (VSB 89391)
                        Nicholas Marritz (VSB 89795)
                        Legal Aid Justice Center
                        1000 Preston Ave, Suite A
                        Charlottesville, VA 22903
                        Tel: (434) 977-0553
                        Fax: (434) 977-0558
                        jasony@justice4all.org
                        simon@justice4all.org
                        rmcfarland@justice4all.org
                        nicholas@justice4all.org


                        *Counsel for Plaintiffs*