# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

ARTURO ESPARZA MACIAS,⁣        )
VICTOR DE LOS REYES RABANALES,  )
CESAR IVAN ESPARZA AGUILAR,   )
JAIME MARQUEZ ESPARZA,      )
MANUEL MARQUEZ ESPARZA,    )
JACOBO ESPARZA AGUILAR,     )
JOSE LUIS DIAZ GOMEZ,       )
RICARDO GUADALUPE GOMEZ TORRES, )
RODRIGO CANALES SALAZAR,    )
BLADIMIR GUADALUPE MACIAS ESPARZA, )
CATARINO ODON HERNANDEZ,    )
FRANCISCO ODON HERNANDEZ,   )
REVEL EUGENIO VILLAGRANA CANALES, )
ALONSO CISNEROS AYALA,     )
LEOPOLDO GONZALES,       )
LUIS CARLOS ROMERO, and     )
URIEL CISNEROS,         )
                  )
Plaintiffs,           )
                  )
v.                 )     Case No. 3:19-cv-00830
                  )
MONTERREY CONCRETE, LLC, and   )
JOSE DE LA ROSA,        )
                  )
Defendants.          )

## MONTERREY CONCRETE, LLC AND JOSE DE LA ROSA'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' COMPLAINT

Defendants Monterrey Concrete, LLC, and Jose De La Rosa ("Monterrey Concrete"), by and through counsel, files its Memorandum in Support of its Motion to Dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiffs' contract and quasi contract claims (Counts IV, V and VI) are governed by Mexican law under the clear choice of law rules of Virginia. Plaintiffs fail to plead facts supporting Counts IV – VI under the law of Mexico. Plaintiffs' Trafficking Victims Protection Act ("TVPA") claims (Counts I and II) also fail to state

a claim under established Fourth Circuit law. Stripped of their invective and hyperbole, Plaintiffs do not allege plausible claims of forced labor. At best, the factual allegations allege a "bad employee-employer relationship" but "the forced labor provisions of the TVPA are not intended to redress every bad employment relationship." *Muchira v. Al-Rawaf*, 850 F.3d 605, 620, 625 (4th Cir. 2017), *cert. denied*, 138 S. Ct. 448 (2017).

Plaintiffs' Fair Labor Standards Act ("FLSA") claim (Count III) is hopelessly vague and does not "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). Plaintiffs implausibly allege that all seventeen Plaintiffs worked "at least" 70 to 80 hours per week, every week, for the entirety of their employment at Monterrey Concrete. Yet not a single Plaintiff can allege a day, week, or month when he was underpaid. The United States Supreme Court requires that the "[f]actual allegations must be enough to raise a right to relief above the speculative level," rendering the right "plausible on its face." *Id.* at 555, 570. Plaintiffs do not meet this standard with their patently implausible allegations.

Finally, many of the individual Plaintiffs' claims are time-barred on their face because they were not brought within the applicable statutes of limitations. For the foregoing reasons, further discussed below, Monterrey Concrete respectfully requests that the Court dismiss Plaintiffs' Complaint and grant such other relief as the Court deems appropriate.

## Background and Information

Seventeen Plaintiffs[1], many of whom are related, filed a forty-eight page Complaint on November 6, 2019. Plaintiffs allege that they are all Mexican nationals who were lawfully present

---

[1] For ease of reference, Monterrey Concrete has prepared a chart identifying the Plaintiffs, their alleged dates of employment, and the paragraphs in the Complaint, which plead specific facts for each individual plaintiff. *See* Exhibit 1. For clarity, Monterrey Concrete will refer to the individual Plaintiffs by their number in the chart.

in the United States under lawfully issued H-2B visas while working for Monterrey Concrete. *See* Compl. at ¶¶ 13; 25; 32; 93 (Plaintiff No. 1); 104 – 106 (Plaintiff No. 2); 119 (Plaintiff No. 3); 129 (Plaintiff No. 4); 141 (Plaintiff No. 5); 152 (Plaintiff No. 6); 162 (Plaintiff No. 7); 171 (Plaintiff No. 8); 179 (Plaintiff No. 9); 191 (Plaintiff No. 10); 205 (Plaintiff No. 11); 217 (Plaintiff No. 12); 230 (Plaintiff No. 13); 240 (Plaintiff No. 14); 251 (Plaintiff No. 15); 262 (Plaintiff No. 16); and 274 (Plaintiff No. 17).[2]

The seventeen Plaintiffs allege that they are a smaller subset of approximately 68 H2-B concrete workers employed by Monterrey Concrete between March 1, 2014 and December 20, 2018. *See id.* at ¶¶ 28 – 31.

The H-2B visas for Plaintiffs corroborate the lawful employment dates (the "issue" and "expiration" dates) for each Plaintiff, and further corroborate that Monterrey Concrete is their lawful employer. *See* Exhibit 2 (Plaintiff No. 1); Exhibit 3 (Plaintiff No. 3); Exhibit 4 (Plaintiff No. 4); Exhibit 5 (Plaintiff No. 5); Exhibit 6 (Plaintiff No. 6); Exhibit 7 (Plaintiff No. 7); Exhibit 8 (Plaintiff No. 8); Exhibit 9 (Plaintiff No. 9); Exhibit 10 (Plaintiff No. 10); Exhibit 11 (Plaintiff No. 11); Exhibit 12 (Plaintiff No. 12); Exhibit 13 (Plaintiff No. 13); Exhibit 14 (Plaintiff No. 14); Exhibit 15 (Plaintiff No. 15); Exhibit 16 (Plaintiff No. 16); and Exhibit 17 (Plaintiff No. 17).[3]

Each and every Plaintiff alleges that he was offered a job at Monterrey Concrete when he

---

[2] ¶ 274 appears to contain a typographical error. The section is devoted to Plaintiff No. 17 – Catarino Odon Hernandez. However, ¶ 274 identifies "Mr. Esparza Macias" – Plaintiff No. 8.

[3] Monterrey Concrete respectfully requests that the Court consider Exhibits 2 – 17, the actual H2-B visas issued to the Plaintiffs. (One Plaintiff – Plaintiff No. 2 – was present on an H2-A visa, see n. 4 *supra*.) The H2-B visas are repeatedly referenced in Plaintiffs' Complaint. "Generally, a district court does not consider extrinsic materials when evaluating a complaint under Rule 12(b)(6). It may consider 'documents incorporated into the complaint by reference' [and] documents attached to the defendant's motion to dismiss if those documents are central to the plaintiff's claim or are 'sufficiently referred to in the complaint,' so long as the plaintiff does not challenge their authenticity." *Fei Guan v. Bing Ran,* No. 1:17cv332 (JCC/IDD), 2017 U.S. Dist. LEXIS 104809, at *9 (E.D. Va. July 6, 2017) (quoting *Witthohn v. Fed. Ins. Co.*, 164 F. App'x 395, 396-97 (4th Cir. 2006); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007); and citing *Blankenship v. Manchin*, 471 F.3d 523, 526 n.1 (4th Cir. 2006).

was **in Mexico** and accepted the job when he was **in Mexico**. *See* Compl. at ¶¶ 38 – 39; 93 (Plaintiff No. 1); 104 – 106 (Plaintiff No. 2); 119 (Plaintiff No. 3); 129 (Plaintiff No. 4); 141 (Plaintiff No. 5); 152 (Plaintiff No. 6); 162 (Plaintiff No. 7); 171 (Plaintiff No. 8); 179 (Plaintiff No. 9); 191 (Plaintiff No. 10); 205 (Plaintiff No. 11); 217 (Plaintiff No. 12); 230 (Plaintiff No. 13); 240 (Plaintiff No. 14); 251 (Plaintiff No. 15); 262 (Plaintiff No. 16) and 274 (Plaintiff No. 17). Each and every Plaintiff expressly alleges that a contract was formed between each of them and Monterrey Concrete when they accepted Monterrey Concrete's job offer **while they were in Mexico**. *See id.*

Plaintiffs do not allege that Monterrey Concrete signed an employment contract with any Plaintiff. *See id.* at ¶¶ 312 – 314. Instead, each Plaintiff alleges that an oral employment contract was formed when each Plaintiff accepted, in Mexico, offers of H2-B employment from Monterrey Concrete. *See id.* at ¶ 38. Plaintiffs then proceeded to Monterrey, Mexico for consular processing. *Id.* at ¶ 39.

Each Plaintiff alleges that the terms and conditions of the job he accepted in Mexico are found in the H2-B Application and job order for each respective year. *See id.* at ¶¶ 28 – 31; 33. Plaintiffs also allege that there were other contractual terms and conditions for certain Plaintiffs that were not included on the H2-B Application and job order for each respective year. *See id.* at ¶ 37. Eight Plaintiffs allege that, when they were in Mexico, they were promised housing in the United States. *See id.* at ¶¶ 91 (Plaintiff No. 1); 117 (Plaintiff No. 3); 151 (Plaintiff No. 6); 161 (Plaintiff No. 7); 170 (Plaintiff No. 8); 229 (Plaintiff No. 13); 239 (Plaintiff No. 14); and 261 (Plaintiff No. 16). Three Plaintiffs allege that, when they were in Mexico, they were also promised food. *See id.* at ¶¶ 151 (Plaintiff No. 6); 161 (Plaintiff No. 7); and 239 (Plaintiff No. 14).

Plaintiffs all allege that, after they accepted Monterrey Concrete's offer (and "a contract

was thus created"), they immediately suffered contract damages in paying the transportation costs from their hometown to Monterrey, Mexico for consular processing. *Id.* at ¶¶ 39; 57.

All Plaintiffs allege that when they arrived in Henrico, Virginia, they were forced to "work at least 70 to 80 hours a week, sometimes even more than that." *Id.* at ¶¶ 4; 43; 49; 55. Plaintiffs allege that unnamed Plaintiffs were required "to work overnight, sometimes up to nearly 24 hours straight." *See id.* at ¶43.

Plaintiffs allege that Monterrey Concrete "retained" the passports of some of the Plaintiffs. *Id.* at ¶ 47. They admit, however, that Monterrey Concrete advised Plaintiffs that it intended to keep the passports safe. *Id.* at ¶ 48. Plaintiffs admit that Monterrey Concrete returned their passports when workers complained, or when they were returning to Mexico at the end of their H2-B employment period. *See id.* at ¶¶ 145; 199; and 233. Plaintiffs also admit that Monterrey Concrete advised them, accurately, that Plaintiffs were only lawfully permitted to work for Monterrey Concrete, the H2-B applicant. *Id.* at ¶ 48.

Plaintiffs allege that they were all threatened and coerced to provide labor services against their will under 18 U.S.C. § 1589(a). *See id.* at ¶¶ 61 – 70. Plaintiffs claim that Monterrey Concrete coerced their unwilling labor services by firing them or sending them back home to Mexico. *See id.* at ¶¶ 101; 123; 196; 234; 242; 254; and 280.

More specifically, Plaintiffs allege that Monterrey Concrete used threats of "immigration consequences" to force Plaintiffs to work beyond their H2-B visa period against their will. *See id.* at ¶¶ 61 – 65. However, no Plaintiff alleges that he ever worked beyond his H2-B visa period. In fact, each Plaintiff alleges that he "worked under a H2-B visa" for the entire time that he was at Monterrey Concrete.[4] *See id.* at ¶¶ 94; 120; 130; 141; 153; 163; 172; 180; 192; 203; 218; 228;

---

[4] There is one exception: Plaintiff No. 2 claims that he worked at Monterrey Concrete under an H2-A visa. *See*

238; 249; 263; 275.

Plaintiffs Nos. 1, 3 and 4 actually returned to Mexico at the end of their first H2-B period and then rejoined Monterrey Concrete at the commencement of the second H2-B visa. *See id.* at ¶¶ 100; 116 – 120; 127 – 130; *see also* Exhibits 2; 4 and 5.

Although all of the H2-B visas were issued for roughly nine month periods (typically late March to late December),[5] most Plaintiffs – twelve out of seventeen – allege that they worked at Monterrey Concrete less than nine months before they "escaped" or returned to Mexico. *See* Compl. at ¶¶ 94 (Plaintiff No. 1 – eight months on second H2-B visa); 120 (Plaintiff No. 3 – six months on second H2-B visa); 142 (Plaintiff No. 5 – seven months); 153 (Plaintiff No. 6 – five months); 163 (Plaintiff No. 7 – five months); 192 (Plaintiff No. 10 – eight months); 203 (Plaintiff No. 11 – eight months); 218 (Plaintiff No. 12 – eight months); 242 (Plaintiff No. 14 – one month); 249 (Plaintiff No. 15 – six months); and 275 (Plaintiff No. 17 – six months). Although Plaintiffs describe this group as having "escaped" from Monterey Concrete, Plaintiffs never disclose where these individuals "escaped" to.[6]

The H2-B visas corroborate the allegations that each Plaintiff worked, lawfully, pursuant to an H2-B visa while at Monterrey Concrete. *See* Exhibits 2 – 18. No Plaintiff alleges that he worked at Monterrey Concrete outside of an H2-B visa.

Although Plaintiffs admit that they always worked under an H2-B visa while at Monterrey Concrete, and further admit that the H2-B visas were exclusive to Monterrey Concrete (*see* Compl. at ¶¶ 28 – 32), Plaintiffs claim that they worked for Monterrey Concrete only because of threats

---

*Compl.*at ¶ 109. Monterrey Concrete is searching for this visa.
[5] **2014 H2-B period** – March 13, 2014 – December 20, 2014**. 2016 H2-B period** – April 21, 2016 – December 31, 2016; **2017 H2-B period** – April 6, 2017 – December 31, 2017; and **2018 H2-B period** – March 28, 2018 – December 20, 2018. *See* Exhibits 2 – 18.
[6] Monterrey Concrete has firm reason to believe that the "escapee" Plaintiffs are working, illegally, in the United States, including for a competitor concrete business in Richmond, Virginia.

and coercive statements by Mr. De La Rosa, owner of Monterrey Concrete. *See id.* at ¶ 61.

Plaintiffs allege that Monterrey Concrete coerced their labor by force by:

a) Taking a Plaintiff to Mexico;

b) Threatening to take other Plaintiffs to Mexico;

c) Firing other Plaintiffs;

d) Making non-specific verbal threats about Defendant Mr. De La Rosa's connections to "dangerous people" in Mexico;

e) Making non-specific verbal threats to "suspend" Plaintiffs' H2-B visas;

f) Making non-specific verbal threats to jail Plaintiffs for unspecified reasons;

g) Making non-specific threats to report Plaintiffs to immigration authorities for unspecified reasons; and

h) Making unspecified "racist" slurs about the indigenous heritage of unnamed Plaintiffs.

*See id.* at ¶¶ 61 – 66.

Some Plaintiffs also allege that a fight in December 2017 between Mr. De La Rosa and Plaintiff No. 9 coerced them into forced labor. *See id.* at ¶¶ 125; 175; 183 – 184; 201; 213; 226; 236; 247; 257; 269; and 282. Plaintiff No. 9, however, never alleges that the fight was caused by his refusal to provide forced labor to Monterrey Concrete. In fact, Plaintiff No. 9 never alleges any facts about the cause of the fight. He alleges, instead, that he left Monterrey Concrete immediately after the fight. *Id.* at ¶¶ 183 – 184. The Plaintiffs who cite the fight between Mr. De La Rosa and Plaintiff No. 9 never allege how or why this alleged fight coerced them into providing forced labor pursuant to their H2-B visa. *See id.* at ¶¶ 125; 175; 183 – 184; 201; 213; 226; 236; 247; 257; 269; and 282.

Plaintiffs allege certain indignities including overcrowded quarters, distasteful food, disrupted sleep and inadequate furniture.  *See id.* at ¶¶ 59; 67; 68 and 80.  However, no Plaintiff included these indignities in their Complaint as a cause of their alleged "forced labor" while they worked for Monterrey Concrete pursuant to lawfully issued H2-B visas.  *See id.* at ¶¶ 102; 114; 125; 137; 148; 158; 167; 175; 187; 201; 213; 226; 236; 247; 257; 269 – 270; and 282 – 283.

Although each of the Plaintiffs alleges his education and English-speaking ability, none of the Plaintiffs mention his age.  The H2-B visas, however, show that the Plaintiffs are all fully-grown men between the ages of 22 and 46 years old.  *See* Exhibits 2 – 18.

Each Plaintiff makes a Fair Labor Standards Act claim.  *See* Compl. Count III, ¶¶ 302 – 310.  However, no Plaintiff alleges how much he has been underpaid or the days, weeks or months that he was underpaid.  *See id.* at ¶¶ 49 – 56.  Plaintiffs simply and globally allege that they all worked "at least 70 – 80 hours a week and sometimes even more than that," and no one was ever paid overtime.  *See id.* at ¶¶ 43; and 49 – 56.

Finally, Plaintiffs make numerous allegations related to an alleged breach of contract.  *See id.* at ¶¶ 45 (housing and food); 57 – 60 (tools, transportation and utilities); 71 – 72 (work other than concrete work); and 73 – 75 (inadequate lunch breaks, water and signage).  These allegations are related, solely, to Plaintiff's Virginia contract and quasi-contract claims and are not related to Plaintiff's federal claims.

Based on the factual allegations, Plaintiffs bring six claims that are related as follows:

- Traffic Victims Protection Act ("TVPA") – Counts I and II:

    o Count I: "Forced Labor" under 18 U.S.C. § 1589; and

    o Count II: "Trafficking" under 18 U.S.C. § 1590 (which requires a predicate § 1589 violation).

- Fair Labor Standards Act ("FLSA") – Count III.

- Virginia Breach of Contract and Quasi-Contract – Counts IV, V and VI:

    o   Count IV – Breach of Contract under Virginia Common Law;

    o   Count V – Quantum Meruit under Virginia Common Law; and

    o   Count VI – Unjust Enrichment under Virginia Common Law.

*See id.* at ¶¶ 285 – 340.

Plaintiffs seek compensatory damages, punitive damages, attorney fees, back pay, declaratory relief, pre-judgment interest and post judgment interest.

## ARGUMENT

### A.   Plaintiffs' Complaint Does Not State A Claim for Relief Under Any Count.

Plaintiffs' forty-eight page Complaint is long on adjective but short on substance. Plaintiffs allege a "bad employer-employee relationship" but do not allege plausible facts that show that the employer's actions knowingly and intentionally caused Plaintiffs to remain at Monterrey Concrete against their will. *Muchira*, 850 F.3d at 620. In fact, Plaintiffs' allegations illustrate the opposite. Plaintiffs' allegations show that each of them had "a viable exit option" as an alternative to "forced labor" at Monterrey Concrete. *Id.* Each Plaintiff was in the United States pursuant to a short, nine-month H2-B visa. *See* Exhibits 2 – 18. Twelve of the seventeen Plaintiffs left ("escaped") before the expiration of their nine-month visa. Other Plaintiffs left at the end of their H2-B visa period. Of those, several returned to Monterrey Concrete after working on an earlier H2-B visa. *See id.* at ¶¶ 100; 119; 130. In short, Plaintiffs' description of their working conditions illustrates that they all had a "viable exit option." Their labor was not coerced. They sought out and obtained temporary manual labor in the United States and Monterrey Concrete did not violate a criminal statute by providing it.

With respect to their breach of contract and quasi-contract claims, Plaintiffs admit, repeatedly, that they accepted Monterrey Concrete's offer of employment in Mexico and that they began performance while in Mexico. Under black letter Virginia law, a contract is governed by the laws of the place of formation. That place is Mexico.

Black letter Virginia law also holds that quantum meruit and unjust enrichment claims are based on contract and are governed by the choice of law principles for contract. Thus, Mexican law governs Plaintiffs' quantum meruit and unjust enrichment claims. Plaintiffs never plead Mexican law; they only plead Virginia law. Because Virginia law does not apply to Plaintiffs' contract and quasi-contract claims, Plaintiffs have failed to state a claim upon which relief can be granted.

With respect to Plaintiffs' FLSA claims, Plaintiffs plead no facts. They simply proffer "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 548. As the United States Supreme Court stated, over a dozen years ago, this "will not do." *Id.*

Moreover, Plaintiffs preposterously allege that every single one worked "at least 70 to 80 hours a week and sometimes even more than that." *See* Compl. at ¶¶ 4; 43; 49; and 55. Yet, notwithstanding this Dickensian work schedule, not a single Plaintiff can allege his work hours for a given day, week, month or year. They all simply allege they worked overtime and were never paid for it. *See id.* at ¶¶ 302 – 310. Here again, the United States Supreme Court speaks to the Plaintiffs' allegations: "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.*

For the foregoing reasons, further outlined below, Monterrey Concrete respectfully requests that the Court dismiss Plaintiffs' Complaint.

## 1.    Standard of Review.

When challenged by a motion to dismiss pursuant to Rule 12(b)(6), a complaint must be dismissed if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 547. The plaintiff's allegations must "raise a right to relief above the speculative level." *Id.* at 545. Moreover, the Court "need not accept as true unwarranted inferences" or "unreasonable [conclusions or] arguments." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).

The "court cannot simply accept a 'plaintiff's declaration of a legal claim's essential elements; elements of a claim are not 'facts' and need not be accepted as true.'" *See Hilgeford v. Nat. Union Fire Ins. Co. of Pittsburgh*, No. 3:08-CV-669, 2009 U.S. Dist. LEXIS 9766, at *8 (E.D. Va. Feb. 6, 2009) (quoting *Twombly*, 550 U.S. at 555). "Because the central purpose of the complaint is to provide the defendant with 'fair notice of what the plaintiff's claim is and the grounds upon which it rests, 'the plaintiff's legal allegations must be supported by some factual basis sufficient to allow the defendant to prepare a fair response.'" *Bragg v. Hackworth*, No. 1:10cv693 (GBL/IDD), 2012 U.S. Dist. LEXIS 19196, at *11 (E.D. Va. Feb. 13, 2012) (quoting *Twombly*, 550 U.S. at 556 n.3).

A plausible complaint must plead sufficient facts to allow a court, "drawing on judicial experience and common sense, to infer more than the mere possibility of misconduct. Without such 'heft,' the plaintiff's claims cannot establish a valid entitlement to relief, as facts that are merely consistent with a defendant's liability, fail to nudge claims across the line from conceivable to plausible." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 256 (4th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 673-81, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)).

"A court decides whether this standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer that the defendant is liable for the misconduct alleged. In other words, the factual allegations (taken as true) must permit the court to infer more than the mere possibility of misconduct." *ASWAN v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011) (citations omitted).

Facts pled that are "merely consistent with" liability are not sufficient. *Id.* (quoting *Twombly*, 550 U.S. at 557). "A court need not accept a complaint's legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." *TM, LLC v. Anderson*, No. 2:11-CV-00071-FL, 2012 U.S. Dist. LEXIS 139231, at *4-5 (E.D.N.C. Sept. 26, 2012) (citing *Alfaro v. United States*, No. 5:09-CT-3073-D, 2011 U.S. Dist. LEXIS 12409, 2011 WL 561320, at *1 (E.D.N.C. Feb. 8, 2011), *aff'd*, *Alfaro v. United States*, 2011 U.S. App. LEXIS 15336 (4th Cir. July 25, 2011), and *Nemet Chevrolet*, 591 F.3d at 256)) (emphasis added).

Courts in this District will dismiss a complaint if it only alleges limited factual allegations against a defendant and fails to "produce an inference of liability strong enough to nudge the plaintiff's claims 'across the line from conceivable to plausible.'" *Newby v. Brooks*, Civil Action No. 3:16CV944, 2017 U.S. Dist. LEXIS 161530, at *14 (E.D. Va. Sept. 28, 2017) (quoting *Nemet Chevrolet, Ltd.*, 591 F.3d at 256; *Iqbal*, 556 U.S. at 683).

Finally, because Plaintiffs brings a civil claim under the criminal TVPA, Plaintiffs' complaint "must not only pass the test of *Twombly* and *Iqbal*, **but also must be strictly construed**." *Fei Guan v. Bing Ran*, 1:17cv332 (JCC/IDD), 2017 U.S. Dist. LEXIS 104809, at *9 (E.D. Va. July 6, 2017) (citing *Crandon v. United States*, 494 U.S. 152, 158, 110 S. Ct. 997, 108 L. Ed. 2d 132 (1990) (applying the rule of lenity where the governing standard in a civil case is

embedded in a criminal statute) and *Fed. Communications Comm'n v. Am. Broad. Corp.*, 347 U.S. 284, 296, 74 S. Ct. 593, 98 L. Ed. 699 (1954) (noting that criminal statutes must be strictly construed, even when they are applied in civil cases)) (emphasis added).

### 2. Plaintiffs' Contract Claims Are Governed by Mexican Law.

Virginia follows the traditional *lex loci* choice of law rules. "In cases involving choice-of-law questions, Virginia adheres to the use of traditional rules applicable to conflicts of laws. Under such rules, questions of substantive law are governed by the law of the place of the transaction or the place where the right is acquired (*lex loci*)." *Frye v. Commonwealth*, 231 Va. 370, 376, 345 S.E.2d 267, 272 (1986) (citing *McMillan* v. *McMillan*, 219 Va. 1127, 1129-31, 253 S.E.2d 662, 663-64 (1979)); *see also Hardwood Plywood & Veneer Ass'n v. Mass. Bay Ins. Co.*, No. 97-2498, 1998 U.S. App. LEXIS 17158, at *5-6 (4th Cir. 1998) ("Under Virginia law, contracts are interpreted according to the law of the *lex loci*, meaning the state where the contract was made.").

With respect to contracts, "The nature, validity and interpretation of contracts are governed by the law of the place where made." *Woodson v. Celina Mut. Ins. Co.*, 211 Va. 423, 426, 177 S.E.2d 610, 613 (1970); *Dreher v. Budget Rent-A-Car Sys. Inc.*, 272 Va. 390, 395, 634 S.E.2d 324 (2006) ("[T]he law of the place where the contract was formed applies when interpreting the contract and determining its nature and validity"). A contract is made "where the last act necessary to give validity to the contract occurs." *Pro-Football Inc. v. Paul*, 39 Va. App. 1, 569 S.E.2d 66, 71 (Va. Ct. App. 2002) (internal quotation marks and citation omitted).

Here, Plaintiffs are very clear about where their employment contracts were made: Mexico. Their factual allegations repeatedly and expressly state that "**a contract was thus created**" when each Plaintiff accepted Monterrey Concrete's offer **in Mexico** and obtained an H2-B visa **in Mexico**. *See* Compl. at ¶¶ 38 – 39; 93 (Plaintiff No. 1); 104 – 106 (Plaintiff No. 2); 119 (Plaintiff

No. 3); 129 (Plaintiff No. 4); 141 (Plaintiff No. 5); 152 (Plaintiff No. 6); 162 (Plaintiff No. 7); 171 (Plaintiff No. 8); 179 (Plaintiff No. 9); 191 (Plaintiff No. 10); 205 (Plaintiff No. 11); 217 (Plaintiff No. 12); 230 (Plaintiff No. 13); 240 (Plaintiff No. 14); 251 (Plaintiff No. 15); 262 (Plaintiff No. 16); and 274 (Plaintiff No. 17).

Even though Plaintiffs specifically allege that "a contract was thus created" in Mexico, Plaintiffs never allege that the "contract" was formed pursuant to Mexican law.  *See* Count IV; ¶¶ 311 – 322.  In fact, Plaintiffs caption Count IV as "Breach of Contract under **Virginia Common Law.**"  *Id.*  Mexico follows the Napoleonic Code and is a civil law jurisdiction.  The elements of a binding contract are different under the Napoleonic Code than Virginia common law.  As an example (before an amendment on November 9, 2019), Mexican law appeared to make distinctions between offers accepted in person, by telephone or by electronic means.  *See* Chihuahua Civil Code Articles 1699, 1701, 1705.  Mexican law requires some contracts to be in writing and some contracts must be notarized.  Contracts with foreign companies (like Monterrey Concrete) must be "apostilled" (stamped pursuant to the Hague Convention Abolishing the Requirement of Legalisation for Foreign Public Documents (also known as the "Apostille Conventions")).

Plaintiffs ignore Mexican contract law and make no mention of it in their Complaint. Because the nature, validity and interpretation of their alleged employment contracts are governed by Mexican law, Plaintiffs have failed to state a claim upon which relief can be granted.  Monterrey Concrete respectfully requests that the Court dismiss Plaintiffs' Count IV, Breach of Contract.

### 3. Plaintiffs' Quasi-Contract Claims Are Governed by Mexican Law.

Plaintiffs plead two quasi-contract claims:  Quantum Meruit (Count V) and Unjust Enrichment (Count VI).  *See* Compl. at ¶¶ 323 – 340.  Like their contract claims, Plaintiffs bring these claims under "Virginia Common Law."  *Id.*

Virginia choice of law rules treat Quantum Meruit and Unjust Enrichment as quasi-contract claims arising out of contract. *RMS Tech., Inc. v. TDY Indus.*, 64 F.App'x 853, 857 (4th Cir. 2003) (quantum meruit and unjust enrichment are contracts implied in law); *Humphreys R. Inc. v. F/V Nils S*, 609 F. Supp. 95, 98 (E.D. Va. 1984) (quantum meruit is an implied in law contract); *Tsui v. Sobral*, 39 Va. Cir. 486, 488, 1996 Va. Cir. LEXIS 201, at *5 – 6 (Va. Cir. 1996) (unjust enrichment is a contract implied in law).

Consequently, the choice of law principles governing contracts governs Plaintiffs' quasi-contract claims:

> This Court agrees that contractual choice of law principles should govern the quasi-contractual claims. Thus, counts two [quantum meruit] and three [unjust enrichment] are governed by the law of the place where the contract was made.

*Scott & Stringfellow, LLC v. AIG Commer. Equip. Fin., Inc.*, Civil Action No. 3:10CV825-HEH, 2011 U.S. Dist. LEXIS 38554, at *13 (E.D. Va. Apr. 8, 2011) (citing *See Lexie v. State Farm Mut. Auto Ins. Co.*, 251 Va. 390, 394, 469 S.E.2d 61, 63 (1996)).

As noted above, Plaintiffs expressly state that "a contract was thus created" when each Plaintiff accepted Monterrey Concrete's offer while each Plaintiff was in Mexico. *See* Compl. at ¶¶ 38 – 39.

Plaintiffs do not allege that their quasi-contract claims are governed by Mexican law.[7] They bring both claims under "Virginia Common Law." *See* Compl. at ¶¶ 323 – 340. By failing to allege that their quasi-contract claims meet the essential elements of Mexican law, Plaintiffs have failed to state a claim upon which relief can be granted. Monterrey Concrete respectfully requests that the Court dismiss Plaintiffs' quasi-contract claims – Counts V and VI.

### 4. Plaintiffs Fail To State A Claim for Relief Under the TVPA.

---

[7] Monterrey Concrete has found no reference to quasi-contract in Mexican law.

In assessing a plaintiff's claim brought under the TVPA – 18 U.S.C. §§ 1589, 1590 and 1592(a) – this Court has cautioned that such claims "must not only pass the test of *Twombly* and *Iqbal*, **but also must be strictly construed**." *Fei Guan*, 2017 U.S. Dist. LEXIS 104809, at *9 (citing *Crandon*, 494 U.S. at 158 (applying the rule of lenity where the governing standard in a civil case is embedded in a criminal statute); *Fed. Communications Comm'n*, 347 U.S. at 296 (noting that criminal statutes must be strictly construed, even when they are applied in civil cases)) (emphasis added).

The Fourth Circuit has recently examined the limits of the TVPA in *Muchira v. Al-Rawaf*, and provided the following warning:

> [Plaintiff] misapprehends the scope of the forced labor statute. **Not all bad employer-employee relationships or even bad employer-immigrant relationships will constitute forced labor**.

850 F.3d at 620 (quoting *United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011)) (emphasis added).

*Muchira* is instructive. In that case, plaintiff was a housemaid for a Saudi family and was "granted the permission to live in the United States [but] she did not have the ability to simply leave Defendants employment and legally work elsewhere." *Muchira v. Al-Rawaf*, No. 1:14-cv-770 (AJT/JFA), 2015 U.S. Dist. LEXIS 49806, at *37 (E.D. Va. Apr. 15, 2015). The plaintiff grew tired of the long hours and onerous "house rules" imposed by the Saudi family. *Id.* at *12 - 13. Among the "house rules" cited by the plaintiff was the family's practice of holding her passport. *Muchira*, 850 F.3d at 623 – 24. Plaintiff claimed that she wanted to leave the defendants' employment and home but "feared that she would face hardships or consequences upon leaving." *Muchira*, 2015 U.S. Dist. LEXIS 49806, at *37.

This Court (in an opinion affirmed by the Fourth Circuit) noted that:

Plaintiff had **no legal right to work other than for the Defendants**; and there is no evidence sufficient to establish that any felt sense of imprisonment was attributable to any threats of serious harm by the Defendants (including any threats of arrest), as opposed to **her correctly understanding that under the terms upon which she was granted permission to live in the United States, she did not have the ability simply to leave Defendants' employment and legally work elsewhere**.

*Id.* (emphasis added).

The Fourth Circuit was equally skeptical of the plaintiff's claim that she was threatened by the defendant family in order to compel her unwilling labor:

However, Muchira's evidence in support of her "**implicit threat of arrest" claim consists of little more than conclusory and speculative allegations that fall far short of establishing that this fear was reasonable** or that the Saudi family intended to instill any such fear. **Muchira was not an undocumented immigrant. She was at all times legally present in this country** and able to communicate in English.

*Muchira*, 850 F.3d at 623 (emphasis added).

The Fourth Circuit also placed Plaintiff's "passport confiscation" claims in context:

Her testimony is sufficient to support a finding that the Saudi family kept her passport, just as they had done in Saudi Arabia, in accordance with the cultural practices of their country. But it is insufficient to support a finding that the Saudi family "seized" or "withheld" Muchira's passport as a means of forcing her to remain in a condition of involuntary servitude.

*Id.*

The Fourth Circuit identified the lynchpin of 18 U.S.C. § 1589 – compelled labor caused by the threat of serious harm:

The harm or threat of harm, "considered from the vantage point of a reasonable person in the place of the victim, must be "sufficiently serious" to *compel* that person to *remain*" in her condition of servitude when she otherwise would have left. . . . **The linchpin of the serious harm analysis under § 1589** is not just that serious harm was threatened but that the employer intended the victim to believe that **such harm would befall her" if she left her employment**.

*Id.* at 618 (quoting *Dann*, 652 F.3d at 1170 (italics in original, bold added).

The Fourth Circuit also affirmed this Court's analysis of Muchira's "forced labor" claims. This Court rejected plaintiff's claim that she was lured to this country by defendants' employment offer: "There is no evidence that Defendants were responsible for Plaintiff's lack of employment opportunities." *Muchira*, 2015 U.S. Dist. LEXIS at *29. This Court also noted that "Plaintiff concedes that she was not physically mistreated, harmed or explicitly threatened in any way, either before or after arriving in the United States." *Id.* at *29 – 30.

This Court then considered the plaintiff's claims that she was "held in a psychological prison." *Id*. at *30. This Court concluded that, notwithstanding the fact that defendants held her passport, yelled at her, underpaid her and imposed intrusive "house rules," those work conditions did not amount to "serious harm" under the TVPA because they did not impinge on her ability to stop working if she so chose:

> As reflected in the statutory elements of Plaintiff's claims, the central issue does not concern the terms and conditions of Plaintiff's employment, as such, but rather the volitional nature of that employment. **No matter how unpleasant the work, or the conditions under which services are provided**, the critical inquiry for the purposes of the TVPA is whether a person provides **those services free from a defendant's physical or psychological coercion that as a practical matter eliminates the ability to exercise free will or choice**.

*Id.* at 30 – 31 (emphasis added).

After evaluating the factual basis for Plaintiff's TVPA claims, this Court concluded that the evidence was insufficient, as a matter of law, to find a TVPA violation:

> In short, Plaintiff has not described with any specificity or objective evidence the "serious harm" she experienced or feared that **forced her against her will to remain in Defendants' home and service when she would have otherwise left. . . .** The Court accepts, as Plaintiff claims, that she feared that she would face certain consequences or hardships upon leaving Defendants' employment and home, including arrest. **But Plaintiff had no legal right to work other than for the Defendants; and there is no evidence sufficient to establish that any felt sense of imprisonment was attributable to any threats of serious harm by the Defendants** (including any threats of arrest), as opposed to her **correctly**

**understanding that under the terms upon which she was granted permission to live in the United States, she did not have the ability simply to leave Defendants' employment and legally work elsewhere**.

*Id.* at *35; 37 (emphasis added).

Having found no predicate violation of "forced labor" under 18 U.S.C. §§ 1584 or 1589, this Court also entered judgment against Plaintiff on her recruiting, transporting and harboring claims under 18 U.S.C. § 1590. *Id.* at *40. In affirming this Court, the Fourth Circuit reiterated this Court's focus on the distinction between unpalatable working conditions and coercion for the purpose compelling labor against the will of the laborer:

> [T]he forced labor provisions of the TVPA **are not intended to redress every bad employment relationship involving immigrants, or to punish immigrants for adhering to cultural rules and restrictions that many in this country would refuse to abide by**. They are intended to effectuate the constitutional prohibitions against slavery and involuntary servitude, by criminalizing the act of coercing persons into providing labor and services against their will and by providing a civil remedy to the victims of such actions.
>
> Muchira has failed to develop sufficient evidence upon which a jury could reasonably conclude that the Saudi **family knowingly forced or coerced** her to come to the United States, **or to remain in their employ against her will**, by means of serious psychological harm or abuse of law or legal process, when she otherwise would have left and returned to her home country.

*Muchira*, 850 F.3d at 625 (emphasis added).

The principles articulated in *Muchira* – both in this Court and in the Fourth Circuit – are applied in other courts. In *Headley v. Church of Scientology Int'l*, 687 F. 3d 1173 (9th Cir. 2012), the Ninth Circuit affirmed summary judgment in a TVPA case brought by a married couple who claimed that they were forced to provide labor to the Church of Scientology for fifteen years. *Id.* at 1175 – 78. During that time, they alleged that they worked 100 hours per week for a $50 per week stipend. *Id.* at 1176. They lived on the Scientology compound where the Church censored their mail, monitored their telephone conversations and strictly limited their use of the internet.

*Id.* The Headley's were often forced to engage in manual labor as punishment. This labor included hand-cleaning human excrement from a large aeration pond. *Id.* Both Plaintiffs were physically assaulted. *Id.* The wife was forced to abort her two children. *Id.* The couple fled the Church in 2005 and brought TVPA claims against the Church for compelling their labor against their will.

In reviewing the District Court's summary judgment order against the Headleys, the Ninth Circuit focused on the fact that the Plaintiffs' labor, however bad the conditions, was not forced.

> The Headleys have simply not marshaled enough evidence to satisfy the textual demands of section 1589. That text requires that serious harm befall an employee "if she did not continue to work" or a threat that "compel[s] [her] to *remain*" with the employer. Here, the record shows that the adverse consequences cited by the Headleys are overwhelmingly not of the type that caused them to continue their work and to remain with the [the Church].

*Id.* at 1180 (quoting *Dann*, 652 F.3d at 1170 (emphasis in original)). A key aspect of the Ninth Circuit's affirmance was the fact that the Headley's could and ultimately did leave the Church. *Id.*

In sum, the Ninth Circuit re-affirmed that the TVPA is narrowly construed and is not a substitute for more traditional causes of action:

> [A]lthough the Headleys marshaled evidence of potentially tortious conduct, they did not bring claims for assault, battery, false imprisonment, intentional infliction of emotional distress, or any of a number of other theories that might have better fit the evidence. **The Headleys thus wagered all on a statute enacted "to combat" the "transnational crime" of "trafficking in persons"—particularly defenseless, vulnerable immigrant women and children. Whatever bad acts the defendants (or others) may have committed, the record does not allow the conclusion that the Church or the Center violated the Trafficking Victims Protection Act**.

*Id.* at 1181 (citations omitted) (emphasis added).

*Martinez-Rodriguez v. Giles*, 391 F. Supp. 3d 985 (D. Idaho 2019) is a recent, factually analogous TVPA case. There, the United States District Court of Idaho rejected plaintiffs' general claims of workplace abuse because the alleged abuse was not connected to an intent to compel

forced labor.  In *Giles*, the defendant – a large scale dairy operation – recruited plaintiffs – Mexican animal scientists – to work at the dairy on limited duration work visas ("TN Visas").  *Id.* at 989.  When they arrived in the United States, the Mexican scientists learned that their work was much different than initially advertised:

> Upon arrival at Funk Dairy, Plaintiffs contend that Defendants tasked them with menial, unskilled farm duties, despite their understanding that they would be animal scientists.  Additionally, Plaintiffs assert that Defendants monitored their movements and communications, charged them for things such as rent and transportation, reduced their income arbitrarily, and generally failed to abide by the agreed upon terms of their employment. Ultimately, three Plaintiffs quit, and Funk Dairy terminated three Plaintiffs.

*Id.* at 990.

The District Court identified the essential elements of Plaintiffs' TVPA claim:

> An individual "is guilty of forced labor if he intends to cause a person to believe that if she does not work, she will suffer. . . serious harm[.]"  "[T]he threat [is] considered from the vantage point of a reasonable person in the place of the victim [and] must be 'sufficiently serious' to compel that person to remain."  Overt or subtle threats of financial, reputational, and/or immigration harm can suffice. . . .

*Id.* at 993 (quoting *Dann*, 632 F.3d at 1169 – 70; 1172).

The District Court then highlighted the fact that six of the plaintiffs had either left the dairy of their own volition or were fired by the dairy:

> Plaintiffs here have not presented any evidence that would indicate that Funk Dairy obtained, and kept, their labor *by means of* serious harm, threats, or other improper methods.  **This is most strikingly evidenced by two facts: first, that three of the Plaintiffs quit during their tenure with Funk Dairy because they were dissatisfied with their employment; and second, that Funk Dairy terminated the remaining three employees because they were dissatisfied with their work performance.**  If Funk Dairy was truly forcing Plaintiffs to perform labor, **they would not have allowed three Plaintiffs to quit, nor terminated three Plaintiffs themselves**.  In short, these "harms" were not so sufficiently serious so as to compel Plaintiffs to remain in Funk Dairy's employ.  Certain Plaintiffs' personal choices to leave their employment with Funk Dairy was just that: a personal, independent choice.

*Id.* at 994 (quoting *Dann*, 632 F.3d at 1171 (italics in original; bold added).

The District Court concluded that, although the Dairy had, arguably, been a "bad employer" it had not compelled the forced labor of the Plaintiffs:

> It does appear that working at Funk Dairy was not as enjoyable as Plaintiffs originally thought. It also appears that some aspects of the job were over-emphasized. But these facts alone do not give rise to legal action. In like manner, while it appears that Funk Dairy—mostly via Giles and other supervisory employees—was tough on Plaintiffs, somewhat overbearing, controlling, and even downright insensitive at times, being tough, rude, or even abusive does not rise to the level of forced labor under the TVPRA unless those things *induced Plaintiffs to stay*. Plaintiffs have failed to present material evidence that Funk Dairy knowingly obtained Plaintiffs' labor by force, serious harm, or threat and that they kept Plaintiffs employed via similar means. Accordingly, summary judgment in favor of Defendants is appropriate on this claim.

*Id.* at 998 (emphasis in original).

This Court has taken the principles outlined above and applied them to a Motion to Dismiss under Fed. R. Civ. Pro. 12(b)(6). *Fei Guan*, 2017 U.S. Dist LEXIS 104809, at *11 – 14. There, this Court granted a Motion to Dismiss Plaintiff's TVPA claims of forced labor. *Id.* at *14. This Court considered plaintiff's allegations that he was forced to work for the defendant company because, if he failed to do so, he would lose his H-1B visa and would be substantially indebted to the defendant company. *Id.* This Court wrote:

> Although Plaintiff has included sufficient facts to suggest the existence of an imagined debt, Plaintiff has failed to allege sufficient facts to suggest that he was forced to work at AdSTM against his will. . . . [A]s Defendant AdSTM correctly notes, there is no violation of the TVPA if an employer merely informs an employee about legitimate immigration consequences that may arise from that employee's termination.

*Id.* at *13 - 14 (citing *Muchira*, 850 F.3d at 622-25).

In sum, this Court, this Circuit and other federal courts recognize that allegations of "tough, rude, or even abusive [treatment] does not rise to the level of forced labor under the TVPRA unless those things *induced Plaintiffs to stay*." *Martinez-Rodriguez*, 391 F. Supp. 3d at 990 (emphasis in

original).  Allegations that the defendant employers were harsh, demanding, intrusive and unfriendly are irrelevant unless those allegations establish "serious harm" that compel the plaintiff to provide forced labor against their will.

Here, Plaintiffs do not adequately allege that Monterrey Concrete forced them to provide their labor against their will.  Upon inspection, Plaintiffs' allegations are simply accurate statements about immigration status or florid descriptions of tough working conditions.

Plaintiffs allege that Monterrey Concrete threatened to "have Plaintiffs' visa suspended [and] report Plaintiffs' to immigration authorities if they did not do as he [Mr. De La Rosa] said."  *See* Compl. at ¶ 62.  This is an accurate statement of immigration law.  If a Plaintiff no longer worked at Monterrey Concrete, Mr. De La Rosa was obligated to report this fact to the Department of Homeland Security within five days and, as a consequence, the Plaintiff's visa was rendered null.  *See* 20 C.F.R. § 655.20(y) (abandonment/termination of employment).

With respect to Plaintiffs' allegation that Defendants drove Plaintiff No. 14 to the border of Mexico to return him to his home country (*see* Compl. at ¶¶ 61; 243 – 245), this allegation does not show that Monterrey Concrete was compelling the unwilling labor of the Plaintiff.  It shows the opposite – that Monterrey Concrete did not want the unwilling labor of the Plaintiff.  Plaintiff had been fired within a month of arrival and Monterrey Concrete followed the law in returning Plaintiff No. 14 to Mexico.  *Id.* at ¶ 242.

With respect to the threats of "dangerous groups," Plaintiffs' allegation is hopelessly weak.  They never allege that Monterrey Concrete threatened to unleash "dangerous people" on Plaintiffs.  Plaintiffs allege, at best, that this threat was "suggested."  *See id.* at ¶ 64.  The allegation gets weaker from there: "**Some** Plaintiffs **had heard** that a former employee's family in Mexico had indeed been threatened after the worker reached out to an attorney about the abuses taking place

at Monterrey Concrete." *Id.* (emphasis added). This allegation, of third-hand hearsay about undefined threats to an unnamed former employee, lacks "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 547. Furthermore, as noted in *Martinez-Rodriguez*, the strength of this allegation is belied by the fact that most of the Plaintiffs left Monterrey Concrete before their visa expired. *Martinez-Rodriguez*, 391 F. Supp. 3d at 994; *see also* Compl. at ¶¶ 94 (Plaintiff No. 1 – eight months on second H2-B visa); 120 (Plaintiff No. 3 – six months on second H2-B visa); 142 (Plaintiff No. 5 – seven months); 153 (Plaintiff No. 6 – five months); 163 (Plaintiff No. 7 – five months); 192 (Plaintiff No. 10 – eight months); 203 (Plaintiff No. 11 – eight months); 218 (Plaintiff No. 12 – eight months); 242 (Plaintiff No. 14 – one month); 249 (Plaintiff No. 249 – six months); and 275 (Plaintiff No. 17 – six months). The factual allegations show that Plaintiffs were not impressed into involuntary servitude at Monterrey Concrete. Most of those who wanted to leave, did leave.

Regarding the allegation that some Plaintiffs were threatened with debts if they intended to leave Monterrey Concrete (*see* Compl. ¶ 61), Plaintiffs were all H2-B visa employees and were not free to find other jobs. They were obligated to work for Monterrey Concrete or return to Mexico. This Court addressed similar allegations in *Fei Guan*: "there is no violation of the TVPA if an employer merely informs an employee about legitimate immigration consequences that may arise from that employee's termination." 2017 U.S. Dist LEXIS 104809, at *13. Furthermore, as noted above, many Plaintiffs left well before the expiration of their H2-B visas.

There is no allegation or even suggestion that Monterrey Concrete made any effort to collect H2-B visa fees or other charges from the Plaintiffs who left Monterrey Concrete before their H2-B visas expired. In short, Plaintiffs' allegation that Monterrey Concrete threatened them with an "imagined debt" does not plausibly allege that they remained at Monterrey Concrete for

fear of this "imagined debt." *Id.* The other allegations demonstrate that Plaintiffs left Monterrey Concrete or stayed at Monterrey Concrete, through their "personal, independent choice." *Martinez-Rodriguez*, 391 F. Supp. 3d at 994.

Finally, some Plaintiffs allege that they were compelled to remain at Monterrey Concrete because they witnessed or heard about a fight between Mr. De La Rosa and Plaintiff No. 9. *See* Compl. at ¶¶ 125; 175; 183 – 184; 201; 213; 226; 236; 247; 257; 269; and 282. Plaintiff No. 9, however, never alleges that the fight was caused by his refusal to provide forced labor to Monterrey Concrete. In fact, Plaintiff No. 9 alleges that he left Monterrey Concrete immediately after the fight. *Id.* at ¶¶ 183 – 184. Plaintiffs who cite the fight between Mr. De La Rosa and Plaintiff No. 9 never allege how or why this alleged fight coerced them into remaining at Monterrey Concrete to continue to provide forced labor pursuant to their H2-B visa. *See id.* at ¶¶ 125; 175; 183 – 184; 201; 213; 226; 236; 247; 257; 269; and 282.

In sum, Plaintiffs' TVPA allegations do not allege the essential elements of their TVPA claims. As this Court previously held, Plaintiffs allegations under the TVPA "must not only pass the test of *Twombly* and *Iqbal*, **but also must be strictly construed**." *Fei Guan*, 2017 U.S. Dist. LEXIS 104809, at *9.

> In light of this standard of review, this Court's previous holding in *Muchira* is applicable:
>
> In any event, there is no evidence sufficient to establish that any of the relied upon conduct forced Plaintiff to accompany Defendants to the United States against her will or to remain in Defendants' service, when she would have otherwise terminated that relationship.

*Muchira*, 2015 U.S. Dist. LEXIS 49806, at *38.

Having failed to adequately allege that Monterrey Concrete threatened serious harm which compelled Plaintiffs to work against their will, Plaintiffs have failed to allege the predicate violation for their "recruiting, transporting and harboring" claim – Count II. *See id.* at *40; *see*

*also* Compl. at ¶¶ 295 – 301.  For the foregoing reasons, Monterrey Concrete respectfully requests that the Court dismiss all of Plaintiffs' TVPA claims – Counts I and II.

### 5.  Plaintiffs Have Not Adequately Alleged A FLSA Claim.

Plaintiffs allege that they each worked "at least 70 to 80 hours a week and sometimes even more than that."  *Compl.* at ¶¶ 4; 43; 49; and 55.  Plaintiffs claim that they were not paid overtime and, further, that they were not paid the minimum wage.  *See id.* at ¶¶ 306 – 307.

Plaintiffs provide absolutely no factual support for their claims that they worked "at least 70 to 80 hours a week and sometimes even more."  None of the individual Plaintiffs allege a day, week or month where they were not paid overtime or were not paid the minimum wage.  Instead, each Plaintiff reflexively alleges the formulaic elements of a FLSA claim without any factual context.  *See, e.g.*, ¶ 103 ("[Defendants] failure to pay wages to Mr. Gonzales that they were legally and contractually obligated to pay. . . caused Mr. Gonzales monetary and emotional injury.").

The "court cannot simply accept a 'plaintiff's declaration of a legal claim's essential elements; elements of a claim are not 'facts' and need not be accepted as true.'"  *See Hilgeford*, 2009 U.S. Dist. LEXIS 9766, at *8 (quoting *Twombly*, 550 U.S. at 555).

Courts in this District will dismiss a complaint if it only alleges limited factual allegations against a defendant and fails to "produce an inference of liability strong enough to nudge the plaintiff's claims 'across the line from conceivable to plausible.'"  *Newby*, 2017 U.S. Dist. LEXIS 161530, at *14 (quoting *Nemet Chevrolet, Ltd.*, 591 F.3d at 256 and *Iqbal*, 556 U.S. 662, 683).

Here, Plaintiffs' FLSA claims have alleged no factual allegations other than the formulaic recitation that Monterrey Concrete did not pay overtime or the minimum wage.  Plaintiffs do not allege a single specific pay period where any one of them was paid less than the minimum wage or was not paid overtime.  Instead, Plaintiffs offer the implausible allegation that each and every

one of the 17 Plaintiffs worked a **minimum** of **70 to 80 hours** per week for the entirety of their time at Monterrey Concrete. *See* Compl. at ¶¶ 4; 43; 49; and 55. This allegation is rendered even more implausible in light of the fact that three of the seventeen Plaintiffs – Plaintiffs Nos. 1, 3 and 4 – **returned to work** at Monterrey Concrete after their first H2-B visa employment term. *See id*. ¶¶ 100; 116 – 117; and 129 – 130; *see also* Exhibits 2; 4 and 5.

Plaintiffs' Complaint contradicts their minimum wage allegations. *See* Compl. at ¶¶ 50 – 54. In those paragraphs, Plaintiffs admit that their hourly wage was well above the minimum wage – between $15.72 per hour and $ 17.66 per hour. Plaintiffs never allege that they were paid less than the minimum wage for their regular hourly rate. Instead, they allege by inference that their hourly rate was below minimum wage because they worked "70 – 80 hours per week."

Plaintiffs' FLSA claims "**must be supported by some factual basis sufficient to allow the defendant to prepare a fair response.**'" *Bragg*, 2012 U.S. Dist. LEXIS 19196, at *11 (quoting *Twombly*, 550 U.S. at 556 n.3) (emphasis added). The allegations in this Complaint are devoid of factual context and amount to little more than the "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 548. As the United States Supreme Court stated more than twelve years ago, this "will not do." *Id.*

For the foregoing reasons, Monterrey Concrete respectfully requests that the Court dismiss Plaintiffs' FLSA claim – Count III.

**6.**      **Some Plaintiffs' Claims Are Barred By the Statute of Limitations.**

Plaintiffs filed their lawsuit on November 6, 2019. As alleged, Plaintiffs claims accrued over various times beginning on March 13, 2014. *Id.* at ¶¶ 90 – 103; Exhibit 2.

To the extent that Plaintiffs even properly alleged Breach of Contract Claims and quasi-contract claims under Virginia law, those claims are governed by the three year statute of limitation

for "unwritten contracts express or implied." Virginia Code § 8.01-246(4) (Counts IV – VI)[8]; *see also Harbour Gate Owners Assoc. v. Berg*, 232 Va. 98, 106 , 348 S.E. 2d 252, 257 (1986) (implied contracts governed by three year statute of limitations of Va. Code § 8.01-246(4)). Consequently, Plaintiff Nos. 1 – 7's claims are time-barred.

Similarly, the FLSA has a two year or three year statute of limitations (depending on whether the violation is willful). *See* 29 U.S.C. § 255(a). Here, Plaintiffs plead a willful violation of the FLSA. *See* Compl. at ¶ 310. Even accepting Plaintiffs' allegations of willful violation, Plaintiffs Nos. 1 – 7's claims are time-barred.

Plaintiffs seek to excuse their delay by citing (without reference) the Fourth Circuit's opinion in *Cruz v. Maypa*, 773 F.3d 138, 146 (4th Cir. 2014). *See* Exh. 1, ¶309. However, Plaintiffs misread *Cruz*. In *Cruz*, the Fourth Circuit remanded the dismissed FLSA claims of a woman who had been imprisoned in the home of a World Bank executive for nearly six years. *Cruz*, 773 F.3d at 141 – 42. The executive would not let this woman out of the house, except to walk the executive's "aggressive dog." *Id.* at 142. The plaintiff had no outside contact, had her telephone calls monitored, she worked 18 hours per day, seven days a week, she was paid $8 per day, and she was not allowed to visit a doctor or dentist. *Id.* at 141 – 42. Based on those allegations, the Fourth Circuit applied the "rare remedy" of equitable tolling based on "extraordinary circumstances beyond plaintiff's control that made it impossible to file [her] claims on time." *Id*. at 145 – 46.

Contrary to Plaintiffs' claims, *Cruz* did not establish a blanket exception to the FLSA statute of limitations when an employer fails to display a FLSA poster. Rather, *Cruz* considered

---

[8] Plaintiffs never allege that Monterrey Concrete or Mr. De La Rosa signed a contract with any Plaintiff. *See* Compl. at ¶¶ 28 – 33; 93; 109; 119; 129; 141;152; 162; 171; 179; 191; 205; 217; 230; 240; 251; 262; and 274. Consequently, Va. Code § 8.01-246(2) and its five year statute of limitations does not apply.

the failure of the World Bank executive to display an FLSA poster in the broader context of equitable tolling. The Fourth Circuit remanded the case to allow discovery as to when Plaintiff first learned that she may have had a FLSA claim. *Id.* at 147.

The Fourth Circuit has consistently held that equitable tolling is rarely permitted and even then, only in the most extreme circumstances:

> The **discretionary** equitable tolling doctrine applies when (1) a defendant wrongfully prevents a plaintiff from asserting her claims, or (2**) extraordinary circumstances beyond the plaintiff's control prevent her from filing on time.** We apply the doctrine infrequently, so that "individualized hardship" and "subjective notions of fair accommodation" do not "supplant the rules of clearly drafted statutes." In other words, equitable tolling "**must be reserved for those rare instances where**—due to circumstances external to the party's own conduct—it would be unconscionable to enforce the limitation period against the party and gross injustice would result."

*Ott v. Md. Dep't of Pub. Safety & Corr. Servs.*, 909 F.3d 655, 660-61 (4th Cir. 2018) (quoting *Harris v. Hutchinson*, 209 F.3d 325, 330 (4th Cir. 2000) (emphasis added)).

Here, Plaintiffs do not plausibly allege facts that remotely approach the facts in *Cruz*. This case is clearly distinguishable from *Cruz* because the plausibly alleged factual allegations simply are not as extreme[9] as the factual allegations in *Cruz*, and do not warrant the "rare" remedy of equitable tolling.

In short, as alleged, Plaintiffs' FLSA and Virginia contract and quasi contract claims are governed by three year statutes of limitations. This Court has recognized that "[a] complaint showing that the statute of limitations has run on the claim is the most common situation in which the affirmative defense appears on the face of the pleading." *Tao of Sys. Integration v. Analytical Servs. & Materials, Inc.*, 299 F. Supp. 2d 565, 570 (E.D. Va. 2004) (quoting 5A Charles A. Wright

---

[9] Notably, the Fourth Circuit distinguished the factual allegations in *Cruz* from the factual allegations in *Muchira*. *Muchira*, 850 F. 3d at 619. This case is much closer to *Muchira* than *Cruz*.

& Arthur R. Miller, *Federal Practice and Procedure* § 1357, at 352 (2d ed. 1990)). Based on the four corners of the Complaint, Monterrey Concrete respectfully requests that this Court dismiss the contract, quasi contract and FLSA claims of Plaintiff Nos. 1 – 7.

## **CONCLUSION**

In sum, Plaintiffs' claims do not meet the federal pleading standards.  Mexican law governs Plaintiffs' contract and quasi-contract claims, but Plaintiffs never plead Mexican law.  Plaintiffs' TVPA allegations are both inadequate and contradictory.  They are inadequate because they never plausibly allege that vague "threats and coercion" compelled them to stay at Monterrey Concrete. They are contradictory because most of the Plaintiffs left before their nine-month H2-B tenure was over, so they plainly had a "viable exit option."  Plaintiffs' FLSA claims are factually insufficient because they never allege how and when they were underpaid even though they worked for "70 – 80 hours per week, sometimes more."  Finally, Plaintiff Nos. 1 – 7's claims are time-barred on their face.

For these reasons, Monterrey Concrete respectfully requests that this Court dismiss Plaintiffs' Complaint and grant such other relief as appropriate.

Dated: February 14, 2020     Respectfully submitted,

            */s/ Robert F. Redmond, Jr.*
            Robert F. Redmond, Jr. (VSB No. 32292)
            McGuireWoods LLP
            Gateway Plaza
            800 East Canal Street
            Richmond, Virginia  23219
            rredmond@mcguirewoods.com
            T: (804) 775-1123
            F: (804) 698-2145

            *Counsel for Defendants Monterrey Concrete, LLC,*
            *and Jose De La Rosa*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 14, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send automatic notification of such filing to all counsel of record who are registered with the CM/ECF System.

*/s/ Robert F. Redmond, Jr.*