```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE EASTERN DISTRICT OF VIRGINIA

 3                      RICHMOND DIVISION

 4

 5    --------------------------------------
                                          :
 6    ARTURO ESPARZA MACIAS, et al.       :    Civil Action No.
                                          :    3:19cv830
 7    vs.                                 :
                                          :
 8    MONTERREY CONCRETE, LLC, et al.     :    September 16, 2020
                                          :
 9    --------------------------------------

10

11          COMPLETE TRANSCRIPT OF THE CONFERENCE CALL

12           BEFORE THE HONORABLE ROBERT E. PAYNE

13                UNITED STATES DISTRICT JUDGE

14

15    APPEARANCES:

16    Ian S. Hoffman, Esquire
      Preston M. Smith, Esquire
17    Arnold & Porter Kaye Scholer, LLP
      601 Massachusetts Ave NW
18    Washington, D.C.  20001

19    Jason B. Yarashes, Esquire
      Legal Aid Justice Center
20    1000 Preston Avenue
      Suite A
21    Charlottesville, Virginia  22903
      Counsel for the plaintiffs
22

23

24                   Peppy Peterson, RPR
                    Official Court Reporter
25                United States District Court
```

```
1    APPEARANCES:  (cont'g)

2    Robert F. Redmond, Jr., Esquire
     Mitchell D. Diles, Esquire
3    McGuireWoods, LLP
     Gateway Plaza
4    800 East Canal Street
     Richmond, Virginia  23219
5    Counsel for the defendants

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                        P R O C E E D I N G S

2

3              THE COURT:  Hello.  This is Macias against Monterrey

4    Concrete, 3:19CV830.  Who is here for whom starting with

5    counsel for the plaintiff, and when you speak, please give your

6    name so the court reporter will know about it.  Hello?  Anybody

7    there?  Hello?

8              MR. REDMOND:  Good afternoon, Your Honor.  This is

9    Bob Redmond and Mitch Diles.  I think we got cut off when we

10   were on hold.  Are you prepared for us to conference in the

11   plaintiffs, Your Honor?

12             THE COURT:  Yes.  I cut you off.  I'm sorry.  It has

13   to do with the technical difficulties with my brain.

14             MR. REDMOND:  Your Honor, they're on the line.  Let

15   me conference them in right now.  Thank you.

16             Your Honor, it looks like the plaintiffs are in.

17   Ian, are you there?

18             MR. HOFFMAN:  Yes, Your Honor.  Good afternoon.  Ian

19   Hoffman from Arnold & Porter on behalf of the plaintiffs.

20             THE COURT:  This is Macias against Monterrey

21   Concrete, 3:19CV830.  So, who is it that's here for the

22   plaintiff?

23             MR. HOFFMAN:  This is Ian Hoffman, Your Honor, from

24   Arnold & Porter.  I'm happy to proceed if Your Honor is ready.

25             THE COURT:  Is anybody else here from Arnold &
```

1    Porter?

2           MR. HOFFMAN:  Yes, Your Honor.  My colleague Preston

3    Smith who was also present at the motion to dismiss hearing is

4    present.  Also on the line is another Arnold & Porter attorney

5    name Daniel Cantor, C-a-n-t-o-r.  Mr. Cantor has not yet

6    entered his appearance, but he will.  He's just listening in

7    today.  We also have Mr. Jason Yarashes from the Legal Aid

8    Justice Center who is also counsel in the case and is present

9    on the line.

10          THE COURT:  All right, and for the defendants?

11          MR. REDMOND:  Good afternoon, Your Honor.  It's Bob

12   Redmond and Mitch Diles, both of McGuireWoods.

13          THE COURT:  All right.  Well, this thing got started

14   because there was this motion for a protective order.

15          MR. HOFFMAN:  I'm sorry, Your Honor.  I'm having

16   trouble hearing you.

17          THE COURT:  Plaintiffs called in here wanting to talk

18   about two discovery disputes, and then there came in a motion

19   to enter a protective order, ECF 39, and a motion to strike it,

20   ECF 40, then a supporting memo, ECF 44.  So what's the

21   discovery dispute, Mr. Hoffman?

22          MR. HOFFMAN:  Again, good afternoon, Your Honor.  May

23   it please the Court, I believe there are two discovery

24   disputes, at least from plaintiffs' perspectives.  Mr. Redmond

25   might want to raise other issues, and I will let him do so, but

1    the two issues from plaintiffs' perspective, Your Honor, are,

2    number one, whether the deposition of certain of our clients,

3    the plaintiffs, that are located in Mexico, whether those

4    depositions should be conducted remotely via Zoom or similar

5    technology or whether they must be conducted in person in

6    Richmond.

7          That's issue number one, and I'm prepared to address

8    that issue today.  The parties have met and conferred about it,

9    but we have not been able to resolve the issue.

10          The second issue, Your Honor, is whether the

11    defendants may seek discovery of the immigration status,

12    immigration status information about the plaintiffs both

13    through written discovery like interrogatories and also through

14    deposition questions.

15          And plaintiffs' position is that whether plaintiffs

16    are here illegally or have been here illegally in the past or

17    undocumented or that kind of discovery and those types of

18    questions should be subject to the protective order and should

19    be out of bounds, Your Honor, and so I'm happy to address those

20    two issues in whatever order you would like.

21          The -- obviously the Court recognizes that there's

22    been some filings recently, and I'm happy to address those if

23    the Court wishes.

24          THE COURT:  Let's take the issues of depositions

25    first.  What's your position?

1                MR. HOFFMAN:   Our position, Your Honor, is that

2      there's sufficient special circumstances and good cause under

3      the local rules and under the federal rules to permit

4      plaintiffs to make -- certain of the plaintiffs, Your Honor, to

5      make themselves available for a deposition via Zoom, and I

6      won't keep caveating it, but I'll say Zoom as a shorthand for a

7      remote virtual deposition.

8                There are 17 plaintiffs in this action, Your Honor.

9      Seven of them are currently in the United States, and ten of

10     them are currently in Mexico.   Immediately after your last

11     status conference we had with the Court, the next day, I

12     believe, the defendants served 17 deposition notices for all of

13     the plaintiffs for the depositions to start approximately

14     11 days later and continue sequentially.

15               The next business day that I received those notices,

16     I reached out to Mr. Redmond and explained that ten of those

17     individuals are in Mexico and that we would make them available

18     for depositions via Zoom.   For the seven that are in the United

19     States, we would commence to make efforts.   Notwithstanding

20     COVID and other similar challenges, we would make efforts to

21     bring them for deposition in Richmond before the individuals

22     located in Mexico because of all of the safety concerns related

23     to the COVID-19 pandemic, which are particularly acute in

24     Mexico, as well as there is immigration-related border crossing

25     type of hurdles, that we would gladly make them available via

1    Zoom and that we were making efforts right away to wind that up

2    and make it happen, and we, at the time, were attempting to

3    secure it, and we have since secured local counsel in Mexico

4    near where our clients, most of our clients at least are

5    located in Mexico so that there are (indecipherable).

6              THE COURT:  Mr. Hoffman, the combination of the speed

7    at which you are talking and the interference on the signal

8    make it difficult to follow you, so you need to slow it down.

9              MR. HOFFMAN:  I apologize very much, Your Honor.  I

10   will do my best to slow it down.  If the interference issue

11   causes any more problems, please speak up and I'll try

12   something else, but for now I'll slow down.

13             Your Honor, there is --

14             THE COURT:  Excuse me a minute, Mr. Hoffman.  You say

15   there are ten plaintiffs in Mexico, and because of COVID

16   concerns and border-crossing hurdles, I was under the

17   impression that there were current immigration rules that

18   foreclosed people coming into Mexico -- from Mexico into this

19   country except with certain explicit permissions and for

20   certain reasons.  Is that wrong?

21             MR. HOFFMAN:  That is not wrong, Your Honor, and I

22   was headed right there, so you're one step ahead of me in the

23   argument.  Your Honor, all nonessential travel is barred

24   between the United States and Mexico.  All of the normal visa

25   processes at the consulate in Mexico are closed.  The only

1   access to visas is for emergency situations, and the only way

2   to get an emergency visa is to travel to a consulate and apply,

3   and there are lengthy wait times, and there are lengthy

4   distances our clients would have to travel, like perhaps an

5   all-day bus trip in the time of COVID in order to even sit for

6   an interview.

7           There are only very narrow types of visas that would

8   even conceivably apply here, and the timetables to get those

9   visas are lengthy, and even if you were to go through the

10   entire process, there's no guarantee that it would be

11   permitted.  For example, you know, tourist visas, highly

12   unlikely that would be granted for this kind of travel.  It's

13   not for tourism.

14           My understanding from consulting with various

15   immigration counsel who deal with these kinds of issues

16   regularly is that there's lengthy wait times even for those.

17           Other processes like special parole permissions, my

18   understanding is that they take months, three or four months in

19   normal times to even get processed, and there's no guaranteed

20   outcome at the end of that.  That's in normal times, not in

21   COVID times.

22           THE COURT:  Let me ask you something.  Are your

23   clients coming up here to work sometimes?  How do they get here

24   when they're going to work?

25           MR. HOFFMAN:  My understanding is that -- so, Your

1    Honor, I believe some are here now working, and I don't know

2    the plan of the ten who are in Mexico to come and work.  My --

3           THE COURT:  How can they have any plans to come and

4    work if they can't get any visas unless they violate the law

5    and slip across the border?

6           MR. HOFFMAN:  Your Honor, I have no -- maybe I

7    misspoke.  I have no awareness of any plans for any of the ten

8    plaintiffs to come into the United States to work.  I was

9    merely pointing out that I think there is a work visa process

10   that would have to be gone through that would have -- they

11   would have to apply through, and my understanding is it would

12   also take a long amount of time, and I think that the current

13   state of the law is -- because of, I believe, certain executive

14   orders, it makes these types of workers extremely -- makes the

15   applications for that type of work extremely unlikely to be

16   granted at this time.

17          THE COURT:  Well, as I understand it, they're letting

18   a lot of people in on visas to pick vegetables and fruits and

19   things that work in the agricultural industry, but they're

20   requiring them to be on visas.  And how do they get in?

21          Have you actually gone to look at the law and

22   determine what the law says about whether your people could get

23   a visa to come in here and work, Mr. Hoffman?

24          MR. HOFFMAN:  Your Honor, I have spoken with

25   immigration counsel who deal with these issues regularly, and I

1   explained my understanding.  I don't practice immigration law

2   so I can't cite to you which law and regulations would apply.

3   I would be happy to brief the matter, Your Honor, so we could

4   identify with particularity, but we cross-referenced this with

5   several immigration counsel who deal with it, but I would be

6   happy to follow up, Your Honor, by providing more specificity.

7           But just to be clear, the argument, Your Honor, is

8   that there is enough -- there are enough hurdles here with the

9   immigration-related and visa-related hurdles combined with the

10  COVID pandemic to provide sufficient good cause to permit these

11  depositions to happen via Zoom.

12          THE COURT:  Thank you.  Let me hear from Mr. Redmond.

13          MR. REDMOND:  Good afternoon, Your Honor.  On this

14  issue, there's Eastern District of Virginia case law on point,

15  and if I may -- we didn't have a chance to brief it, but I'm

16  citing to *Lafleur v. Dollar Tree Stores*, 2013 U.S. Dist. LEXIS

17  189291, Magistrate Judge Lawrence, now District Judge Lawrence.

18  Plaintiffs are expected to appear for their deposition in the

19  forum where they initiate their lawsuit absent a hardship.  It

20  is insufficient for a plaintiff to make unsupported assertions

21  with respect to undue hardship in order to avoid appearing in

22  person for his deposition, collecting cases including *Lerman v.*

23  *Chuckleberry*, 521 F. Supp. 228 requiring plaintiffs to appear

24  at a deposition to submit to a treating physician's affidavit.

25          Also, Your Honor, a more recent case --

1          THE COURT:  I'm not going to deal with this now.  I

2    just want to know -- with the cases now.  Why do you want to --

3    you know, Mexico is probably fourth in the world in COVID

4    problems.  What leads you to believe that they could get into

5    the United States anyway?

6          MR. REDMOND:  Well, Your Honor, first off, I think

7    at -- we have documentary evidence that four of the ten

8    plaintiffs are already here in the United States:  Manuel

9    Esparza, Roderigo Canales Salazar, Alonso Cisneros Ayala, and

10   Jaime Marquez Esparza all have current Facebook profiles that

11   shows that they are in the United States including recent

12   updated photographs that show that these are current profiles.

13         So we believe at least four of the ten are already

14   here, and we have asked plaintiffs to provide some proof that

15   they're in Mexico, and they have not -- declined that

16   opportunity.  So we believe that on balance, the evidence shows

17   very clearly that four of the ten are already here.

18         Also we have -- we've had testimony evidence that two

19   others, Leopoldo Gonzales and Luis Carlos Romero, are also

20   here.  It's likely that six of the ten are here in the United

21   States, and we've asked for some proof from the plaintiff that

22   they are not, and they have declined that opportunity to prove

23   it.  We believe they have the duty to prove that these

24   gentlemen are in Mexico, and they have declined that

25   opportunity.

1    With respect to the remaining, all the plaintiffs

2    that they claim are away, there are two other issues that we

3    think are important, Your Honor.  First off, when did these

4    plaintiffs leave for Mexico, because if they left after the

5    case was filed, then the plaintiffs should have petitioned the

6    Court for a deposition prior to -- before time pursuant to Rule

7    30(a), but they didn't.  And even if they left for Mexico after

8    they engaged counsel but before they filed the lawsuit, they

9    should have petitioned the Court for a deposition pursuant to

10   Federal Rule of Civil Procedure 27(a).

11   Their failure -- if indeed some or all of these ten

12   plaintiffs have left the United States for Mexico after this

13   lawsuit is filed, that has put us in a difficult position

14   because we are facing a highly fact-intensive lawsuit for multi

15   millions of dollars with translators, and they propose to do

16   this through an internet connection using Zoom.

17   We think that that's going to be inadequate in spades

18   because we'll have to have translators on both sides.  It's

19   document intensive.  I have lots of document I want to show

20   these folks, and I can't do it effectively over Zoom, or to do

21   so over Zoom would be onerous

22   THE COURT:  Hold on just a minute.  To begin, it

23   seems to me that I have enough before me at this juncture to

24   require that the matter be briefed with the plaintiff having

25   the burden of proof.  Mr. Hoffman, if, in fact, four people are

1   in the United States according to their Facebook pages and two

2   according to some testimony -- I haven't heard any details on

3   that yet -- are in the United States, then your motion has far

4   less force.

5          In addition, you have the burden of showing how an

6   effective deposition can be taken of the other four.  But if

7   you've got six in the United States, pony them up for

8   deposition right now and stop arguing over it it seems to me is

9   the answer to that question.

10         Mr. Redmond, have you shown the plaintiffs' lawyers

11  your proof that four -- I'm not going to try their names and

12  nobody else is, and you need to give Ms. Peterson the spelling

13  of their names, of the four that you say have been reported on

14  Facebook and the two that you say have been reported on

15  testimony so she can have it for the transcript and I can have

16  it.

17         But have you given them the proof that you say you

18  have about the presence of these six people in the United

19  States?

20         MR. REDMOND:  I have given them -- Your Honor, thank

21  you.  I have given them Mr. Jaime Marquez Esparza's Facebook

22  page, and I will commit to giving them, before close of

23  business today, the three remaining Facebook pages for Manuel

24  Esparza, Rodrigo Canales Salazar, and Alonso Cisneros Ayala.

25         THE COURT:  What about the testimony you are talking

1    about as to the other two?

2         MR. REDMOND:  I will get -- it's in my notes, Your

3    Honor, and if it's not committed to an affidavit, I'll get that

4    committed to an affidavit, Your Honor.

5         THE COURT:  All right.  It seems to me on the issue

6    of where the depositions be taken, it's the rule that they're

7    to be taken here in the forum where the case was filed absent a

8    showing of good cause to the contrary, and it's the burden of

9    the plaintiff who wants to have the depositions of the

10   plaintiffs taken somewhere else to prove an exception and to

11   prove good cause, and the papers -- the oral statement just

12   doesn't get the job done.

13        So I'll require a brief on it, but I do think it

14   would be a good idea for you to, even before then, provide the

15   information you are talking about, Mr. Redmond, to the

16   plaintiffs' counsel.  If those people are in the United States,

17   set the depositions now, Mr. Hoffman, and don't let them go

18   back home before you do it.

19        And then as to the other four, you do need to make a

20   showing about when they left and why you didn't do what the law

21   gives you a right to do to preserve their testimony.  That's

22   the way it is.  So you have -- when are you going to file your

23   brief, Mr. Hoffman, on leave to take depositions other than in

24   Richmond?

25        MR. HOFFMAN:  Your Honor, I believe we can file that

```
 1   on Friday.
 2              THE COURT:  Okay.  That day is -- what day of the
 3   month is that?
 4              MR. REDMOND:  18th, Your Honor.
 5              MR. HOFFMAN:  I'm sorry, Your Honor.
 6              THE COURT:  All right.  You're going to file your
 7   brief.  Mr. Redmond, when are you going to file your response?
 8              MR. REDMOND:  September 25th, Your Honor, one week
 9   later if that's permissible with the Court.
10              THE COURT:  That's fine.  And your reply?
11              MR. HOFFMAN:  Your Honor, we can file -- yes, Your
12   Honor.  I'm looking at my calendar.  How about Wednesday,
13   September 30th?
14              THE COURT:  All right.
15              MR. HOFFMAN:  Your Honor, may I respond briefly to
16   some of the points Mr. Redmond made?
17              THE COURT:  Well, you can.  You're going to have an
18   opportunity to do that in your papers, but go ahead.
19              MR. HOFFMAN:  Thank you, Your Honor.  I just want to
20   underscore that we have been attempting to work all this out in
21   good faith, and we've been attempting to bring every plaintiff
22   who is in the United States to the district to sit for a
23   deposition.
24              Your Honor, we are not trying to play any games here,
25   and I represented to Mr. Redmond as an officer of the court
```

1    that these individuals were in Mexico.  Mr. Redmond also knows

2    that during the mediation that we conducted by Zoom, I believe

3    seven or eight of our plaintiffs who are in Mexico participated

4    from Mexico by Zoom in that mediation.

5           And, Your Honor, I'm glad you asked for the proof

6    because I had the very same questions.  I made the

7    representation to Mr. Redmond that these gentleman be

8    confirmed, that contend are in Mexico, and I asked him please

9    provide the proof that you think they're not in Mexico so that

10   we can try to sort out this confusion.  Mr. Redmond's response

11   was that's work product, I can't tell you because that's work

12   product.

13          Now our understanding is that his proof is a Facebook

14   profile page.  All we know is for one of them.  So we will

15   happily rebut this evidence.  I think it's -- it could have

16   been worked out sooner, and we'll put all of this into our

17   responsive papers, Your Honor.

18          MR. REDMOND:  Your Honor, this is Bob Redmond.  May I

19   have a moment to respond to one of the comments that was made?

20          THE COURT:  Yes.

21          MR. REDMOND:  At the mediation, we were never told

22   that people on the video were in Mexico.  We were told that

23   some of the plaintiffs are appearing by video.  That's what we

24   were instructed.  We're not misleading the Court.  We didn't

25   mislead plaintiffs' counsel.  I explained to plaintiffs'

1    counsel that the burden is on them to show that these

2    individuals are not in the United States, and I don't think

3    it's a fair characterization to say we misled the Court or

4    them.  So that's all I have to say about that, Your Honor.

5              THE COURT:  Well, I actually have to say that you all

6    need to quit worrying about whether somebody is accusing you of

7    doing something wrong.  You come here with the presumption that

8    -- you all are officers of the court, and so I presume that you

9    don't do things wrong.

10             The other thing is, you need, when you are talking

11   about the other side, conduct of the lawyers, you need to be

12   careful in your choice of words so you don't leave it open to

13   the interpretation that you are, in fact, pointing fingers,

14   people misrepresenting or something.  That's the way we conduct

15   business here, folks, so let's keep that up, and we'll be all

16   right.

17             Now, the next thing is the immigration status that

18   you wanted to deal with.  What are you talking about there, Mr.

19   Hoffman?

20             MR. HOFFMAN:  So, Your Honor, Ian Hoffman again.  We

21   received voluminous written discovery requests from defendants,

22   and we have worked through them and served our objections to

23   them last night.  We understand from those requests and from

24   other indications from the defendants that they intend to seek

25   discovery into our clients' immigration status at various

1    times, and by immigration status I mean whether they are

2    presently living and working in the states illegally, whether

3    they worked illegally at any other time, for example when they

4    left the employment of Monterrey Concrete or, again, at any

5    other time.

6            Several of the discovery requests go to this, and so

7    we have, obviously, depositions coming up, Your Honor, and so I

8    wanted to raise this issue before the deposition started that

9    plaintiffs -- and the law is clear that in these types of

10   cases, particularly FLSA cases, an employee's immigration

11   status is irrelevant, and even if it had some marginal

12   relevance, there is a high risk that seeking discovery of this

13   type of information would lead to a potential for feelings of

14   harassment and chilling of parties' rights.

15           So I don't think that there's any relevance to these

16   parties' immigration status, whether that's current or at times

17   in the past, and we are not trying to block any legitimate

18   discovery efforts that the defendants want to take to build

19   their case, but we think that crossing the line into whether

20   and when each plaintiff was here illegally and whether they

21   acted illegally or whether they overstayed visas or entered

22   without visas is outside the scope of the issues in the case,

23   and seeking aggressive discovery on that could lead to that,

24   warrants a protective order, Your Honor.  That's our position

25   on that.  So we would seek an order declaring that discovery,

1    including deposition questions aimed at soliciting the type of

2    immigration status information, are barred.

3              THE COURT:  Why do you need the immigration

4    information, Mr. Redmond?

5              MR. REDMOND:  Your Honor, we filed our answer on

6    June 24th, and nearly every single affirmative defense

7    addresses the fact that these gentlemen engaged in fraud on

8    Monterrey Concrete by intending to enter the country using the

9    Monterrey Concrete visa and then leaving Monterrey Concrete to

10   work illegally in the United States.

11             It's fraud in the inducement.  It is a contract

12   offense.  It was known to the plaintiffs on June 24th.  We

13   served our discovery on August 28th.  We had numerous discovery

14   requests addressed to the fact that these gentlemen came to

15   Monterrey Concrete with the full intention of jumping ship

16   during their time and working illegally in the country.

17             They didn't say anything about this issue until

18   yesterday at 4:00.  I told Mr. Hoffman by email yesterday and

19   again today that we are -- this is a significant, significant

20   issue that requires briefing, and I requested that he not raise

21   it with the Court on this call because it requires briefing.

22             To address why we need this, it's because they claim

23   that they entered into a contract with Monterrey Concrete, and

24   we think that they entered into an effort, a fraudulent effort

25   to get into the country using our visas and jump ship, and we

```
1    have ample evidence to show that's what most of them did,
2    nearly all of them.  That directly rebuts, A, the contract
3    claims; B, the TVPA claims, and, to some degree, the FLSA
4    claims.  This is not an FLSA claim.  We wish it was.  It's a
5    TVPA case with horrendous accusations against a small
6    businessman claiming that he's put people in slavery and made
7    them work 24 hours a day in some circumstances.  So we need --
8              THE COURT:  Has the Fair Labor Standards Act claim
9    been dropped?
10             MR. REDMOND:  Your Honor, we're all ears on that one.
11   We have not heard from the Court on that.
12             THE COURT:  No --
13             MR. REDMOND:  Plaintiffs have not dropped it.
14             THE COURT:  All right.
15             MR. REDMOND:  Your Honor, if I could just wrap this
16   up briefly --
17             THE COURT:  What is your docket number of your
18   answer?
19             MR. REDMOND:  It is 25, Your Honor, and the
20   affirmative defenses can be found on page 23 of 24.
21             THE COURT:  Well, there are two affirmative
22   defenses -- there are two affirmative defenses, three of that
23   sort, but then there's one that says they're unlawfully present
24   in the United States and, therefore, lack the capacity to sue.
25   Is that the law?
```

1          MR. REDMOND:  I believe that is the law, Your Honor,

2    but I will make sure that's the case.  I believe that is based

3    on the law.

4          THE COURT:  All right.  Okay.

5          MR. REDMOND:  For the record, Your Honor --

6          THE COURT:  All right, Mr. Hoffman.

7          MR. HOFFMAN:  Just starting on the last part, Your

8    Honor, I don't have the case law handy at present, but I would

9    not concede that that is the state of the law, that someone

10   who's unlawfully present in the United States lacks the

11   capacity to sue.  But we can certainly back get back to the

12   Court on that if the Court wishes.

13          I don't think that any of these affirmative defenses

14   change the analysis.  If Mr. Redmond wants to argue that -- and

15   seek discovery that my clients left his employment for some

16   other reason other than the treatment that they were receiving

17   and the lack of pay that they were receiving, I think he can

18   elicit that.  The issue is whether he can elicit that they

19   acted illegally in terms of immigration status when they -- in

20   connection with any other work they did for anyone else in the

21   United States really at any time.

22          And so if he wants to develop a case that our clients

23   didn't intend to work for Monterrey Concrete, I'm not sure that

24   that would even touch on immigration status.  It's the

25   illegality and --

1          THE COURT:  Let me stop you there a minute and ask

2    both of you something that I don't know the answer to.  Tell me

3    what you know.  If I get a visa to come to work in the United

4    States, is that visa to work for Joe Smith's company, or is it

5    just to work?

6          MR. REDMOND:  Your Honor, this is Bob Redmond.  It is

7    the former.  Visas are employer specific.  They are not general

8    passes to let people work in the United States, and there are

9    requirements that Monterrey Concrete have to report to the

10   Department of Labor if employees or visa holders, like the 17

11   plaintiffs in this case, leave before their term.  And, in

12   fact, that's a very big part of it, and it is inevitable that

13   the fact that they left Monterrey Concrete and went to work for

14   years at other concrete companies in Richmond or Dallas or

15   Tennessee or places like that, that that will engage in our

16   defense.

17         And the fact that Mr. -- that the plaintiffs have

18   just raised this issue yesterday at 4:00 when we have a

19   deposition starting on Monday morning is problematic to us.  We

20   think this is a huge issue and should be fully briefed.  We

21   talked about it in our answer and we talked about it in our

22   discovery.  It was a lively topic in the mediation --

23         THE COURT:  All right.  Okay.  That's enough.  I

24   agree it should be briefed, but I guess my first question is

25   who has the burden on the question.  Since the defendant wants

1  the protective order and wants the -- I mean the plaintiff

2  does, I think the plaintiff starts it, you respond, and they

3  reply.  We'll follow that -- do you want to do that on the same

4  schedule that you have on the others, or do you want to do it

5  later?

6          MR. REDMOND:  Your Honor, this is Bob Redmond.  We

7  would prefer to do it later, and, in the interim, we will

8  provide a running objection to those questions to the three

9  depositions we have scheduled next week because we think it's

10  imperative to get these depositions started.  We have a

11  discovery cutoff in just a few months, and we prefer not to

12  delay these depositions while the Court addresses this issue.

13          MR. HOFFMAN:  Your Honor, this is Ian Hoffman for

14  plaintiffs.  Our first preference, Your Honor, would be, if at

15  all possible, to get this issue resolved before the depositions

16  start because of the type of chilling effect, and, again, Your

17  Honor, taking your prior admonition to heart, Your Honor, I

18  want to be clear that I'm not accusing Mr. Redmond of

19  harassment, but that's the language that the case law uses for

20  the effect that these kinds of discovery requests can have on

21  plaintiffs who are trying to exercise their lawful right.

22          I fear that the effect of these questions at a

23  lengthy in-person deposition will not be good, Your Honor, and

24  that we would seek protection from that.  I provided the case

25  law authority that we believe supports the request to Mr.

1    Redmond already, and I'm happy to provide that authority to the

2    Court, and perhaps, you know, if Mr. Redmond could provide any

3    counter authority by the end of this week, we could try to get

4    a quick decision on this issue.  That would be our first

5    preference.

6              THE COURT:  That might be your preference, but I'm

7    not going to give you a decision on it quickly.  I have several

8    other things including a decision sitting on my desk about your

9    complaint that I'm working on.  When do you want to brief it?

10   I would think the proper procedure is that at the deposition,

11   you ask the question, and then the plaintiff's lawyer can

12   instruct the witness not to answer and then it will be on the

13   record what the question is.

14             Meanwhile, let's brief it.  I want the precise

15   question.  So when do you want to file your papers on the

16   immigration issue, gentlemen?  When do you want that done?

17             MR. REDMOND:  If the Court wants to proceed in that

18   manner, which makes sense, I would recommend that we have the

19   depositions next week.  We get the transcripts, plaintiff files

20   his motion on the 25th, we file our opposition on the 30th, he

21   files -- actually we have another deposition on the 2nd, so,

22   Your Honor, may be best if we just do all the depositions and

23   then brief it.

24             So we could brief it on October 16, he files his

25   motion for protective order on October 16th, we would file an

1  opposition on October 23rd, he files his reply October 28th.

2  If the Court grants our -- rules in favor of the defendant and

3  identifies the questions that can be answered, we can call

4  these folks back and ask them the questions and get the answers

5  that way.  That's my recommendation, Your Honor.

6          THE COURT:  Any objection?

7          MR. HOFFMAN:  Your Honor, this is Ian Hoffman.  I

8  just need a little bit of clarification of the Court's

9  direction.  Is the Court envisioning that I would -- that

10  counsel defending these depositions would be permitted to

11  direct the witness not to answer?

12          THE COURT:  Yes.  I just told you that.

13          MR. HOFFMAN:  Okay.

14          THE COURT:  This is a situation where I need to see

15  the question that is asked before making a ruling.  I don't

16  want to make a general ruling on immigration information.  I

17  need to know the extent to which the particular question may

18  pertain to the particular defense that is being asked about.

19          I can understand the argument that if these people

20  signed up with Monterrey and all the time it was their intent

21  to go somewhere else, then you need to know what their

22  immigration status was at particular times, and -- but I can't

23  link it precisely, so I need to have it briefed, and I think

24  the best way to do it is conduct the depositions and then

25  it's -- in order for you to preserve the issue you're going to

1    brief, you have to tell them not to answer the question, and

2    that's perfectly all right when you have the imprimatur of The

3    Court to allow you to do that.  Then is the schedule all right

4    with you then that he suggested, Mr. Hoffman?

5            MR. HOFFMAN:  I'd rather it be done jointly on a

6    faster basis, Your Honor.  I would be okay with briefing being

7    done after the first three depositions, so that puts our brief

8    due on September 25.

9            THE COURT:  Wait a minute.  How many depositions are

10   there and when are they being taken?

11           MR. REDMOND:  Your Honor, this is Bob Redmond.  There

12   are seven depositions being taken.  The first three are

13   September 21, 22, 23.  Then there's a deposition on

14   October 2nd.  Then there's a deposition on October 5th, 6th,

15   and 7th, and those are the depositions that are currently

16   scheduled.

17           THE COURT:  And that's a total of three depositions

18   on the 21st through the 23rd of September, three on the 5th,

19   6th, and 7th of October, and one on the 2nd; is that right?

20           MR. REDMOND:  Yes, Your Honor, that's correct.

21           THE COURT:  And then you would file when, have the

22   plaintiff file when?

23           MR. REDMOND:  Your Honor, I would recommend that the

24   plaintiff obtain the transcript, file his motion for protective

25   order on October 16th, we would file our opposition on

1    October 23rd, he file his reply on October 28th.  That would

2    allow us to have time to get the transcripts for all of the

3    depositions that are at issue and then identify for the Court

4    the questions that are subject to the Court's ruling.

5           THE COURT:  All right.  I think that schedule makes

6    sense.  Why is it not best to get all the depositions taken and

7    get the questions on the record and do it that way, Mr.

8    Hoffman?

9           MR. HOFFMAN:  Two reasons, Your Honor.  Number one, I

10   think that the first three depositions will give us ample

11   guidance on how the remaining depositions are going to go.  I

12   don't see a particular need to go all the way through all seven

13   before knowing the kinds of questions that Mr. Redmond is going

14   to ask.  I think the first three will be sufficient to give the

15   parties and the Court guidance.

16          The second concern I have, Your Honor, is that

17   because of all the logistical difficulties with bringing these

18   plaintiffs to the district for their deposition, I'm not sure

19   what Mr. Redmond's position is going to be, if he's going to

20   recall all of them to travel back to Richmond to sit for a

21   follow-up deposition depending on the Court's ruling, so I'm

22   trying to minimize the risk that we have to have 14 depositions

23   instead of seven.

24          MR. REDMOND:  Your Honor, if I may speak briefly to

25   that.  I have already started preparing for these depositions,

1    and the questions are not the same.  These are individuals with

2    different fact patterns.  They are at different experiences in

3    Monterrey.  I have different evidence that I'd like to ask them

4    about.  So I don't think it's accurate to say that everything

5    covered in the first three depositions is going to apply to the

6    remaining four depositions.  I think it just makes more sense

7    to do it the way we've suggested.

8            THE COURT:  All right, thank you, gentlemen.  I would

9    prefer to have them, all the depositions done and the questions

10   down, and then it will narrow what you all are going to argue

11   about.  It will also permit you to put different questions into

12   categories, and it will make more sense in the long run.  So if

13   you finish the depositions on the 7th, you'll be getting the

14   transcripts all along.  Any reason you can't file on the 16th

15   of October, Mr. Hoffman?  You want it later, or what?

16           MR. HOFFMAN:  I think the 16th of October is fine,

17   Your Honor.  I understand the Court's ruling.

18           THE COURT:  16th of October you file your brief on

19   the questioning about the immigration questions raised in the

20   depositions.  Mr. Redmond, the defendant will file a response

21   on October 23rd.  Then the plaintiff, you want to file your

22   response when -- your reply on the 28th, is that what one of

23   you said?  Is that the schedule you want, gentlemen?

24           MR. HOFFMAN:  Yes, that's what Mr. Redmond proposed,

25   and I think that's fine on the 28th.

```
 1              THE COURT:  Okay.  Is there anything else we need to
 2    go over now?
 3              MR. REDMOND:  Your Honor, this is Bob Redmond, Your
 4    Honor.
 5              THE COURT:  Excuse me.  I think the motion for
 6    protective order, ECF number 39, and the motion to strike, ECF
 7    number 40, are moot given what we've just decided.  Do you all
 8    agree with that?
 9              MR. REDMOND:  Your Honor, this is Bob Redmond.  We
10    agree the motion to strike is moot.  The motion for protective
11    order addressed the privilege log and --
12              THE COURT:  That's right.  You are right.  I'm sorry.
13    The privilege log.
14              MR. REDMOND:  We agree that the motion to strike is
15    moot, and there's no reason for the Court to rule on that.
16              THE COURT:  All right.  So there is a motion for
17    protective order on a privilege log and a supporting brief, but
18    you haven't replied to it.
19              MR. REDMOND:  Your Honor, that's correct.  We just
20    got that last night at 11:38.
21              THE COURT:  What have you been doing?
22              MR. REDMOND:  On the privilege log, Your Honor?
23              THE COURT:  In the meantime since 11:38, come on.
24              MR. REDMOND:  Your Honor, getting ready for this
25    call.
```

```
 1              THE COURT:  All right.  So when are you going to
 2    file -- as a general proposition, I don't really understand
 3    what the basis for the protective order is, but go on and file
 4    your response brief.  When are you going to file it?
 5              MR. REDMOND:  Your Honor, we would like to file that
 6    next Friday if possible.
 7              THE COURT:  What date is that?
 8              MR. REDMOND:  That is September 25th.
 9              THE COURT:  All right.  And then you want to file
10    your reply when, Mr. Hoffman?
11              MR. HOFFMAN:  Your Honor, I believe we could file on
12    Thursday, October 1st.
13              THE COURT:  Okay.  All right.  That is the response
14    to -- excuse me a minute.  The response to number 39 and 44 --
15    44 is a memo in support of 39, so the response will be
16    September 25, and the reply will be October 1; is that right?
17              MR. HOFFMAN:  Yes, Your Honor.
18              THE COURT:  Have you all rethought your positions
19    about trying to settle the case now that you've been doing all
20    the arm-wrestling you've been doing?
21              MR. REDMOND:  Your Honor, this is Bob Redmond.  We
22    are ready, willing, and able.  We know that Magistrate Judge
23    Stillman retired and is engaging each side by telephone in the
24    immediate past couple of days.  We are happy, happy, happy,
25    happy to continue discussions.
```

```
 1              MR. HOFFMAN:  Your Honor, this is Ian Hoffman for the
 2   plaintiffs.  Of course we're always open and interested in
 3   getting a fair resolution to the case.  We just haven't been
 4   able to to date.
 5              THE COURT:  This is a jury trial, is it?
 6              MR. REDMOND:  Yes, Your Honor, it is.
 7              MR. HOFFMAN:  Yes, Your Honor.
 8              THE COURT:  What do you see as the scope, the amount
 9   of the recovery that is obtainable in this case, Mr. Hoffman,
10   in terms of dollar amount?  Assume you win.  What's the
11   damages?
12              MR. HOFFMAN:  Your Honor, it's over two and a half
13   million dollars, I believe.  I'm pulling up my initial
14   disclosures because I want to be precise with it, but that's
15   the ballpark that we're in, Your Honor, because the Fair Labor
16   Standards Act overtime claims alone I believe -- I'm having
17   trouble putting my fingers on the initial disclosures, but I
18   believe it's over 6- or $700,000, and those are doubles as a
19   matter of the statute plus recovery of attorneys' fees on top
20   of that.  That's totally setting aside the TVPA damages which
21   are also very high.
22              MR. REDMOND:  Your Honor, this is Bob Redmond.  I
23   have initial disclosures at the ready.  They're asking for
24   over, well over $4 million.
25              THE COURT:  Well, that's very ambitious.  I hope you
```

1    are able to settle it.  Meanwhile, we've got a schedule, and

2    we'll go forward.  So thank you all very much.

3              MR. HOFFMAN:  Thank you, Your Honor.  There is one --

4              MR. REDMOND:  There is one discovery motion

5    outstanding that hasn't been raised, but 38 was filed on

6    Friday, September 11th.  37 and 38.

7              THE COURT:  What are they?  I don't know that I've

8    read them.

9              MR. REDMOND:  It is defendant's motions for sanctions

10   under Federal Rule 37(b)(3) because Mr. Esparza did not attend

11   his deposition.

12             THE COURT:  Esparza.

13             MR. REDMOND:  I think it's one of the several

14   Esparzas.  This is Jaime Marquez Esparza.

15             THE COURT:  Has that been briefed?

16             MR. REDMOND:  It's been filed by us.  They have not

17   opposed it, Your Honor.  I don't think under the standard

18   schedule it's due yet.  We filed it Friday, September 11th.

19             THE COURT:  Well, then, they have time to file a

20   response.  Are you planning to respond, or are you going to

21   agree to sanctions?

22             MR. HOFFMAN:  Of course we plan to respond with our

23   position, Your Honor, and I'm happy to answer any questions

24   about that.  It certainly overlaps with the first issue we

25   spoke of today, and as Mr. Redmond said, he didn't show up for

1    his deposition.  This is one of those gentlemen who is in

2    Mexico, and there's been, you know, close communications with

3    Mr. Redmond all along he's in Mexico.

4              THE COURT:  Just brief it in the ordinary course, but

5    I'm going to tell you something.  If any of these people turn

6    out to be in the United States that he's talking about -- Mr.

7    Redmond, remember you need to send the names to Ms. Peterson.

8              MR. REDMOND:  Yes, sir.

9              THE COURT:  For all of the ten you were talking about

10   and what category they're in so we'll know what you're talking

11   about.  You went through that with lightning speed.  If it

12   turns out that they're in the United States, then you get them

13   here to get them deposed.  You work it out.  Because there will

14   be a cost associated if I find they are and they haven't been

15   brought to Richmond to be deposed.  All right.  I'll hear your

16   brief in the ordinary course on the others.

17             MR. REDMOND:  Thank you, Your Honor.

18             MR. HOFFMAN:  Thank you.

19             THE COURT:  Thank you very much.  Bye-bye.

20

21                       (End of proceedings.)

22

23

24

25

```
 1

 2

 3              I certify that the foregoing is a correct transcript

 4    from the record of proceedings in the above-entitled matter.

 5

 6

 7    _____/s/_____              _____
      P. E. Peterson, RPR                Date
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```