## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

ARTURO ESPARZA MACIAS,
VICTOR DE LOS REYES RABANALES,
CESAR IVAN ESPARZA AGUILAR,
JAIME MARQUEZ ESPARZA,
MANUEL MARQUEZ ESPARZA,
JACOBO ESPARZA AGUILAR,
JOSE LUIS DIAZ GOMEZ,
RICARDO GUADALUPE GOMEZ TORRES,
RODRIGO CANALES SALAZAR,
BLADIMIR GUADALUPE MACIAS ESPARZA,
CATARINO ODÓN HERNÁNDEZ,
FRANCISCO ODÓN HERNÁNDEZ,
REUEL EUGENIO VILLAGRANA CANALES,
ALONSO CISNEROS AYALA,
LEOPOLDO GONZALES,
LUIS CARLOS ROMERO, and
URIEL CISNEROS,

**JURY TRIAL DEMANDED**

Plaintiffs,

v.

Case No. 3:19cv830

MONTERREY CONCRETE, LLC, and
JOSE DE LA ROSA,

Defendants

### FIRST AMENDED COMPLAINT

#### Preliminary Statement

1.      This lawsuit seeks to recover damages incurred by the Plaintiffs as a result of

Defendants Monterrey Concrete, LLC, and Jose De La Rosa's violations of the Trafficking

Victims Protection Act ("TVPA"), 18 U.S.C. § 1589 et seq., the Fair Labor Standards Act

("FLSA"), 29 U.S.C. § 201 et seq., and the Virginia common law of contracts. In the alternative

to their breach-of-contract claim, Plaintiffs seek restitution from Defendants under a Virginia common-law claim for unjust enrichment and quantum meruit.

2.     At various times between 2014 and 2018, Defendants offered Plaintiffs, all low-income Mexican laborers, employment and induced them to come to the United States to work for Defendants under temporary "H-2B" work visas (except Plaintiff Reuel Eugenio Villagrana Canales), with the promise that Defendants would pay Plaintiffs between $14.50 and $18 per hour plus overtime.  Defendants also promised to provide Plaintiffs with decent housing and meals.

3.     Contrary to Defendants' promises, Plaintiffs were exploited and abused, trafficked for their labor, grossly underpaid, and subjected to inhumane working and living conditions.

4.     Upon Plaintiffs' arrival, Defendants confiscated their passports, required them to work at least 70 to 80 hours per week, and paid them only a fraction of what Defendants had promised to pay. Defendants also failed to pay the wages that federal law requires, including overtime.

5.     In order to get visas for Plaintiffs, Defendants told the U.S. Department of Labor that Plaintiffs (except Plaintiff Reuel Eugenio Villagrana Canales) would be working for Defendants as concrete masons and cement finishers. But in reality, Monterrey Concrete's owner and manager, Jose De La Rosa, sometimes "rented" Plaintiffs to other employers for a fee, and sometimes used them to repair and maintain the homes and property of Mr. De La Rosa and his associates.

6.     Moreover, Defendants housed Plaintiffs in deplorable conditions. At times Defendants housed certain of the Plaintiffs in an unheated garage shared by 15 to 25 people. At other times Defendants put them in a small house with a single toilet shared by approximately 20 people.

7.     When Plaintiffs complained about their work and living conditions, Monterrey Concrete's owner and manager Jose De La Rosa used a variety of tactics to cow the workers into obedience. Sometimes he threatened to send certain of the Plaintiffs back to Mexico—in some instances even driving certain employees all the way back to the U.S.–Mexico border to make an example of them and show the other workers that he was serious. Other times he threatened certain of the Plaintiffs by saying that he had connections to dangerous people in Mexico, which Plaintiffs understood to be a threat of harm to Plaintiffs' families in Mexico. And sometimes he would say that the worker was free to leave and work somewhere else without retaliation by Mr. De La Rosa—if the worker would first pay Mr. De La Rosa $10,000 or a similar sum to "buy his freedom."

8.     Defendants' conduct violated the TVPA and FLSA and constituted a breach of contract and unjust enrichment under Virginia law.

### Jurisdiction and Venue

9.     The Court has personal jurisdiction over Defendant Monterrey Concrete, LLC ("Monterrey Concrete") because (1) it is domiciled in Virginia; (2) it transacts business in Virginia; and (3) as Plaintiffs' joint employer, its acts and omissions in Virginia gave rise to Plaintiffs' claims.

10.     The Court has personal jurisdiction over Defendant Jose De La Rosa because (1) he is domiciled in Virginia; (2) he transacts business in Virginia; and (3) as Plaintiffs' joint employer, his acts and omissions in Virginia gave rise to Plaintiffs' claims.

11.     The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) because the action arises under the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1589 et seq., and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201

et seq.  The Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this District, and because both Defendants reside and have their primary place of business in this District.

### The Parties

13.     The Plaintiffs are all citizens of Mexico. Defendants arranged for all of them to come to the United States under "H-2B" temporary work visas (except Plaintiff Reuel Eugenio Villagrana Canales, who was initially recruited on an "H-2A" temporary work visa, as described more fully in the Complaint below). The Plaintiffs then performed work for Defendants under those visas in and around Henrico, Virginia between 2014 and 2018.

14.     Defendant Monterrey Concrete is a Virginia limited-liability company with its principal place of business in Henrico, Virginia.

15.     Upon information and belief, Defendant Jose De La Rosa is a citizen of Virginia. Upon information and belief, he is, and at all relevant times was, the sole member, owner, and/or managing partner of Monterrey Concrete.  Mr. De La Rosa had and exercised the power to control Plaintiffs' work schedules and locations, to provide the instruments and materials that Plaintiffs needed to perform the work, and to hire and fire Plaintiffs.  Mr. De La Rosa also oversaw payroll and, upon information and belief, made decisions about how much to pay Plaintiffs.

### FACTS

16.     Monterrey Concrete operates as a concrete contracting business, performing concrete work on building projects in and around the Henrico, Virginia area.

17.     Monterrey Concrete was organized as a limited liability company in July 2008.  Its existence as a duly licensed LLC was automatically terminated in October 2012 and was reinstated in March 2014.

18.     Upon information and belief, the gross annual business volume of Monterrey Concrete exceeded $500,000 at all times relevant to this action.

19.     Jose De La Rosa is a member of Monterrey Concrete. Upon information and belief, he is the sole member of Monterrey Concrete.  Upon information and belief, Mr. De La Rosa oversees the day-to-day operations of Monterrey Concrete.

20.     Mr. De La Rosa supervised the work that Plaintiffs performed for him.

21.     Mr. De La Rosa made the essential decisions for Monterrey Concrete, had and exercised the power to control Plaintiffs' work schedules and locations and instructed workers on their daily assignments.  In practice, this meant that Plaintiffs worked whenever Mr. De La Rosa commanded them to work.

22.     Mr. De La Rosa had the power to hire, discipline, and fire Plaintiffs.

23.     Mr. De La Rosa also oversaw payroll and, upon information and belief, made decisions about how much to pay Plaintiffs.

**The H-2B Visa Program**

24.     During all years relevant to this Complaint, Monterrey Concrete sought to bring immigrant workers from Mexico to the United States to perform work under the H-2B visa program.

25.     The H-2B visa program is a nonimmigrant visa program that allows companies to bring unskilled workers to the United States to perform non-agricultural jobs on a temporary basis. 8 U.S.C. § 1101(a)(15)(H)(ii)(b). In order to use the program, the employer must convince the

U.S. Department of Labor ("DOL") that (1) there are not enough qualified U.S. workers available to do the jobs, and (2) the use of foreign workers will not negatively affect the wages or working conditions of similarly-employed U.S. workers. 20 C.F.R. § 655.50(b).

26.    By participating in the H-2B program, employers agree to provide numerous worker protections. See 20 C.F.R. § 655.20 and 29 C.F.R. § 503.16. These agreements include, without limitation, that the employer will (1) comply with applicable federal, state, and local employment-related laws, (2) pay the higher of the prevailing wage for the occupation or the minimum wage, (3) provide all tools and supplies free of charge, (4) not hold or confiscate employees' passports or visas, and (5) not retaliate against workers for asserting their H-2B program rights and protections.  Id. at (a), (k), (n), and (z).

27.    Additionally, employers must give H-2B workers a document called a "job order" that contains all other material terms and conditions of employment and must display a Department of Labor poster at the job site that sets out the rights and protections for H-2B workers. 20 C.F.R. § 655.5 (defining "job order"); 20 C.F.R. § 655.20 and 29 C.F.R. § 503.16 at (l)–(m) (requiring disclosure of job order and notice of worker rights).

*Monterrey Concrete's 2014 – 2018 H-2B Applications*

28.    In or around December 2013, Monterrey Concrete filed an H-2B Application for Temporary Employment Certification with DOL seeking to employ H-2B workers in 2014 (the "2014 H-2B Application"). The 2014 H-2B Application sought DOL's permission to employ up to 12 foreign workers as concrete masons and cement finishers from March 1, 2014 through December 20, 2014. As part of its application, Monterrey Concrete included a job order that contained the material terms and conditions of the jobs. The 2014 H-2B Application and job order represented to DOL that the jobs entailed 40 hours of work per week and a workday of 8:00 AM

to 4:00 PM. The application and job order stated that the regular rate of pay would be $15.72 per hour and that the overtime rate of pay would be $23.58 per hour.

29.     In or around January 2016, Monterrey Concrete filed an H-2B Application for Temporary Employment Certification with DOL seeking to employ H-2B workers in 2016 (the "2016 H-2B Application"). The 2016 H-2B Application sought DOL's permission to employ up to 17 foreign workers as concrete masons and cement finishers from April 1, 2016 through December 31, 2016. As part of its application, Monterrey Concrete included a job order that contained the material terms and conditions of the jobs. The 2016 H-2B Application and job order represented to DOL that the jobs entailed 35 hours of work per week and a workday of 8:00 AM to 4:00 PM with a one-hour unpaid lunch break. The application and job order stated that the regular rate of pay would be $16.49 per hour and that the overtime rate of pay would be $24.74 per hour.

30.     In or around December 2016, Monterrey Concrete filed an H-2B Application for Temporary Employment Certification with DOL seeking to employ H-2B workers in 2017 (the "2017 H-2B Application"). The 2017 H-2B Application sought DOL's permission to employ up to 17 foreign workers as concrete masons and cement finishers from April 1, 2017 through December 20, 2017. As part of its application, Monterrey Concrete included a job order that contained the material terms and conditions of the jobs. The 2017 H-2B Application and job order represented to DOL that the jobs entailed 35 hours of work per week and a workday of 8:00 AM to 4:00 PM with a one-hour unpaid lunch break. The application and job order stated that the regular rate of pay would be $17.24 per hour and that the overtime rate of pay would be $25.86 per hour.

31.     In or around December 2017, Monterrey Concrete filed an H-2B Application for Temporary Employment Certification with DOL seeking to employ H-2B workers in 2018 (the "2018 H-2B Application"). The 2018 H-2B Application sought DOL's permission to employ up to 22 foreign workers as concrete masons and cement finishers from April 1, 2018 through December 20, 2018. As part of its application, Monterrey Concrete included a job order that contained the material terms and conditions of the jobs. The 2018 H-2B Application and job order represented to DOL that the jobs entailed 35 hours of work per week and a workday of 8:00 AM to 4:00 PM with a one-hour unpaid lunch break. The application and job order stated that the regular rate of pay would be $17.66 per hour and that the overtime rate of pay would be $26.49 per hour.

32.     DOL granted the 2014, 2016, 2017, and 2018 H-2B Applications.

33.     Under 20 C.F.R. § 655.20 and 29 C.F.R. § 503.16, by executing the 2014, 2016, 2017, and 2018 H-2B Applications, Defendants agreed to:

> (i)  pay the higher of the prevailing wage for the occupation or the minimum wage;
> (ii)  comply with applicable Federal, State and local employment-related laws and regulations;
> (iii)  not place any H-2B workers employed outside the area of intended employment or in a job classification not listed on the approved application;
> (iv)  keep a record of workers' earnings and provide the workers with the required earnings statements on or before each payday;
> (v)  provide, without charge or deposit, all tools, supplies, and equipment required to perform the duties assigned; and
> (vi)  not retaliate against workers for exercising their H-2B program rights and protections.

**Defendants' Recruitment and Hiring of Plaintiffs**

34.     In advance of each of the relevant seasons, Defendants, either directly or through their agents, recruited Plaintiffs in Mexico to come to work for Defendants in Virginia.

8

35.     In general, recruitment worked as follows: First, Mr. De La Rosa or someone acting on his behalf would contact the Plaintiff, stating that Mr. De La Rosa had good-paying concrete work jobs in Virginia.

36.     All Plaintiffs (except Mr. Villagrana Canales) were told that they would be paid at approximately the regular rates required by that year's H-2B application, plus overtime. He also told some of the Plaintiffs that good housing would be provided.

37.     Plaintiffs elected to accept employment with Monterrey Concrete based on Defendants' promises and representations regarding the nature of the work, the compensation to be paid, and the provision of employer housing.

38.     Defendants then required the Plaintiffs to obtain passports and to travel to the U.S. consulate in the city of Monterrey, Mexico in order to undergo consular processing and get their H-2B visas.

39.     Defendants hired a company called Action Visa Assistance to help manage the process of getting the Plaintiffs their H-2B visas from the U.S. consulate.

40.     During the H-2B visa process at the consulate, Plaintiffs were given copies of their respective H-2B Job Orders. But, the Job Orders were then taken from all or almost all of the Plaintiffs rather than letting them keep the copy for themselves.

**Defendants' Labor and Labor-Trafficking Violations In General**

*Misrepresentation of Job Terms and Conditions*

41.     Upon arriving at Monterrey Concrete's headquarters in Henrico, Virginia, Plaintiffs were gathered for meetings and informed that the working conditions and pay rates would be far different than what Defendants had promised them at the time of recruitment.

42.     Namely, instead of the 8:00 AM to 4:00 PM workdays that Defendants had agreed to provide at the time of recruitment, Plaintiffs were told that they would be working as much as Mr. De La Rosa told them to work. And throughout their employment, Defendants regularly required Plaintiffs to work at least 70 to 80 hours a week, and sometimes even more than that. Defendants also occasionally required some Plaintiffs to work overnight, sometimes up to nearly 24 hours straight or more.

43.     Instead of paying them the hourly and overtime rates to which they were legally entitled, Plaintiffs were told that they would only be paid at a rate equivalent to 40 regular hours per week, even if they worked more hours than that. And except for certain instances, that is how Defendants in fact paid them.

44.     At the time of recruitment in Mexico, Defendants also promised certain Plaintiffs that they would be provided with good housing while in Defendants' employ. But when they arrived in Virginia, they were required to live in grossly overcrowded and substandard housing that Defendants owned or controlled, as detailed further below.

45.     Upon information and belief, Defendants made these false representations to Plaintiffs at the time of recruitment knowingly and with intent to defraud.

*Document Confiscation*

46.     Also at those initial meetings, Mr. De La Rosa retained the passports of Plaintiffs Esparza Macias, Reyes Rabanales, Macias Esparza, Catarino Odon Hernandez, Jacobo Esparza Aguilar, Gonzales (in 2016), Canales Salazar, Manuel Marquez Esparza, Jaime Marquez Esparza, Cesar Esparza Aguilar, Francisco Odon Hernandez, Gomez Torres, Diaz Gomez, and Romero.

47.     Mr. De La Rosa retained the social security cards of Plaintiffs Reyes Rabanales, Macias Esparza, Cesar Esparza Aguilar, Francisco Odon Hernandez, Gomez Torres, and Diaz Gomez.

*Wage and Hour Violations*

48.     During their time at Monterrey Concrete, all Plaintiffs worked on average approximately 70 to 80 hours per week, and sometimes more. But despite working at least 70 to 80 hours a week, Plaintiffs were almost always paid at a flat salary rate equivalent to 40 hours of work at the regular rate set out in that year's H-2B Application. Except in certain instances, Plaintiffs were not paid overtime for any hours worked over 40 in a workweek.

49.     In 2014, Plaintiff Gonzales (his first season) was paid biweekly, generally at $629.20 per week, regardless of how many hours he actually worked. $629.20 is 40 times the regular wage rate of $15.72 per hour that Defendants promised to pay in the 2014 H-2B Application.

50.     In 2015, Plaintiff Villagrana Canales was paid biweekly, generally at $900 biweekly, regardless of hours actually worked, based on a contract rate of $16.49 per hour.

51.     In 2016, Plaintiffs Manuel Marquez Esparza (his first season), Jacobo Esparza Aguilar (his first season), Canales Salazar, Alonso Cisneros Ayala, Gonzales (his second season) and Uriel Cisneros were paid biweekly, generally at $659.60 per week, regardless of hours they actually worked. $659.60 is 40 times the regular wage rate of $16.49 per hour that Defendants promised to pay in the 2016 H-2B Application.

52.     In 2017, Plaintiffs Arturo Esparza Macias, Jaime Marquez Esparza, Manuel Marquez Esparza (his second season), Reyes Rabanales, Cesar Esparza Aguilar, Diaz Gomez, Gomez Torres, Esparza Salazar (his second season) and Francisco Odon Hernandez were paid

biweekly, generally at $689.60 per week, regardless of how many hours they actually worked. $689.60 is 40 times the regular wage rate of $17.24 per hour that Defendants promised to pay in the 2017 H-2B Application.

53.     In 2018, Plaintiffs Bladimir Macias Esparza, Luis Carlos Romero, and Catarino Odon Hernandez were paid biweekly, generally at $706.40 per week, regardless of how many hours they actually worked. $706.40 is 40 times the regular wage rate of $17.66 per hour that Defendants promised to pay in the 2018 H-2B application.

54.     In addition to consistently being made to work 70 to 80 hours a week, Defendants also occasionally required some Plaintiffs to work overnight, sometimes up to nearly 24 hours straight.

55.     Defendants gave Plaintiffs pay statements falsely indicating that Plaintiffs had only worked 40 (and occasionally 42.5) hours per week, even though Plaintiffs had actually worked hours far exceeding that.

*Improper Charges*

56.     Plaintiffs almost always had to pay for their own transportation from their hometown in Mexico to the U.S. consulate in Monterrey, Mexico to undergo consular processing and receive their H-2B visas. Then, during the bus ride from Monterrey to Virginia, the workers had to pay for their own meals.

57.     Defendants did not provide most Plaintiffs with the tools and supplies necessary to perform the work free of charge, in violation of 20 C.F.R. § 655.20(k) and 29 C.F.R. § 503.16(k). Instead, Mr. De La Rosa purchased the tools and supplies, and most Plaintiffs were required to purchase the tools and supplies from Mr. De La Rosa.  A few Plaintiffs purchased the tools and supplies directly from the store with their own money.

58.     Defendants charged most Plaintiffs $50 for food each week, with the exception of Mr. Macias Esparza.  The food, prepared by Mr. De La Rosa's sister, Ana de la Rosa, consisted large amounts of venison meat hunted by a friend of the De La Rosa family and was often an insufficient amount. Defendants made these charges without obtaining these Plaintiffs' written consent.

59.     Defendants charged certain Plaintiffs for rent and utilities without including those charges in the Job Order and without obtaining Plaintiffs' written consent, as detailed further below.

*Threats and Coercion*

60.     When Plaintiffs complained about their working and living conditions, Mr. De La Rosa used a variety of tactics to cow the workers into obedience. Sometimes he threatened to send Plaintiffs back to Mexico—in some instances even driving certain employees all the way back to the U.S.–Mexico border to make an example of them and show the other workers that he was serious. Other times he threatened Plaintiffs by saying that he had connections to dangerous people in Mexico, which Plaintiffs understood to be a threat of harm to Plaintiffs' families in Mexico. And sometimes he would say that the worker was free to leave and work somewhere else without retaliation by Mr. De La Rosa—if the worker would first pay Mr. De La Rosa $10,000 or a similar amount to "buy his freedom."

61.     Mr. De La Rosa also threatened that he could have Plaintiffs' visas suspended, have Plaintiffs sent to jail, or report Plaintiffs to immigration authorities if they did not do as he said.

62.     Mr. De La Rosa told some Plaintiffs that he had connections with dangerous people in Mexico, which those Plaintiffs understood to mean that their families would be in danger if they complained.  Some Plaintiffs had heard that a former employee had indeed been threatened after

the worker reached out to an attorney, or sued, about the abuses taking place at Monterrey Concrete.  One Plaintiff heard that that former employee's family in Mexico had been threatened for the same reason.

63.     By means of threats of retaliation and immigration consequences, Mr. De La Rosa attempted to coerce some Plaintiffs into overstaying their visas and illegally working a second season for Monterrey Concrete under different names.

64.     Mr. De La Rosa fired several Plaintiffs, including Plaintiffs Gonzales, Reyes Rabanales, and Francisco Odon Hernandez, for refusing to overstay their visas.

65.     Mr. De La Rosa required Plaintiffs to live in overcrowded, substandard housing that he owned or controlled.

66.     On multiple occasions, Mr. De La Rosa brought friends or associates into Plaintiff's housing late at night while Plaintiffs were sleeping, so that Mr. De La Rosa could show off his dominance over "his" workers.  On another occasion, Mr. De La Rosa ordered all the workers to wake up, get out of their beds, and stand in a line—which they did.  On several occasions, Mr. De La Rosa would boast to about his ability to coerce and control his employees.  These actions were taken to demonstrate and exert power and control over Plaintiffs.

67.     Some Plaintiffs even became afraid to leave their housing on their day off, for fear that if Mr. De La Rosa saw them, he would force them to work.  This fear arose after an incident in which Mr. De La Rosa encountered a group of workers outside of their housing and spontaneously decided that he would make them work additional hours on another project, even though they had already worked for 11 hours that day for another employer to whom he had "rented" them.

68.     Many Plaintiffs participated in a *tanda* while working at Monterrey Concrete, which is an informal money-pooling group often entered into among trusted friends and family members in Mexico.  In the tanda, each participant contributed a set amount every two weeks— typically $300—and then, after a set period of time, one tanda participant would receive the entire collection of funds as a payout.  However, when Mr. De La Rosa found out about the tanda, he demanded that he and his family members participate.  Upon information and belief, Mr. De La Rosa manipulated the tanda arrangement so that he and his family members would receive payments before some of the workers.  This had the effect of coercing some of the participating Plaintiffs to stay at Monterrey Concrete longer than they would have otherwise, while they waited to receive their tanda payout.  Some Plaintiffs participating in the tanda ended up leaving Monterrey Concrete without having ever received a tanda payout—or the entire tanda amount they were due—despite paying thousands of dollars into the tanda.

69.     As a result of Mr. De La Rosa's threats and actions, Plaintiffs feared retaliation if they escaped, were fired or challenged their mistreatment.

### *Requiring Plaintiffs to Work for Other Employers and Perform Tasks Outside of the Job Order*

70.     Plaintiffs performed some concrete work, including preparing residential and commercial sites, pouring, smoothing, finishing, and breaking. But Defendants also required Plaintiffs to perform work outside of the scope of the H-2B job order.  Sometimes Defendants required Plaintiffs to perform this work directly for Mr. De La Rosa or his family members, and at other times Mr. De La Rosa "rented" Plaintiffs to other companies, entities, or individuals for a fee.

71.     These tasks included, but are not limited to:

(i)     Repairing, improving, and maintaining Mr. De La Rosa's home and property;

(ii)    Repairing, improving, and maintaining the home and property of Mr. De La Rosa's brother, Julio;

(iii)   Performing work at a local church, including but not limited to:

    i.  Shoveling snow;

    ii.  Cooking for events;

   iii.  Working in the garden;

   iv.  Repairing the church; and

    v.  Cleaning;

(iv)   Doing insulation work;

(v)    Doing roofing work for a neighbor of Mr. De La Rosa;

(vi)   Repairing machinery;

(vii)  Performing work for other construction companies, by "rental" agreement;

(viii) Remodeling Mr. De La Rosa's restaurant; and

(ix)   Cleaning horse stables and restocking horse food at the state fair.

*Other Working Conditions*

72.    Plaintiffs were often not given a lunch break while working for Defendants.

73.    Water was not typically provided at job sites.  At times, Defendants would provide empty coolers, and Plaintiffs would be responsible for filling the coolers with bottles of water that Plaintiffs purchased, or with tap water from the job site.

74.    Upon information and belief, Defendants did not display a poster informing Plaintiffs of their rights under governing labor laws.

*Substandard Living Conditions*

75.     Mr. De La Rosa or his agents promised to provide good housing for Plaintiffs. Although housing was indeed provided, it was anything but good.

76.     Defendants housed Plaintiffs in several different living arrangements, depending largely upon the year in which they were working.

77.     In 2014 and much of 2016, Defendants required the workers to live in a garage on Mr. De La Rosa's property.  Some Plaintiffs in 2017 also lived in the garage for a period of time.

78.     Among other problems with living arrangements in the garage, some Plaintiffs were only provided mattresses with no bedframe, some were only provided air mattresses, and some were not provided any mattress at all.  Some Plaintiffs were required to share one mattress with others.

79.     The garage housed approximately 15-25 individuals at a time.

80.     Plaintiffs living in the garage included Mr. Gonzales, Mr. Alonso Cisneros, Mr. Jacobo Esparza Aguilar, Mr. Manuel Marquez Esparza, Mr. Canales Salazar, Mr. Uriel Cisneros, Mr. Esparza Macias, Mr. Francisco Odon Hernandez, Mr. Gomez Torres, Mr. Romero, and Mr. Diaz Gomez.

81.     Eventually in 2017 after various Plaintiffs performed work on a smaller house on Mr. De La Rosa's property, he permitted them to relocate into the house from the garage.  The house, however, was only a moderate improvement.

82.     The house only had one bathroom and there was no water pressure.  Many workers showered outside with a hose.

83.     Approximately 20 workers at a time, depending on the season, lived in the house.

84.     Some Plaintiffs were charged $100 a month each for rent to live in the house. Defendants did not disclose this charge at the time of their recruitment, and Plaintiffs did not authorize this charge in writing.

85.     Some Plaintiffs were also charged for electricity. The workers did not authorize this charge in writing.

86.     Plaintiffs residing in the house included Mr. Esparza Macias, Mr. Reyes Rabanales, Mr. Macias Esparza, Mr. Catarino Odon Hernandez, Mr. Jacobo Esparza Aguilar, Mr. Gonzales, Mr. Manuel Marquez Esparza, Mr. Jaime Marquez Esparza, Mr. Cesar Esparza Aguilar, Mr. Francisco Odon Hernandez, Mr. Gomez Torres, and Mr. Diaz Gomez.

87.     Finally, some plaintiffs lived in a trailer, including Mr. Cesar Esparza Aguilar, who was charged $100 per month, and Mr. Villagrana Canales, who was not charged.

**Facts Regarding Individual Plaintiffs**

*Leopoldo Gonzales*

88.     Mr. Leopoldo Gonzales was recruited in 2014 and in 2016 by Mr. De La Rosa or someone acting on his behalf.

89.     In 2014, Mr. Gonzales was promised $16.00 per hour plus overtime and good housing.

90.     In 2016, Mr. Gonzales was promised the contract rate for that year, plus overtime and good housing.

91.     Based on those promises, Mr. Gonzales obtained an H-2B visa each time, traveled from Mexico to Virginia, and began to work for Defendants. A contract was thus created.

92.     Mr. Gonzales worked for Defendants in Henrico, Virginia under an H-2B visa for approximately 10 months in 2014 and 8 months in 2016.

93.     In 2014, Mr. Gonzales paid for his trip from his hometown to Monterrey and for his food and hotels during the journey.

94.     In 2014, Mr. Gonzales witnessed a confrontation between Mr. De La Rosa and another worker wherein Mr. De La Rosa called the worker "worthless" and had his father drive the employee back to Mexico.  Mr. De La Rosa's forced deportation showed Mr. Gonzales realize that Mr. De La Rosa's threats were real.

95.     In 2014, Mr. Gonzales lived in a garage with approximately 16 people the entire time he was employed by Defendants, sleeping in a mattress on the floor and sharing one bathroom.

96.     Mr. Gonzales was fired in November 2014 when he refused to overstay the visa.

97.     Mr. Gonzales was required to buy tools in 2014 for the job and was not permitted to take them with him when he left; when he returned in 2016, he was required to buy new tools.

98.     Mr. Gonzales only returned in 2016 on Mr. De La Rosa's false promises that conditions and treatment had improved. When Mr. Gonzales arrived in Virginia, he quickly realized that the working conditions and treatment were the same.

99.     In 2016, Mr. Gonzales paid for his trip from Zacatecas to Monterrey, Mexico, and then traveled to Virginia.

100.     In 2016, shortly after arriving in Virginia, Mr. De La Rosa held a meeting and demanded that Mr. Gonzales and other workers hand over their passports.

101.     In 2016, Mr. De La Rosa held a meeting and told Mr. Gonzales and other employees that they could leave and work wherever they wanted if they reimbursed him the cost of their visas, which he stated was $8,000-$10,000.

102.     In 2016, Mr. Gonzales lived in the garage for several weeks and then lived in a storage building constructed by the workers.  While living in the storage building Mr. Gonzales

slept on plywood bed he constructed for himself and then an inflatable bed he purchased for himself.

103.    In 2016, while living on Mr. De La Rosa's property, Mr. De La Rosa prohibited Mr. Gonzales from having visitors.  In addition, Mr. De La Rosa became angry when Mr. Gonzales and the other workers were planning to socialize with family or friends offsite.

104.    Mr. Gonzalez was fired again in 2016.  Mr. De La Rosa only returned Mr. Gonzales' passport to him when he agreed to sign a paper saying that Mr. De La Rosa and Monterrey Concrete had complied with all legal obligations.

105.    Julio De La Rosa, an employee of Defendants, told Mr. Gonzales that a worker tried to sue Mr. De La Rosa and in response Mr. De La Rosa told the worker that he (Mr. De La Rosa) would call his contacts in Mexico to harm the worker.

106.    Mr. Gonzales graduated from high school in Mexico and does not speak English. Mr. Gonzales felt coerced to keep working for Defendants due to Defendants' conduct described above.

107.    Mr. De La Rosa and Monterrey Concrete's treatment of Mr. Gonzales, their failure to pay wages to Mr. Gonzales that they were legally and contractually obligated to pay, and their failure to abide by the H-2B regulations caused Mr. Gonzales monetary and emotional injury.

*Reuel Eugenio Villagrana Canales*

108.    Mr. Reuel Eugenio Villagrana Canales was recruited in 2015 in Mexico by Defendant De La Rosa or someone acting on his behalf.

109.    Per Mr. De La Rosa's instructions, Mr. Villagrana Canales came to the United States on an H-2A visa (meant for agricultural work) rather than on an H-2B visa (meant for non-agricultural work). Upon information and belief, Mr. De La Rosa arranged for the H-2A visa

through a Tennessee company organization called Perez Labor Contractors. The H-2A visa application stated that Mr. Villagrana Canales would be working for a tobacco grower in Tennessee.

110.    After receiving his H-2A visa, Mr. Villagrana Canales paid for his trip from Mexico to Tennessee. For the first two days upon arrival, Mr. Villagrana Canales was required to work in a tobacco field, pursuant to the H-2A visa.

111.    He was not paid at all for the work he performed in the tobacco field.

112.    After those two days, Mr. De La Rosa picked Mr. Villagrana Canales up from Tennessee, and personally drove him back to Richmond.

113.    Mr. Villagrana Canales worked for Defendants in Henrico, Virginia, under an H-2A visa, for approximately 12 months in 2015.

114.    Mr. De La Rosa told Mr. Villagrana Canales that he wanted him to stay working for Mr. De La Rosa for at least five years because Mr. De La Rosa had paid a lot of money to get Mr. Villagrana Canales his visa.

115.    Mr. De La Rosa also told Mr. Villagrana Canales that if he wanted to leave and work somewhere else, he would have to pay Mr. De La Rosa $10,000.  Mr. De La Rosa stated that if Mr. Villagrana Canales left without paying the $10,000, Mr. De La Rosa would call the immigration authorities and ensure that Mr. Villagrana Canales could not work in the U.S. ever again. In response to Mr. De La Rosa's threats, Mr. Villagrana Canales felt coerced to stay and continue working.

116.    Mr. De La Rosa required that Mr. Villagrana Canales be paid under a false name.

117.    Mr. De La Rosa often gathered Mr. Villagrana Canales and other workers together for meetings.  At these meetings, Mr. De La Rosa often threatened to fire the workers and turn

21

them over to the immigration authorities.  Mr. De La Rosa also threatened Mr. Villagrana Canales and other workers in Mr. Villagrana Canales' presence by saying that he knew dangerous people in Mexico and so they shouldn't cross him.

118.    While living under the constant fear of Mr. De La Rosa's threats and coercion, Mr. Villagrana Canales was required to live in a small trailer with five (5) other men without a bathroom.  The closest bathroom to Mr. Villagrana Canales trailer was in the house next door which was shared by approximately 25 men.  On many occasions, Mr. Villagrana Canales went to a nearby convenience store to use the bathroom or went outside in the yard.  In order to maintain basic hygiene, Mr. Villagrana Canales and other workers nailed plywood to some trees to form a privacy barrier so they could wash themselves with a tank of water.

119.    One night, Mr. Villagrana Canales watched as Mr. De La Rosa came into the trailer and kicked another worker.

120.    Mr. Villagrana Canales was required to ask Mr. De La Rosa permission to leave the residence.

121.    Ultimately Mr. Villagrana Canales escaped Monterrey Concrete.

122.    Mr. Villagrana Canales graduated from high school in Mexico and does not speak English.

123.    Mr. Villagrana Canales felt coerced to keep working for Defendants due to Defendants' conduct described above.

124.    Mr. De La Rosa and Monterrey Concrete's treatment of Mr. Villagrana Canales, their failure to pay wages to Mr. Villagrana Canales that they were legally and contractually obligated to pay, and their failure to abide by the H-2A regulations caused Mr. Villagrana Canales monetary and emotional injury.

*Manuel Marquez Esparza*

125.    Mr. Manuel Marquez Esparza was recruited in Mexico in 2016 by Defendant De La Rosa or someone acting on his behalf.

126.    In 2016, Mr. De La Rosa or his agents promised Mr. Manuel Marquez Esparza $16.50 per hour plus overtime and good housing.

127.    In 2017, Mr. De La Rosa or his agents promised Mr. Manuel Marquez Esparza $17.50 per hour plus overtime and good housing.

128.    Based on those promises, Mr. Manuel Marquez Esparza obtained an H-2B visa, traveled from Mexico to Virginia, and began to work for Defendants. A contract was thus created.

129.    Mr. Manuel Marquez Esparza worked for Defendants in and around Henrico, Virginia, under an H-2B visa for approximately 14 months in 2016 and 2017.

130.    Mr. Manuel Marquez Esparza paid for his trip from his hometown to Monterrey and for his food and hotels during the journey.

131.    Soon after Mr. Manuel Marquez Esparza arrived in Virginia, Mr. De La Rosa gathered the employees for a meeting. At this meeting, Mr. De La Rosa took Mr. Manuel Marquez Esparza's and the other workers' passports and notified the workers that Mr. De La Rosa would not pay the workers overtime.  Instead, Mr. De La Rosa stated that he would pay Mr. Manuel Marquez Esparza and the other workers a set amount every two (2) weeks.  Mr. De La Rosa then stated that he would take anyone who didn't want to work under these conditions back to Mexico. Mr. De La Rosa also stated that the workers could not work for anyone else in the U.S. unless they each paid him $10,000.  Mr. De La Rosa then threatened to report Mr. Manuel Marquez Esparza and the other workers to the immigration authorities if they left without paying him $10,000.  Mr. De La Rosa gave this speech in Mr. Manuel Marquez Esparza's presence many times.

132.     Mr. Manuel Marquez Esparza did not have the $10,000 to pay Mr. De La Rosa for his freedom and felt like a prisoner.

133.     While working for Defendants under a coercive environment, Mr. Manuel Marquez Esparza lived most of the time in a garage.  On several occasions, Mr. De La Rosa would boast to his friends about how he kept his employees and would bring friends into the garage to wake up Mr. Manuel Marquez Esparza and the other workers.  On one occasion, Mr. De La Rosa brought in a friend and yelled, "Here I have my dogs. Look how I have them!"

134.     While living at Mr. De La Rosa's residence under Mr. De La Rosa's coercive control, Mr. Manuel Marquez Esparza did not have ready access to a toilet or shower and often had to go to the bathroom in the yard and give himself bucket showers in the woods.

135.     Mr. De La Rosa required that Mr. Manuel Marquez Esparza seek permission to leave the residence.

136.     Because Mr. Manuel Marquez Esparza did not have access to his immigration papers, he did not feel safe leaving Mr. De La Rosa's home because he could not prove he was in the country legally.

137.     Upon information and belief, Defendants fired Mr. Manuel Marquez Esparza due to a rumor that he was talking to others about insufficient pay and poor working and living conditions.

138.     Mr. Manuel Marquez Esparza finished primary school in Mexico and does not speak English.

139.     Mr. Manuel Marquez Esparza felt coerced to keep working for Defendants due to Defendants' conduct described above.

140.     Mr. De La Rosa and Monterrey Concrete's treatment of Mr. Manuel Marquez Esparza, their failure to pay wages to Mr. Manuel Marquez Esparza that they were legally and contractually obligated to pay, and their failure to abide by the H-2B regulations caused Mr. Manuel Marquez Esparza monetary and emotional injury.

*Jacobo Esparza Aguilar*

141.     Plaintiff Jacobo Esparza Aguilar was recruited in Mexico in 2016 by Mr. De La Rosa or someone acting on his behalf.

142.     Mr. Jacobo Esparza Aguilar graduated from high school in Mexico and does not speak English.

143.     Mr. De La Rosa or his agents promised Mr. Jacobo Esparza Aguilar $18.00 per hour plus overtime.

144.     Based on those promises, Mr. Jacobo Esparza Aguilar obtained an H-2B visa, traveled from Mexico to Virginia, and began to work for Defendants. A contract was thus created.

145.     Mr. Jacobo Esparza Aguilar worked for Defendants in Henrico, Virginia, under an H-2B visa for approximately 20 months from April 2016 to March 2017 and April 2017 to December 2017.

146.     Mr. Jacobo Esparza Aguilar paid for his trip from his hometown to Monterrey and for his food and hotels during the journey.

147.     Before starting work with Monterrey Concrete, Mr. Jacobo Esparza Aguilar had heard that another worker had filed a lawsuit against Monterrey Concrete.  After Mr. Jacobo Esparza Aguilar started working at Monterrey Concrete, he learned that Mr. De La Rosa had retaliated against that worker by threatening to send people to harm his family in Mexico.

148.    After arriving in Virginia, Mr. De La Rosa held a meeting with Mr. Jacobo Esparza
Aguilar and other coworkers wherein Mr. De La Rosa stated that he had his own rules and would
not be complying with the documents received from the consulate. Instead, Mr. De La Rosa stated
that he would pay the workers $1,100 every two weeks regardless of the number of hours worked
instead of the promised $18.00 an hour. Mr. De La Rosa stated that if anyone left, he would report
them to immigration and make sure they never came back into the United States.

149.    Mr. Jacobo Esparza Aguilar heard that Mr. De La Rosa told other workers that they
could pay him $10,000 to leave and go work anywhere in the U.S.

150.    After Mr. Jacobo Esparza Aguilar's first day of work, Mr. De La Rosa gathered all
of the workers together and yelled at Mr. Jacobo Esparza Aguilar for the allegedly bad job he had
done that day.  This caused ongoing fear and tension in Mr. Jacobo Esparza Aguilar.

151.    The next day, Mr. Jacobo Esparza Aguilar worked so hard—out of a fear of Mr. De
La Rosa—that he became dehydrated, developed cysts on his arms, and fainted at a job site.  He
was taken to the hospital and instructed by Defendant De La Rosa's sister to tell the hospital the
fainting incident occurred at home.

152.    Mr. Jacobo Esparza Aguilar heard that Mr. De La Rosa physically assaulted Mr.
Jacobo Esparza Aguilar's brother, Cesar Ivan Esparza Aguilar.

153.    Mr. De La Rosa took Mr. Jacobo Esparza Aguilar's passport and held it between
April and October 2017.

154.    Mr. Jacobo Esparza Aguilar left Monterrey Concrete in December 2017.  He left at
night with only the clothes on his back, and a few papers in his pocket.

155.    After Mr.Jacobo Esparza Aguilar left, Mr. De La Rosa falsely accused him of
stealing tools from Monterrey Concrete and reported Mr. Jacobo Esparza Aguilar to the police.

Mr. Jacobo Esparza Aguilar did not steal any tools.  The allegedly stolen tools later reappeared at Monterrey Concrete, leading some workers to believe that Mr. De La Rosa may have hidden the tools himself.

156.    When Mr. Jacobo Esparza Aguilar's first visa term with Monterrey Concrete expired at the end of 2016, Defendant De La Rosa asked him to illegally overstay his visa and continue working for Monterrey Concrete.  Mr. De La Rosa told Mr. Jacobo Esparza Aguilar to make up a fake name so that Defendants could continue to pay Mr. Jacobo Esparza Aguilar.

157.    Mr. Jacobo Esparza Aguilar felt coerced to tolerate Defendants' mistreatment and to provide labor without full compensation due to Defendants' conduct described above.

158.    Mr. De La Rosa and Monterrey Concrete's treatment of Mr. Jacobo Esparaza Aguilar, their failure to pay wages to Mr. Jacobo Esparza Aguilar that they were legally and contractually obligated to pay, and their failure to abide by the H-2B regulations caused Mr. Gonzales monetary and emotional injury.

*Rodrigo Canales Salazar*

159.    Mr. Rodrigo Canales Salazar worked for Monterrey Concrete for approximately 7 months in 2016 on an H-2B visa.

160.    Mr. Canales Salazar was recruited in Mexico in 2016 by Defendant De La Rosa or someone acting on his behalf.

161.    Mr. De La Rosa or his agents promised to pay Mr. Canales Salazar $16.50 per hour to perform concrete work.

162.    Based on those promises, Mr. Canales Salazar obtained an H-2B visa, traveled from Mexico to Virginia, and began to work for Defendants. A contract was thus created.

163.   Mr. Canales Salazar paid for the entirety of his trip to and from his hometown to Richmond.

164.   Mr. Canales Salazar was required to pay for his tools for the job.

165.   Mr. De La Rosa took Mr. Canales Salazar's passport and social security card. Several months later, Mr. Canales Salazar's passport was returned to him after another worker complained that it was illegal.  He was made to sign a notarized document that he had gotten it back.

166.   Shortly after Mr. Canales Salazar arrived at Monterrey Concrete, Mr. De La Rosa threatened to report Mr. Canales Salazar to immigration if he left Monterrey Concrete but said he would not report Mr. Canales Salazar if Mr. Canales Salazar paid him $10,000 in exchange for the freedom to leave.

167.   Mr. Canales Salazar overheard Mr. De La Rosa threatening to deport other Monterrey Concrete workers on many occasions.  This made Mr. Canales Salazar feel pressured and afraid of what Mr. De La Rosa might do to him.

168.   Mr. Canales Salazar continued to work for Monterrey Concrete because he was afraid of Mr. De La Rosa and that Mr. De La Rosa may take him to Mexico or turn him over to immigration.

169.   Mr. De La Rosa asked Mr. Canales Salazar to illegally overstay his visa.

170.   Mr. Canales Salazar ultimately escaped from Monterrey Concrete.  Another worker described Mr. De La Rosa's mistreatment of the Monterrey Concrete workers to his father, who lived in the United States.  The father was alarmed and came to Virginia to get his son.  Mr. Canales Salazar left with them.

171.    Mr. Canales Salazar graduated from middle school in Mexico and does not speak English.

172.    Mr. Canales Salazar felt coerced to keep working for Defendants due to Defendants' conduct described above.

173.    Mr. De La Rosa and Monterrey Concrete's treatment of Mr. Canales Salazar, their failure to pay wages to Mr. Canales Salazar that they were legally and contractually obligated to pay, and their failure to abide by the H-2B regulations caused Mr. Canales Salazar monetary and emotional injury.

*Uriel Cisneros*

174.    Mr. Uriel Cisneros worked for Monterrey Concrete from approximately March, 2016 through November, 2016 on an H-2B visa.

175.    Mr. Uriel Cisneros graduated from middle school in Mexico and does not speak English.

176.    Mr. Uriel Cisneros was recruited in Mexico in 2016.

177.    Mr. De La Rosa or his agents promised Mr. Uriel Cisneros $14.50 per hour plus overtime and good housing and food.

178.    Based on those promises, Mr. Uriel Cisneros obtained an H-2B visa, traveled from Mexico to Virginia, and began to work for Defendants. A contract was thus created.

179.    Mr. De La Rosa initially paid for Mr. Uriel Cisneros' trip from Mexico to Richmond, but later deducted the expenses from his pay.

180.    Mr. Uriel Cisneros was required to buy tools for the job and was not permitted to take them with him when he left.

181.    Mr. De La Rosa threatened Mr. Uriel Cisneros by demanding more than $10,000 from Mr. Uriel Cisneros to leave Monterrey Concrete.  Mr. Uriel Cisneros felt that he had no choice but to stay and work for Defendant.

182.    Mr. De La Rosa also threatened Mr. Uriel Cisneros by saying that he knew people in Mr. Uriel Cisneros' home state of Zacatecas, Mexico.  Mr. Uriel Cisneros interpreted this as a threat to keep him docile, to intimidate him, and to make him fear Mr. De La Rosa.  Mr. Uriel Cisneros believed that Mr. De La Rosa in fact knew dangerous people in Zacatecas because Mr. De La Rosa previously had been to Zacatecas and walked around while armed.

183.    At approximately 2:00 a.m. or 3:00 a.m. one morning, Mr. De La Rosa entered the garage where Mr. Uriel Cisneros and other Monterrey Concrete workers were sleeping at the time.  Mr. De La Rosa woke the workers up, cursed at them, and said they were good for nothing.

184.    Mr. Uriel Cisneros also feared Defendant De La Rosa because he heard that Mr. De La Rosa had previously hit another Monterrey Concrete worker.

185.    Mr. Uriel Cisneros also feared Mr. De La Rosa because he heard that he had previously taken other Monterrey Concrete workers to the border.

186.    Mr. Uriel Cisneros felt coerced to keep working for Defendants due to Defendants' conduct described above.

187.    Mr. De La Rosa and Monterrey Concrete's treatment of Mr. Uriel Cisneros, their failure to pay wages to Mr. Uriel Cisneros that they were legally and contractually obligated to pay, and their failure to abide by the H-2B regulations caused Mr. Uriel Cisneros monetary and emotional injury.

_Alonso Cisneros Ayala_

188.     Mr. Cisneros Ayala graduated from high school in Mexico and does not speak English.

189.     Mr. Cisneros Ayala was recruited in Mexico in 2016 by Defendant De La Rosa or someone acting on his behalf.

190.     Mr. De La Rosa or his agents promised Mr. Cisneros Ayala $14.50 per hour plus overtime and good housing and food

191.     Based on those promises, Mr. Cisneros Ayala obtained an H-2B visa, traveled from Mexico to Virginia, and began to work for Defendants. A contract was thus created.

192.     Mr. Cisneros Ayala worked for Defendants in Henrico, Virginia, under an H-2B visa for approximately five months in 2016.

193.     Mr. Cisneros Ayala paid for his entire trip from Mexico to Richmond.

194.     Mr. Cisneros Ayala was required to spend $350 to buy tools for the job and was not allowed to take them with him when he left.

195.     Soon after Mr. Cisneros Ayala arrived in Virginia, Mr. De La Rosa demanded Mr. Cisneros Ayala's passport and social security card.

196.     Mr. De La Rosa told Mr. Cisneros Ayala that if he escaped he would send someone to track him down.

197.     Mr. De La Rosa often told Mr. Cisneros Ayala about the dangerous people Mr. De La Rosa knew in Mexico and said that because he had these contacts, if anything happened to Mr. De La Rosa, he could "take care of it."

198.     Mr. De La Rosa often threatened and intimidated Mr. Cisneros Ayala at worker meetings, often humiliating workers in front of each other.  Mr. De La Rosa would say that he had the power to suspend Mr. Cisneros Ayala's and the other workers' visas, report them to ICE or

call the police and send them to jail if they did not work hard.  He coerced Mr. Cisneros Ayala by saying he had this power because he's a U.S. citizen.

199.    While employed by Defendants, Mr. Cisneros Ayala lived in a garage with 18-20 other men, sleeping on a mattress.  The garage had one bathroom for all of the workers and so Mr. Cisneros Ayala often washed himself outside with a bucket of water, regardless of the weather.

200.    Mr. Cisneros Ayala felt coerced to keep working for Defendants due to Defendants' conduct described above.

201.    Mr. De La Rosa and Monterrey Concrete's treatment of Mr. Cisneros Ayala, their failure to pay wages to Mr. Cisneros Ayala that they were legally and contractually obligated to pay, and their failure to abide by the H-2B regulations caused Mr. Cisneros Ayala monetary and emotional injury.

*Arturo Esparza Macias*

202.    Mr. Arturo Esparza Macias was recruited in 2017 in Mexico by Defendant De La Rosa, or someone acting on his behalf, and Gustavo de la Garza.

203.    Mr. De La Rosa or his agents promised Mr. Esparza Macias $17.00 per hour plus overtime and good housing and for workweeks.

204.    Based on those promises, Mr. Esparza Macias obtained an H-2B visa, traveled from Mexico to Virginia, and began to work for Defendants. A contract was thus created.

205.    Mr. Esparza Macias worked for Defendants in and around Henrico, Virginia, under an H-2B visa from approximately April 2017 to the spring of 2018.

206.    Mr. Esparza Macias paid for his trip from his hometown to Monterrey and for his food and hotels during the journey.

207.    Mr. Esparza Macias graduated from high school in Mexico and does not speak English.

208.    After arriving in Virginia, Mr. De La Rosa took Mr. Esparza Macias's passport and other workers' passports at the first group meeting.

209.    Mr. De La Rosa yelled at and threatened Mr. Esparza Macias and the other workers stating that if they did not work, and do as he said, he would drive them back to Mexico, end their visas, complain to immigration, and they would never be able to get another visa to work in the United States.

210.    Mr. De La Rosa told Mr. Esparza Macias during group meetings and other workers that he had a lot of influence in Mexico, which Mr. Esparza Macias understood to be a threat that Mr. De La Rosa could have him hurt.

211.    Mr. De La Rosa told Mr. Esparza Macias that he would extend Mr. Esparza Macias's visa for another year if he would report on what the other workers were saying, but Mr. Esparza Macias refused.

212.    Mr. De La Rosa threated Mr. Esparza Macias in connection with his tanda winnings and obligations.

213.    When Mr. Esparza Macias's visa term with Monterrey Concrete expired, Mr. De La Rosa asked him to illegally overstay his visa and continue working for Monterrey Concrete. Mr. De La Rosa told Mr. Esparza Macias to make up a fake name so that Defendants could continue to pay Mr. Esparza Macias.

214.    Mr. Esparza Macias felt that he as if he was enslaved due to, among other things living conditions where he had to for a time sleep on the garage floor and then share a bed in a

house with 18-25 people with one bathroom, wake up at 5:00 a.m. and work late into the night, and be subject to the various threats and other abuses described above.

215.    Mr. Esparza Macias felt coerced to keep working for Defendants due to Defendants' conduct described above.

216.    Mr. De La Rosa and Monterrey Concrete's treatment of Mr. Esparza Macias, their failure to pay wages to Mr. Esparza Macias that they were legally and contractually obligated to pay, and their failure to abide by the H-2B regulations caused Mr. Esparza Macias monetary and emotional injury.

*Cesar Ivan Esparza Aguilar*

217.    Mr. Cesar Ivan Esparza Aguilar worked for Defendants from April, 2017 through December, 2017 under an H-2B visa.

218.    Mr. Cesar Ivan Esparza Aguilar was recruited in Mexico in 2017 to work for Monterrey by Defendant De La Rosa or someone acting on his behalf.

219.    Mr. De La Rosa or his agents promised Mr. Cesar Ivan Esparza Aguilar $17.24 per hour plus overtime.

220.    Based on those promises, Mr. Cesar Ivan Esparza Aguilar obtained an H-2B visa, traveled from Mexico to Virginia, and began to work for Defendants. A contract was thus created.

221.    Mr. Cesar Ivan Esparza Aguilar paid for his trip from his hometown to Monterrey and for his food and hotels during the journey.

222.    Mr. Cesar Ivan Esparza Aguilar was required to spend $350 to buy tools for the job.

223.    Shortly after Mr. Cesar Ivan Esparza Aguilar arrived in Virginia, Mr. De La Rosa took his passport and visa.

224.     One evening, Mr. De La Rosa physically assaulted Mr. Cesar Ivan Esparza Aguilar. After Mr. Cesar Ivan Esparza Aguilar fell asleep in a car, Mr. De La Rosa got angry, grabbed him, and hit him on the chest trying to wake him up.

225.     Mr. Cesar Ivan Esparza Aguilar felt pressured to work for Defendants to avoid being deported.

226.     Mr. De La Rosa frequently threatened Mr. Cesar Ivan Esparza Aguilar by yelling at him and pressuring him to work harder.

227.     On multiple occasions, Mr. De La Rosa threatened Mr. Cesar Ivan Esparza Aguilar by telling him that, if he did not do enough work, do sufficiently good quality work or work hard enough, Mr. De La Rosa would call the immigration authorities and send Mr. Cesar Ivan Esparza Aguilar back to Mexico.

228.     Mr. De La Rosa also threated Mr. Cesar Ivan Esparza Aguilar by telling him that Mr. De La Rosa would drive him back to Mexico and end his visa.

229.     Additionally, Mr. De La Rosa threatened Mr. Cesar Ivan Esparza Aguilar by telling him Mr. De La Rosa would damage his reputation so that he would never be able to get another visa to work in the United States.

230.     Mr. De La Rosa further threatened Mr. Cesar Ivan Esparza Aguilar by telling him that, if any worker escaped, Mr. De La Rosa would confiscate all workers' visas and make sure they never again got visas to work in the United States.

231.     Mr. Cesar Ivan Esparza Aguilar felt pressured to stay at Monterrey Concrete because Mr. De La Rosa kept him in debt.  Mr. Cesar Ivan Esparza Aguilar and other workers had agreed to form a tanda.  However, Mr. De La Rosa demanded to join the tanda and manipulated it

to ensure that Mr. Cesar Ivan Esparza Aguilar owed money and could not leave Monterrey Concrete.

232.    In December, 2017, Mr. De La Rosa threatened Mr. Cesar Ivan Esparza Aguilar by telling him that Mr. De La Rosa was sending him to Mexico in two weeks because Mr. Cesar Ivan Esparza Aguilar did not want to work for another company where Mr. De La Rosa wanted to send him to work. Mr. Cesar Ivan Esparza Aguilar was scared as a result of this incident.

233.    Mr. Cesar Ivan Esparza Aguilar was threatened by hearing Mr. De La Rosa threaten to deport other workers at meetings.

234.    Mr. Cesar Ivan Esparza Aguilar escaped from Monterrey Concrete in December, 2017.

235.    After Mr. Cesar Ivan Esparza Aguilar left, Mr. De La Rosa falsely accused him of stealing tools from Monterrey Concrete and reported Mr. Cesar Ivan Esparza Aguilar to the police. Mr. Cesar Ivan Esparza Aguilar did not steal any tools.  The allegedly stolen tools later reappeared at Monterrey Concrete, leading some workers to believe that Mr. De La Rosa may have hidden the tools himself.

236.    Mr. Cesar Ivan Esparza Aguilar graduated from high school in Mexico and does not speak English.

237.    Mr. Cesar Ivan Esparza Aguilar felt coerced to keep working for Defendants due to Defendants' conduct described above.

238.    Mr. De La Rosa and Monterrey Concrete's treatment of Mr. Cesar Ivan Esparza Aguilar, their failure to pay wages to Mr. Cesar Ivan Esparza Aguilar that they were legally and contractually obligated to pay, and their failure to abide by the H-2B regulations caused Mr. Cesar Ivan Esparza Aguilar monetary and emotional injury.

*Jaime Marquez Esparza*

239.    Mr. Jaime Marquez Esparza worked for Jose De La Rosa from April, 2017 to November, 2017.

240.    Mr. Jaime Marquez Esparza was recruited in Mexico in 2017 by Defendant De La Rosa or someone acting on his behalf.

241.    Mr. De La Rosa or his agents promised Mr. Jaime Marquez Esparza $17.00 per hour.

242.    Based on those promises, Mr. Jaime Marquez Esparza obtained an H-2B visa, traveled from Mexico to Virginia, and began to work for Defendants. A contract was thus created.

243.    Mr. Jaime Marquez Esparza worked for Defendants in and around Henrico, Virginia, under an H-2B visa for approximately eight months in 2017.

244.    Mr. Jaime Marquez Esparza paid for his trip from his hometown to Monterrey and for his food and hotels during the journey.

245.    Mr. Jaime Marquez Esparza was required to spend $300 to buy tools for the job.

246.    After arriving in Virginia, Mr. De La Rosa held a meeting with Mr. Jaime Marquez Esparza and other coworkers wherein Mr. De La Rosa took Mr. Jaime Marquez Esparza's social security card,  passport and visa and stated that he had his own rules and would not be complying with the documents received from the consulate. Instead, Mr. De La Rosa stated that he would pay the workers $1,200 every two weeks regardless of the number of hours worked instead of the promised $17.00 an hour. Mr. De La Rosa stated that anyone who did not like that arrangement could pay him $10,000 to leave and go work anywhere in the United States.  Mr. De La Rosa further stated that if any worker left without paying him $10,000, he would report that person to the consulate and make sure that the worker could never come back to the United States.

247.    Mr. De La Rosa held another meeting with Mr. Jaime Marquez Esparza and other coworkers because the workers were dissatisfied.  At that meeting, Mr. De La Rosa stated that he had a lot of money and if the workers retained a lawyer, he would outspend and defeat them.

248.    Approximately two (2) months after Mr. Jaime Marquez Esparza began working for Defendants, Mr. Jaime Marquez Esparza requested his social security card so he could obtain a driver's license.  Jose De La Rosa refused this request and so Mr. Jaime Marquez Esparza was unable to obtain a driver's license.

249.    Mr. Jaime Marquez Esparza witnessed Mr. De La Rosa challenge workers to fights, daring the worker to hit him.

250.    Mr. De La Rosa stated that if the workers ever tried to cross him, he knew dangerous people in Mexico and, specifically, in Mr. Jaime Marquez Esparza's hometown.

251.    Mr. Jaime Marquez Esparza realized that he was being rented out to other companies and was additionally concerned about pay.  He made comments to other workers, trying to organize to address their mistreatment by Defendants.

252.    As a result, Defendants fired him.

253.    Mr. Jaime Marquez Esparza's coworkers, including Plaintiffs working during that timeframe, were aware of the firing, which further exacerbated the climate of fear.

254.    At first, upon firing Mr. Jaime Marquez Esparza, Mr. De La Rosa refused to return his passport.

255.    He ultimately agreed to return the passport only when Mr. Jaime Marquez Esparza had a bus ticket to Mexico and was going to the bus station.

256.    Mr. Jaime Marquez Esparza finished some high school in Mexico and does not speak English.

257.     Mr. Jaime Marquez Esparza felt coerced to keep working for Defendants due to Defendants' conduct described above.

258.     Mr. De La Rosa and Monterrey Concrete's treatment of Mr. Jaime Marquez Esparza, their failure to pay wages to Mr. Jaime Marquez Esparza that they were legally and contractually obligated to pay, and their failure to abide by the H-2B regulations caused Mr. Jaime Marquez Esparza monetary and emotional injury.

*Jose Luis Diaz Gomez*

259.     Mr. Diaz Gomez worked for Defendants in and around Henrico, Virginia, under an H-2B visa for approximately eight months from April 2017 to December 2017.

260.     Mr. Diaz Gomez graduated from high school in Mexico and does not speak English.

261.     Mr. De La Rosa or his agents promised Mr. Diaz Gomez $17.00 or $17.50 per hour plus overtime.

262.     Based on those promises, Mr. Diaz Gomez obtained an H-2B visa, traveled from Mexico to Virginia, and began to work for Defendants. A contract was thus created.

263.     Mr. Diaz Gomez paid for his trip from his hometown to Monterrey and for his food and hotels during the journey.

264.     Mr. Diaz Gomez was required to spend $300 to buy tools for the job.

265.     After arriving in Virginia, Mr. De La Rosa took Mr. Diaz Gomez's passport.

266.     Approximately every 15 days, Mr. De La Rosa would hold a meeting with the workers, including Mr. Diaz Gomez, in which he would berate them, humiliate them, tell them they had no value, and use profane language.  He would sometimes tell them that he was losing the money he had invested in them. At some of the meetings, Mr. De La Rosa would threaten the

workers, including Mr. Diaz Gomez, stating that he had the power to suspend their visas, call immigration authorities on the workers, and send them back to Mexico.

267.    Mr. Diaz Gomez was worried that Mr. De La Rosa would send someone to hurt his family in Mexico and that, when he got back to Mexico, Mr. De La Rosa would send someone to hurt him.

268.    Mr. Diaz Gomez witnessed Mr. De La Rosa physically assault Mr. Cesar Esparza Aguilar and a second individual and Mr. Diaz Gomez tried to intervene.

269.    In December 2017, Mr. Diaz Gomez left Monterrey Concrete without his passport.

270.    After Mr. Diaz Gomez left, Mr. De La Rosa falsely accused him of stealing tools from Monterrey Concrete and reported Mr. Diaz Gomez to the police.  Mr. Diaz Gomez did not steal any tools.  The allegedly stolen tools later reappeared at Monterrey Concrete, leading some workers to believe that Mr. De La Rosa may have hidden the tools himself.

271.    Mr. Diaz Gomez felt coerced to tolerate Defendants' mistreatment and to provide labor without full compensation due to Defendants' conduct described above.

272.    Mr. De La Rosa and Monterrey Concrete's treatment of Mr. Diaz Gomez, their failure to pay wages to Mr. Diaz Gomez that they were legally and contractually obligated to pay, and their failure to abide by the H-2B regulations caused Mr. Diaz Gomez monetary and emotional injury.

### Ricardo Guadalupe Gomez Torres

273.    Mr. Ricardo Guadalupe Gomez Torres was recruited in 2017 in Mexico by Defendant De La Rosa or someone acting on his behalf.

274.    Mr. Gomez Torres finished some high school in Mexico and does not speak English.

275.     Defendants promised Mr. Gomez Torres $17.00 per hour.

276.     Based on those promises, Mr. Gomez Torres obtained an H-2B visa, traveled from Mexico to Virginia, and began to work for Defendants. A contract was thus created.

277.     Mr. Gomez Torres worked for Defendants in and around Henrico, Virginia, under an H-2B visa for approximately eight months from April 2017 to December 2017.

278.     Mr. Gomez Torres paid for his trip from his hometown to Monterrey and for his food and hotels during the journey.

279.     Mr. Gomez Torres was required to pay Defendants between $200 and $300 for tools for the job.

280.     Approximately 15-20 days after arriving in Virginia, Mr. De La Rosa took Mr. Gomez Torres's passport and visa and he never got them back.  Mr. De La Rosa told Mr. Gomez Torres that he took the passport and visa because he thought he would leave and go work somewhere else.

281.     Mr. Gomez Torres felt pressured to stay at Monterrey because Mr. De La Rosa kept him in debt in connection with the tanda.  Mr. Gomez participated in the tanda and paid $300 into the tanda every two weeks.  As described above, Mr. De La Rosa manipulated the tanda so that he and his family members would receive the first payments, before the other workers.  This had the effect of coercing Mr. Gomez Torres to stay at Monterrey Concrete longer than he would have otherwise, while he waited to receive his tanda payout.  Mr. Gomez Torres left Monterrey Concrete without having ever received a tanda payout, despite paying over $4,000 into the tanda.

282.     Mr. De La Rosa threatened Mr. Gomez Torres and others that if they renovated their housing, to improve their living conditions while at Monterrey Concrete, he would call ICE.

283.    Mr. Gomez Torres attended meetings at which Mr. De La Rosa would get very mad and yell and curse at the workers whenever they made an alleged mistake.  Mr. De La Rosa told the workers, including Mr. Gomez Torres, that he had power because he had contacts in Mexico.  Mr. Gomez Torres understood that to mean Mr. De La Rosa had money and power and that he could send someone to harm his family in Mexico.  Mr. De La Rosa also threatened to take Mr. Gomez Torres and others to the border.

284.    Mr. Gomez Torres heard that Mr. De La Rosa physically assault Cesar Esparza Aguilar.

285.    Mr. De La Rosa told the workers, including Mr. Gomez Torres, that if they did not do the work he demanded, he would call the immigrations authorities, who would send the workers back to Mexico.  He also said he would drive the workers, including Mr. Gomez Torres, back to Mexico, end their visas, and damage their reputations so that they would never be able to get a visa with any other company.

286.    In December, 2017, Mr. Gomez Torres left Monterrey Concrete.  He left at night with only the clothes on his back, and a few papers in his pocket.

287.    After Mr. Gomez Torres left, Mr. De La Rosa falsely accused him of stealing tools from Monterrey Concrete and reported Mr. Gomez Torres to the police.  Mr. Gomez Torres did not steal any tools.  The allegedly stolen tools later reappeared at Monterrey Concrete, leading some workers to believe that Mr. De La Rosa may have hidden the tools himself.

288.    Mr. Gomez Torres remains scared for himself and his family because of this litigation and Mr. De La Rosa's prior threats.

289.    Mr. Gomez Torres felt coerced to keep working for Defendants due to Defendants' conduct described above.

290.    Defendants' treatment of Mr. Gomez Torres, their failure to pay wages to Mr. Gomez Torres that they were legally and contractually obligated to pay, and their failure to abide by the H-2B regulations caused Mr. Gomez Torres monetary and emotional injury.

*Francisco Odon Hernandez*

291.    Mr. Francisco Odon Hernandez worked for Defendants in and around Henrico, Virginia, under an H-2B visa for approximately 17 months from April 2017 to September 2018.

292.    Mr. Francisco Odon Hernandez finished some high school in Mexico and does not speak English.

293.    Mr. De La Rosa or his agents promised Mr. Francisco Odon Hernandez good hourly pay and good housing.

294.    Based on those promises, Mr. Francisco Odon Hernandez obtained an H-2B visa, traveled from Mexico to Virginia, and began to work for Defendants. A contract was thus created.

295.    Mr. Francisco Odon Hernandez paid for his hotels and food on his journey from Monterrey to Richmond.

296.    Mr. Francisco Odon Hernandez was required to spend $200 to buy tools for the job and was only permitted to keep some of them.

297.    Shortly after arriving in Virginia, Mr. De La Rosa took passports and social security cards from Mr. Francisco Odon Hernandez and other workers.  Mr. De La Rosa said the workers should work as long as they could stand it and threatened to report Mr. Francisco Odon Hernandez to immigration if he left to work elsewhere in the United States, but said he would not report Mr. Francisco Odon Hernandez if Mr. Francisco Odon Hernandez paid him $10,000, in which case he would be free to leave.  Mr. Francisco Odon Hernandez also heard Mr. De La Rosa state at meetings that he controlled immigration and would pay them, and that he knew people in Mexico,

which he understood to mean that Mr. De La Rosa could cause harm to him or his family in Mexico. Mr. Francisco Odon Hernandez further heard that Mr. De La Rosa had assaulted another worker.

298.     Within one month after Mr. Francisco Odon Hernandez arrive in Virginia, Mr. De La Rosa came into the workers' housing and told three or four workers that they were going back to Mexico and had twenty minutes to pack their things. Mr. De La Rosa made Mr. Francisco Odon Hernandez and another stand guard at the door to make sure none of the other workers could leave and Mr. Francisco Odon Hernandez felt like he had no choice but to do what Mr. De La Rosa said. Subsequently, Mr. De La Rosa met with some of the remaining workers, including Mr. Francisco Odon Hernandez, and told them that their colleagues who had been taken to the border had tried to complain to immigration officials, but the immigration officials would not listen because it was Mr. De La Rosa who pays taxes.

299.     Mr. Francisco Odon Hernandez was aware that Mr. De La Rosa went to police and accused workers who had escaped of stealing a generator and other tools, even though the generator later reappeared at Monterrey Concrete.  Mr. Francisco Odon Hernandez answered questions from the police regarding the supposedly stolen items.

300.     When it was Mr. Francisco Odon Hernandez's turn to receive the tanda, Mr. De La Rosa and his family were unwilling to pay their shares.  Instead, Mr. De La Rosa told Mr. Francisco Odon Hernandez to treat it as a loan from Mr. Hernandez to Mr. De La Rosa that would be paid later.  Mr. Francisco Odon Hernandez felt that he had no option but to abide by this demand.  Subsequently, before Mr. Francisco Odon Hernandez departed Monterrey Concrete, Mr. De La Rosa deducted approximately $1,000 from the amount he owed for his family's tanda share

on the purported basis that Mr. Francisco Odon Hernandez had done poor work on a job.  He also failed to pay Mr. Francisco Odon Hernandez for 3-4 days of wages.

301.    Mr. Francisco Odon Hernandez's passport was returned to him after another worker complained that it was illegal.  He was required to sign a notarized document that he had gotten it back.

302.    When Mr. Francisco Odon Hernandez's visa term with Monterrey Concrete expired, Mr. De La Rosa asked him to illegally overstay his visa and continue working for Monterrey Concrete.  Mr. De La Rosa told Mr. Francisco Odon Hernandez to make up a fake name so that Defendants could continue to pay Mr. Francisco Odon Hernandez in 2018.

303.    Mr. Francisco Odon Hernandez felt coerced to keep working for Defendants due to Defendants' conduct described above.

304.    Mr. De La Rosa and Monterrey Concrete's treatment of Mr. Francisco Odon Hernandez, their failure to pay wages to Mr. Francisco Odon Hernandez that they were legally and contractually obligated to pay, and their failure to abide by the H-2B regulations caused Mr. Francisco Odon Hernandez monetary and emotional injury.

*Victor de los Reyes Rabanales*

305.    Mr. Victor de los Reyes Rabanales worked for Monterrey Concrete from either late March, 2018 or early April 2018 through May 2018 under an H-2B visa.

306.    Mr. De La Rosa or his agents promised Mr. Reyes Rabanales good pay and good housing and food.

307.    Based on those promises, Mr. Reyes Rabanales obtained an H-2B visa, traveled from Mexico to Virginia, and began to work for Defendants. A contract was thus created.

308.    Mr. Reyes Rabanales paid for the entirety of his trip to and from his hometown to Richmond.

309.    Mr. De La Rosa took Mr. Reyes Rabanales' passport when Mr. Reyes Rabanales arrived.  Mr. Reyes Rabanales asked Mr. De La Rosa why his passport was being taken.  Mr. De La Rosa answered that Mr. Reyes Rabanales did not need it.

310.    Mr. De La Rosa threatened to call immigration to deport Mr. Reyes Rabanales.

311.    Mr. De La Rosa repeatedly called Mr. Reyes Rabanales by a bad nickname, talked badly to him, and humiliated him in front of other workers.

312.    Mr. De La Rosa threatened to send Mr. Reyes Rabanales back to Mexico if he did not work hard enough.

313.    Mr. De La Rosa threatened to call the police or ICE on Mr. Reyes Rabanales if any of the Monterrey Concrete workers escaped.

314.    Approximately one month after Mr. Reyes Rabanales began his employment for Defendants, Defendants demanded he overstay his visa.  When he refused, they fired him.

315.    Mr. De La Rosa locked Mr. Reyes Rabanales in a room, forced workers to guard the door, and then forced him into a car with Mr. De La Rosa.

316.    Mr. De La Rosa drove Mr. Reyes Rabanales to Texas and abandoned him at a Walmart near the U.S.-Mexico border.

317.    Mr. De La Rosa did not return Mr. Reyes Rabanales' passport.  As a result, Mr. Reyes Rabanales was questioned by Mexican authorities at the border.

318.    Mr. Reyes Rabanales graduated from primary school in Mexico and does not speak English.

319.    Mr. Reyes Rabanales felt coerced to keep working for Defendants due to Defendants' conduct described above.

320.    Mr. De La Rosa and Monterrey Concrete's treatment of Mr. Reyes Rabanales, their failure to pay wages to Mr. Reyes Rabanales that they were legally and contractually obligated to pay, and their failure to abide by the H-2B regulations caused Mr. Reyes Rabanales monetary and emotional injury.

*Luis Carlos Romero*

321.    Mr. Romero graduated from high school in Mexico and does not speak English.

322.    Mr. Romero worked for Defendants in Henrico, Virginia, under an H-2B visa from March 2018 until September 2018.

323.    Mr. De La Rosa or his agents promised Mr. Romero around $17.20 per hour plus overtime.

324.    Based on those promises, Mr. Romero obtained an H-2B visa, traveled from Mexico to Virginia, and began to work for Defendants. A contract was thus created.

325.    Mr. Romero was required to pay $400 to buy tools.

326.    Soon after Mr. Romero arrived in Virginia, Mr. De La Rosa took his passport, visa, and Social Security card.  Mr. De La Rosa stated that the information Mr. Romero received at the consulate about his rights was worthless and that there were many other workers who wanted the job.  Mr. De La Rosa told Mr. Romero that if he wanted to leave he had to pay $10,000 which is money Mr. Romero did not have.

327.    Mr. De La Rosa stated that if Mr. Romero did not work hard, Mr. De La Rosa would send him back to Mexico or call the immigration authorities.  Mr. De La Rosa told Mr. Romero that he had enough money to do what he wanted.

328.     Mr. De La Rosa told Mr. Romero not to tell anyone, including family, about how he was doing or where they were.  Mr. De La Rosa told Mr. Romero and other workers that he could read their messages and so they needed to be careful about what they said about him.

329.     Mr. De La Rosa often held worker meetings where he stated that he had the power to suspend visas and send the workers to jail.  He further stated that the law was on his side because he is a U.S. citizen.

330.     While working for Defendants, Mr. Romero did not keep records of his work schedule because he was afraid of Mr. De La Rosa and believed that if Mr. De La Rosa found out he would fire him or report him to ICE.

331.     Mr. De La Rosa once told Mr. Romero and other workers that he had just returned from taking other employees to the Mexican border and that they had pleaded with him for forgiveness but he had their visas canceled anyway.  The purpose of this story was to threaten the employees who were still there that it could happen to them if they upset Mr. De La Rosa.

332.     While working for Defendants, Mr. Romero lived in a garage with five (5) other men with no heat or air conditioning.  Mr. Romero slept on an air mattress that he purchased for himself.  There was no bathroom in the garage.

333.     Mr. De La Rosa told Mr. Romero that if the police came to investigate that he should say everything was fine.

334.     Mr. De La Rosa harassed Mr. Romero for having a hearing disability.

335.     Because of Mr. De La Rosa's threatening and coercive behaviors, Mr. Romero felt intimidated and unable to talk freely.

336.     Mr. De La Rosa fired Mr. Romero saying there was no more work.

337.    Mr. De La Rosa charged Mr. Romero an extra $50 for tools and then threatened to call ICE if Mr. Romero complained.

338.    Mr. De La Rosa then bought Mr. Romero a ticket back to Mexico and deducted the cost from his paycheck.

339.    Mr. Romero felt coerced to keep working for Defendants due to Defendants' conduct described above.

340.    Mr. Romero felt especially coerced to stay following Mr. De La Rosa's locking Plaintiff Reyes Rabanales into a room and forcing him into a car in Virginia, then personally driving him to the border and dropping him off without a passport.

341.    Mr. De La Rosa and Monterrey Concrete's treatment of Mr. Romero, their failure to pay wages to Mr. Romero that they were legally and contractually obligated to pay, and their failure to abide by the H-2B regulations caused Mr. Romero monetary and emotional injury.

*Bladimir Guadalupe Macias Esparza*

342.    Mr. Bladimir Guadalupe Macias Esparza worked for Defendants from March 2018 through January 2019 under an H-2B visa.

343.    Mr. Macias Esparza graduated from high school in Mexico and speaks minimal English.

344.    Mr. Macias Esparza's father was initially recruited in 2018 in Mexico by Defendant De La Rosa and Arturo Macias Esparza.  Mr. Macias Esparza's father asked if Mr. Macias Esparza could also come work for Monterrey Concrete.  Mr. Macias Esparza was 20 years old at the time.

345.    Mr. De La Rosa or his agents promised Mr. Macias Esparza $17.60 per hour plus overtime and good housing.

346.    Based on those promises, Mr. Macias Esparza obtained an H-2B visa, traveled from Mexico to Virginia, and began to work for Defendants. A contract was thus created.

347.    Mr. Macias Esparza was required to spend $350 to buy tools from Defendants.

348.    When he arrived at Monterrey Concrete, Mr. Macias Esparza had to share a single bedroom with five other workers, and had to share a bed with his cousin, Arturo Esparza Macias.

349.    Shortly after he arrived at Monterrey Concrete, Mr. De La Rosa took Mr. Macias Esparza's passport.  Mr. De La Rosa's brother temporarily returned Mr. Macias Esparza's passport so that Mr. Macias Esparza could go to the Social Security office.  However, Mr. De La Rosa again took Mr. Macias Esparza's passport after that.  Mr. Macias Esparza felt pressured not to leave Monterrey Concrete as a result.

350.    Mr. Macias Esparza witnessed Mr. De La Rosa's taking of other Monterrey Concrete workers' passports.  He felt trapped as a result.

351.    Mr. Macias Esparza was threatened by Mr. De La Rosa on several occasions when Mr. De La Rosa said he could send Mr. Macias Esparza back to Mexico.

352.    Mr. Macias Esparza was threatened when he witnessed Mr. De La Rosa's vigilante deportation of Plaintiff Reyes Rabanales by forcibly driving Mr. Reyes Rabanales to a place near the Mexican border.  Mr. Macias Esparza also witnessed Mr. De La Rosa's return to Monterrey Concrete, when he gathered the workers together (including Mr. Macias Esparza), showed them the cancelled passport of Mr. Reyes Rabanales (which Mr. De La Rosa had stolen from Mr. Reyes Rabanales), and told the workers that he could do the same thing to them and send them back to Mexico at any moment if he wanted to.

353.    At the same meeting, Mr. De La Rosa told the workers, including Mr. Macias Esparza, that he could make them "lick his balls" if he wanted to in order to allow them to stay and not be returned to Mexico.

354.    This entire incident made Mr. Macias Esparza feel like the property of Defendants and trapped at Monterrey Concrete.  Mr. Macias Esparza continued working for Defendants as a result of these and other threats.

355.    Defendant De La Rosa also told Mr. Macias Esparza that he had contacts with criminal cartels in Mexico.  Mr. Macias Esparza understood this to be a threat that Mr. De La Rosa could arrange for Mr. Macias Esparza's family to be kidnapped, killed or hurt if Mr. Macias Esparza did not obey Mr. De La Rosa.

356.    Mr. De La Rosa threatened Mr. Macias Esparza by stating that Mr. Macias Esparza had to pay Mr. De La Rosa $10,000 to leave Monterrey Concrete.

357.    Mr. Macias Esparza also was threatened when Mr. De La Rosa told him that, if anyone escaped, that Mr. De La Rosa would call the police or ICE.

358.    Mr. Macias Esparza was threatened when Mr. De La Rosa yelled at him to work harder, put pressure on him, told Mr. Macias Esparza that he was worthless, and insinuated that Mr. Macias Esparza is gay.

359.    Additionally, Mr. Macias Esparza was threatened when he heard about Mr. De La Rosa's physical assault of other Monterrey Concrete workers.

360.    Mr. Macias Esparza escaped from Monterrey Concrete in January 2019.

361.    Mr. Macias Esparza remains scared for the safety of his family.

362.    Mr. Macias Esparza felt coerced to keep working for Defendants due to Defendants' conduct described above.

363.    Mr. De La Rosa and Monterrey Concrete's treatment of Mr. Macias Esparza, their failure to pay wages to Mr. Macias Esparza that they were legally and contractually obligated to pay, and their failure to abide by the H-2B regulations caused Mr. Macias Esparza monetary and emotional injury.

*Catarino Odón Hernandéz*

364.    Mr. Catarino Odón Hernández was recruited in 2018 in Mexico to work for Monterrey Concrete.

365.    Mr. De La Rosa or his agents promised Mr. Catarino Odon Hernandez good hourly pay and only eight hours of work per day.

366.    Based on those promises, Mr. Catarino Odon Hernandez obtained an H-2B visa, traveled from Mexico to Virginia, and began to work for Defendants. A contract was thus created.

367.    Mr. Catarino Odon Hernández worked for Defendants in and around Henrico, Virginia under an H-2B visa for approximately 6 months in 2018.

368.    Mr. Catarino Odon Hernández paid for his trip from his hometown to Monterrey and for his food and hotels during the journey to Richmond.

369.    Mr. Catarino Odon Hernández was required to spend $350 to buy tools for the job.

370.    Approximately one day after arriving in Virginia, Mr. De La Rosa confiscated Catarino Odon Hernandez's passport and other documents.

371.    Mr. Catarino Odon Hernandez arrived in Virginia with approximately 20 other men. Shortly after Mr. Hernandez arrived, Mr. De La Rosa gathered the workers and informed them that they were not going to work the hours or pay rates they had been promised in Mexico. Instead, Mr. De La Rosa stated that Mr. Catarino Odon Hernandez and the others would work as

many hours as Jose De La Rosa desired and the workers would be paid $1,200 every two weeks regardless of the number of hours worked.

372.    In the meeting, Mr. De La Rosa told the employees that if they didn't agree to the unlawful compensation scheme, he would drive them back to Mexico.  Mr. De La Rosa then stated to Mr. Catarino Odon Hernandez and the other employees that they could only work somewhere else in the U.S, if they paid him $10,000.  Otherwise, Mr. De La Rosa stated that he would call the immigration authorities and make sure they could never work in the U.S. again.

373.    Mr. De La Rosa continued having regular meetings with Mr. Catarino Odon Hernandez and the other employees.  In these meetings, Mr. De La Rosa threatened Mr. Catarino Odon Hernandez and the other employees, telling them that he could do whatever he wanted with them and they couldn't win because they didn't have the money and he did.  Mr. De La Rosa further threatened Mr. Catarino Odon Hernandez and the employees, stating that he knew people in Mexico.  These messages were designed to intimidate and frighten Mr. Catarino Odon Hernandez and the other workers so they wouldn't speak up about their working conditions.  Mr. Odon Hernandez understood these statements as threats that Mr. De La Rosa had connections to people who could harm him.  Mr. Odon Hernandez feared Mr. De La Rosa as a result of these statements.

374.    A few weeks after arriving in Virginia, Mr. Catarino Odon Hernandez witnessed the following. Mr. De La Rosa and his brother Julio De La Rosa stormed into Catarino Odon Hernandez's living quarters, pointed to several other employees, including Plaintiff Victor de los Reyes Rabanales, and told them that they had 20 minutes to pack their belongings because he was sending them back to Mexico.  He told Plaintiff Francisco Odon Hernandez and another employee to stand by the door so no one could leave.  Mr. De La Rosa then drove Plaintiff Victor de los

Reyes Rabanales and others to Mexico.  After this, Mr. Catarino Odon Hernandez was constantly terrified that he would also be suddenly sent back to Mexico.  Catarino Odon Hernandez also attended a subsequent meeting at which Mr. De La Rosa stated that the individuals he had taken back to the border had tried to complain to immigration, but immigration would not listen to them.

375.    When Mr. Catarino Odon Hernandez told Mr. De La Rosa that he intended to return to Mexico at the end of his contract, Mr. De La Rosa demanded that he stay beyond his visa for at least another year and continue to work for him.  When Mr. Catarino Odon Hernandez refused, he was fired.

376.    Catarino Odon Hernandez graduated from high school in Mexico and does not speak English.

377.    Catarino Odon Hernandez felt coerced to keep working for Defendants due to Defendants' conduct described above.

378.    Catarino Odon Hernandez felt especially coerced to stay following Mr. De La Rosa's locking Plaintiff Reyes Rabanales into a room and forcing him into a car in Virginia, then personally driving him to the border and dropping him off without a passport.

379.    Mr. De La Rosa and Monterrey Concrete's treatment of Catarino Odon Hernandez, their failure to pay wages to Catarino Odon Hernandez that they were legally and contractually obligated to pay, and their failure to abide by the H-2B regulations caused Catarino Odon Hernandez monetary and emotional injury.

## CLAIMS FOR RELIEF

## COUNT I: Forced Labor in Violation of the Trafficking Victims Protection Act (18 U.S.C. § 1589 et seq.), *against all Defendants jointly and severally*

380.    Plaintiffs reallege and incorporate by reference each and every allegation contained in this Complaint as if fully set forth herein.

381.   18 U.S.C. 1589(a) makes it unlawful to:

> [K]nowingly provide[] or obtain[] the labor or services of a person, by one of, or by any combination of, the following means--(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

382.   Defendants knowingly provided or obtained Plaintiffs' labor in violation of 18 U.S.C. § 1589(a)(1) by inter alia, retaining Plaintiffs' passports and other documents; making threats of returning Plaintiffs to Mexico; firing workers who complained about their working conditions and taking them to the U.S.-Mexico border, including certain of the Plaintiffs; telling Plaintiffs that Defendant De La Rosa had connections to dangerous people in Mexico; and physically assaulting and/or restraining certain of Plaintiffs.

383.   The actions of Defendants that constitute a violation of 18 U.S.C. § 1589(a)(1) and give rise to a cause of action for each Plaintiff are set forth in paragraphs 88 to 379.

384.   Defendants knowingly provided or obtained Plaintiffs' labor in violation of 18 U.S.C. § 1589(a)(2)  by inter alia, retaining Plaintiffs' passports and other documents; making threats of returning Plaintiffs to Mexico; firing and taking to the border individuals, including certain of the Plaintiffs, who questioned their working conditions; telling Plaintiffs that Defendant De La Rosa had connections to dangerous people in Mexico; and physically assaulting and/or restraining certain of Plaintiffs.

385.   The actions of Defendants that constitute a violation of 18 U.S.C. § 1589(a)(2) and give rise to a cause of action for each Plaintiff are set forth in paragraphs 88 to 379.

386.    Defendants knowingly provided or obtained Plaintiffs' labor in violation of 18 U.S.C. § 1589(a)(3) by inter alia, retaining Plaintiffs' passports and other documents, making threats of returning Plaintiffs to Mexico; firing and taking to the border individuals, including certain of the Plaintiffs, who questioned their working conditions; firing Plaintiffs who were not willing to overstay their visas; telling Plaintiffs they could buy their freedom for a payment of thousands of dollars; telling Plaintiffs that Defendant De La Rosa had connections to dangerous people in Mexico; and physically assaulting and/or restraining certain of Plaintiffs.

387.    The actions of Defendants that constitute a violation of 18 U.S.C. § 1589(a)(3) and give rise to a cause of action for each Plaintiff are set forth in paragraphs 88 to 379.

388.    Defendants knowingly provided or obtained Plaintiffs' labor in violation of 18 U.S.C. § 1589(a)(4) by inter alia, retaining Plaintiffs' passports and other documents, making threats of returning Plaintiffs to Mexico; firing and taking to the border individuals, including certain of the Plaintiffs, who questioned their working conditions; firing Plaintiffs who were not willing to overstay their visas; telling Plaintiffs they could buy their freedom for a payment of thousands of dollars; telling Plaintiffs that Defendant De La Rosa had connections to dangerous people in Mexico; and physically assaulting and/or restraining certain of Plaintiffs.

389.    The actions of Defendants that constitute a violation of 18 U.S.C. § 1589(a)(4) and give rise to a cause of action for each Plaintiff are set forth in paragraphs 88 to 379.

390.    Plaintiffs bring this claim for relief pursuant to 18 U.S.C. § 1595.

391.    As a direct and proximate cause of Defendants' actions, Plaintiffs have suffered damages in an amount to be established at trial.

392.    Defendants conduct as alleged herein was undertaken deliberately and with actual malice, that is, with a sense of consciousness and deliberate wrongdoing, evil or wrongful motive,

intent to injure, ill will, or fraud.  Alternatively, Defendants' conduct involved reckless or callous indifference to the rights of Plaintiffs.

393.    Plaintiffs are entitled to recover damages to account for the full value of their losses, including emotional distress, lost wages, punitive damages, and other losses suffered by Plaintiffs as a result of Defendants' conduct, along with reasonable attorneys' fees incurred in this action.

### Count II: Trafficking with Respect to Peonage, Slavery, Involuntary Servitude, or Forced Labor in Violation of the Trafficking and Violence Protection Act, 18 U.S.C. § 1589 et seq., *against all Defendants jointly and severally*

394.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in this Complaint as if fully set forth herein.

395.    18 U.S.C. § 1590 makes it unlawful to "recruit[], harbor[], transport[], provide[], or obtain[] by any means, any person for labor or services in violation of this chapter."

396.    As alleged in the preceding paragraphs, Defendants knowingly harbored, transported, provided for, and obtained Plaintiffs for labor in violation of numerous provisions of Chapter 77, including 18 U.S.C. §§ 1589 and 1592(a).

397.    The actions of Defendants that constitute a violation of 18 U.S.C. §§ 1589 and 1592(a) and give rise to a cause of action for each Plaintiff are set forth in paragraphs 88 to 379.

398.    Plaintiffs bring this claim for relief pursuant to 18 U.S.C. § 1595.

399.    As a direct and proximate result of Defendants' actions, Plaintiffs have suffered damages in an amount to be established at trial.

400.    Defendants conduct as alleged herein was undertaken deliberately and with actual malice, that is, with a sense of consciousness and deliberate wrongdoing, evil or wrongful motive, intent to injure, ill will, or fraud.  Alternatively, Defendants' conduct involved reckless or callous indifference to the rights of Plaintiffs.

401.     Plaintiffs are entitled to recover damages to account for the full value of their losses, including but not limited to, emotional distress, lost wages, punitive damages and other losses suffered by Plaintiffs as a result of Defendants' conduct along with reasonable attorneys' fees incurred in this action.

## Count III: Failure to Pay Overtime in Violation of the Fair Labor Standards Act, 29 U.S.C. § 201 et seq., *against all Defendants jointly and severally*

402.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in this Complaint as if fully set forth herein.

403.     Pursuant to 29 U.S.C. § 216(b), Plaintiffs have consented in writing to be plaintiffs in this FLSA action. Their written consents are attached hereto as Ex. A.

404.     This count sets forth a claim for declaratory relief and damages for Defendants' violation of the overtime provisions of the FLSA.

405.     At all times relevant to this action:

(i)      Plaintiffs were "employees" of Defendants within the meaning of 29 U.S.C. § 203(e)(1);

(ii)     Defendants were the joint "employers" of Plaintiffs within the meaning of 29 U.S.C. § 203(d);

(iii)    Defendants jointly "employed" Plaintiffs within the meaning of 29 U.S.C. § 203(g); and

(iv)     Plaintiffs were engaged in commerce or the production of goods for commerce, and/or were employed by Defendants in an enterprise engaged in commerce or the production of goods for commerce.

406.    Defendants violated the FLSA's overtime provision, 29 U.S.C. § 207(a), by failing to pay Plaintiffs a time-and-a-half overtime premium for their weekly hours worked over 40, to Plaintiffs' harm, and are liable to Plaintiffs in damages.

407.    As a consequence of Defendants' violations of the FLSA, Plaintiffs are entitled to recover their unpaid overtime wages, plus an additional equal amount in liquidated damages, the costs of suit, and reasonable attorneys' fees pursuant to 29 U.S.C. § 216(b).

408.    By not displaying an FLSA poster advising workers of their FLSA rights as required by DOL regulations, the statute of limitations is tolled.

409.    In the alternative, Defendants' violations of the FLSA were "willful" within the meaning of 29 U.S.C. § 255(a), in that Defendants made no effort whatsoever to pay the Plaintiffs the proper overtime premium notwithstanding the fact that they were plainly and obviously working more than 40 hours a week.

## Count IV: Breach of Contract under Virginia Common Law, *against Defendant Monterrey Concrete, LLC*

410.    Plaintiffs re-allege and incorporate by refence each and every allegation in this Complaint as if fully set forth herein.

411.    An employment contract existed between each Plaintiff and Defendant Monterrey Concrete by virtue of Defendant Monterrey Concrete offering employment to Plaintiffs and Plaintiffs accepting that offer and beginning work for Defendant Monterrey Concrete.

412.    The terms and conditions provided in the temporary labor certification, its accompanying attestations, and the law and regulations applicable to the H-2B program (including the worker protections of 20 C.F.R. § 655.20 and 29 C.F.R. § 503.16) constituted terms of the contracts between Plaintiffs and Defendant Monterrey Concrete.

413.    Alternatively, the terms and conditions provided in the temporary labor certifications, its accompanying attestations, and the law and regulations applicable to the H-2B program (including the worker protections of 20 C.F.R. § 655.20 and 29 C.F.R. § 503.16) constituted the governing law at the time an employment contract was otherwise formed and thus became terms of the contract.

414.    Defendant Monterrey Concrete also promised to provide some Plaintiffs acceptable housing for $100 per month.

415.    Plaintiffs accepted Defendant Monterrey Concrete's promise and paid Defendants $100 per month.

416.    Plaintiffs satisfactorily performed all employment duties and responsibilities required of them under the employment contracts with Defendant Monterrey Concrete.

417.    Defendant Monterrey Concrete breached the employment contracts with Plaintiffs by compensating Plaintiffs below the applicable rates set forth in their contracts, the prevailing wages, or the required overtime premiums for their work, both of which were additionally promised to Plaintiffs by Defendant De La Rosa acting as an agent for Defendant Monterrey Concrete.

418.    Defendant Monterrey Concrete breached its agreement to provide Plaintiffs with adequate housing, instead cramming up to 20 individuals into an unheated garage and up to 30 people into a small house with a single toilet.

419.    Defendant Monterrey Concrete breached its contract with Plaintiffs by failing to abide by the applicable H-2B regulations, including the requirements that the employer (1) comply with applicable federal, state, and local employment-related laws, (2) pay the higher of (a) the prevailing wage for the occupation or (b) the minimum wage, (3) reimburse the worker for any

out-of-pocket transportation and subsistence costs incurred in traveling from their home country to the job site if the worker completes 50% of the contract period stated in the job order, (4) provide all tools and supplies free of charge, (5) not hold or confiscate employees' passports or visas, and (6) not retaliate against workers for asserting their H-2B program rights and protections.  See 20 C.F.R. § 655.20(a), (j), (k), (n), and (z).

420.    Defendant Monterrey Concrete's breaches of the contracts caused Plaintiffs substantial injuries, including lost wages, money paid improperly for transportation and tools, money paid for inadequate housing, and emotional distress, for which Plaintiffs are entitled to actual and consequential damages, punitive damages, and prejudgment interest.

421.    As a result of Defendants' conduct, the statute of limitations was tolled.

## Count V: Quantum Meruit Under Virginia Common Law (in the alternative to breach of contract), *against Defendant Monterrey Concrete, LLC*

422.    Plaintiffs re-allege and incorporate by reference each and every allegation in this Complaint as if fully set forth herein.

423.    Plaintiffs provided the aforesaid requested and valuable services to Defendant Monterrey Concrete.

424.    Defendant Monterrey Concrete knowingly and voluntarily accepted Plaintiffs' work, 70 to 80 hours per week and sometimes more, which was of material benefit to Defendants.

425.    Much of the work requested and provided exceeded the scope of any contract that may have been in existence, as the H-2B orders and offers of employment only covered concrete work, but Plaintiffs were required to perform services other than concrete work.

426.    Defendant Monterrey Concrete did not pay Plaintiffs fair value for the work performed, paying only for 40 hours per week.

427.     Plaintiffs have been injured and damaged as a result of Defendant Monterrey Concrete's failure to fully and fairly compensate Plaintiffs for the above-mentioned services for any hour over 40 in a workweek.

428.     It is inequitable for Defendant Monterrey Concrete to retain the benefits of Plaintiffs' services without fully compensating them for the value of their services.

429.     Defendant Monterrey further promised to provide good housing and food to Plaintiffs during their employment.

430.     Plaintiffs paid for housing and food, but both were woefully substandard.

431.     It is inequitable for Defendant Monterrey Concrete to retain the benefits of Plaintiffs' payments for grossly inadequate food and housing.

432.     As a result, Plaintiffs are entitled to the reasonable value of services performed for which they have not been compensated.

### Count VI: Unjust Enrichment Under Virginia Common Law (in the alternative to breach of contract), *against Defendant Monterrey Concrete, LLC*

433.     Plaintiffs re-allege and incorporate by refence each and every allegation in this Complaint as if fully set forth herein.

434.     Plaintiffs conferred a benefit upon Defendant Monterrey Concrete by laboring between 70 to 80 hours, and sometimes more, per week.

435.     Plaintiffs further conferred a benefit upon Defendant Monterrey Concrete by paying for grossly inadequate housing and food.

436.     Defendant Monterrey Concrete knew that Plaintiffs conferred these benefits to Defendant Monterrey Concrete.

437.     Defendant Monterrey Concrete accepted the benefits (namely, the value of Plaintiffs labor, and the payments for inadequate housing and food) under circumstances that

render it inequitable for Defendant Monterrey Concrete to retain the benefits without paying for its value.

438.    Defendant Monterrey Concrete did not pay Plaintiffs the amounts promised to Plaintiffs or required by law.  Defendant Monterrey Concrete therefore has been unjustly enriched.

439.    Plaintiffs are therefore entitled to an award of compensatory damages and/or equitable relief including without limitation imposition of a quasi-contract, restitution, disgorgement or the imposition of a constructive trust upon the monies derived by the Defendant Monterrey Concrete by means of the above-described actions.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully pray this Court will enter an order:

1.      Under Count I, a declaration that the Defendants' actions as set forth herein willfully violated the TVPA under 18 U.S.C. § 1589;

2.      Under Count I and pursuant to 18 U.S.C. §§ 1589 and 1595 an award of to each plaintiff, jointly and severally against each Defendant of compensatory damages, punitive damages, attorneys' fees, and costs;

3.      Under Count II, a declaration that the Defendants' actions as set forth herein willfully violated the TVPA under 18 U.S.C. § 1590;

4.      Under Count II and pursuant to 18 U.S.C. §§ 1590 and 1595 an award of to each plaintiff, jointly and severally against each Defendant of compensatory damages, punitive damages, attorneys' fees, and costs;

5.      Under Count III, a declaration that because there was no FLSA rights poster, the statute of limitations is tolled such that there is no statute of limitations;

6.      In the alternative, under Count III, a declaration that the Defendants' actions as set forth herein willfully violated the overtime provisions of the Fair Labor Standards Act, 29 U.S.C. §§ 206 and 207, such that a three-year statute of limitations is appropriate;

7.      Under Count III, an award of each plaintiff's actual damages under the FLSA, pursuant to 29 U.S.C. §§ 206 and 207 in the amount of all unpaid overtime, jointly and severally against both defendants;

8.      Under Count III, an additional equal amount to each plaintiff as liquidated damages, pursuant to 29 U.S.C.§ 216(b), jointly and severally against both defendants;

9.      Under Counts I and II, an order permanently enjoining each Defendant from further violations of the TVPA;

10.      Under Counts I-III, an award of Plaintiffs' costs and reasonable attorney's fees, as appropriate under the Fair Labor Standards Act, 29 U.S.C. § 216(b), and the Trafficking Victims Protection Act, 18 U.S.C. § 1595, jointly and severally against both defendants;

11.      Under Count IV an award of each plaintiff's unpaid promised wages, in an amount appropriate to the proof at trial, against Monterrey Concrete, LLC, plus statutorily authorized interest payments from the date of failure to pay the wages, to the extent that such relief would not reduce the amount otherwise owed Plaintiffs;

12.      Under Count V, in the alternative to Count IV, an award to Plaintiffs of the reasonable value of the services Plaintiffs performed to Defendant Monterrey Concrete for which Defendant  Monterrey Concrete has not yet compensated them, against Monterrey Concrete, LLC, plus statutorily authorized interest payments from the date of failure to pay the wages, to the extent that such relief would not reduce the amount otherwise owed Plaintiffs;

13.    Under Count VI, in the alternative to Count IV, an award equal to the amount Defendants were unjustly enriched, in an amount appropriate to the proof at trial, against Monterrey Concrete, LLC, plus statutorily authorized interest payments from the date of failure to pay the wages, to the extent that such relief would not reduce the amount otherwise owed Plaintiffs;

14.    Under all counts, pre-judgment and post-judgment interest as permitted by law; and

15.    Such other and further relief as this court deems necessary and proper.

Plaintiffs demand a trial by jury.

Dated:  October 8, 2020                    Respectfully submitted,


                                   _____/s/ Daniel A. Cantor_____
                                   Daniel A. Cantor (admitted *pro hac vice*)
                                   Ian S. Hoffman (VSB No. 75002)
                                   Preston Smith (VSB No. 86908)
                                   ARNOLD & PORTER KAYE SCHOLER LLP
                                   601 Massachusetts Avenue, NW
                                   Washington, DC 20001
                                   Phone:  202-942-5000
                                   Fax:  202-942-5999
                                   Daniel.Cantor@arnoldporter.com
                                   Ian.Hoffman@arnoldporter.com
                                   Preston.Smith@arnoldporter.com

                                   Karen Rigberg (admitted *pro hac vice*)
                                   ARNOLD & PORTER KAYE SCHOLER LLP
                                   777 South Figueroa Street, 44th Floor
                                   Los Angeles, CA 90017-5844
                                   Phone:  213-243-4000
                                   Fax:  213-243-4199
                                   Karen.Rigberg@arnoldporter.com

                                   Jason Yarashes (VSB No. 90211)
                                   Simon Sandoval-Moshenberg (VSB 77110)
                                   Rachel McFarland (VSB 89391)
                                   Nicholas Marritz (VSB 89795)
                                   Legal Aid Justice Center
                                   1000 Preston Ave, Suite A
                                   Charlottesville, VA 22903
                                   Tel: (434) 977-0553
                                   Fax: (434) 977-0558
                                   jasony@justice4all.org
                                   simon@justice4all.org
                                   rmcfarland@justice4all.org
                                   nicholas@justice4all.org


                                   *Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 8, 2020, I electronically filed the foregoing document via

ECF, which caused a copy of the foregoing to be served on all counsel of record.

Respectfully submitted,

/s/ Ian S. Hoffman
Ian S. Hoffman (VA Bar # 75002)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, D.C.  20001-3743
Telephone:  +1 202.942.5000
Facsimile:  +1 202.942.5999
E-mail:  ian.hoffman@arnoldporter.com